Jonathan W. Fountain
Nevada Bar No. 10351
JFountain@LRLaw.com
LEWIS AND ROCA LLP
3993 Howard Hughes Pkwy.
Suite 600
Las Vegas, NY 89169-5996
Telephone: (702) 949-8340
Facsimile: (702) 949-8374

E. Leif Reid
Nevada Bar No. 5750
LReid@LRLaw.com
LEWIS AND ROCA LLP
50 West Liberty Street
Suite 410
Reno, NY 89501-1922
Telephone: (775) 321-3415
Facsimile: (775) 823-2929

Josh Krevitt (Admitted *Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000
Fax: 212.351.4035

H. Mark Lyon (Admitted *Pro Hac Vice*)
Y. Ernest Hsin (Admitted *Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Fax: 650.849.5333

Attorneys for Defendant Apple Inc.

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNWIRED PLANET LLC, a Nevada limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> APPLE INC., a California corporation, <br><br> Defendant. | Case No. 3:12-cv-00505-RCJ-VPC <br><br> **ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT, AFFIRMATIVE AND OTHER DEFENSES, AND COUNTERCLAIM** <br><br> **(JURY DEMAND)** |

## ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT

Defendant Apple Inc. ("Apple"), by and through its attorneys, hereby responds to Unwired Planet LLC's ("Unwired Planet's") Complaint for Patent Infringement. Apple denies each and every allegation in the Complaint, except as specifically admitted herein. The responses below reflect only the current status of Apple's knowledge and belief regarding the subject matter of the allegations to which they respond and are subject to additional or different information that may be discovered during the course of this proceeding. The headings below track those used in the Complaint and are for convenience only. They do not constitute any part of Apple's Answer to the Complaint or any admission by Apple as to the truth of the matters asserted.

### JURISDICTION

1.      Apple admits that Unwired Planet purports to bring this action as one arising under the patent law of the United States, 35 U.S.C. § 101 *et seq.* Apple admits that this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

### VENUE

2.      For the purposes of this action, Apple does not challenge the personal jurisdiction of this Court over Apple. Apple admits for the purposes of this action that it has conducted and does conduct business within the State of Nevada. Apple admits for the purposes of this action that it, directly or through subsidiaries or intermediaries, ships, distributes, offers for sale, sells, and advertises products and/or services in the United States, the State of Nevada, and the District of Nevada. Apple denies that any of its products infringe any patent asserted by Unwired Planet. But, for the purposes of this action, Apple admits that it, directly or through subsidiaries or intermediaries, has placed one or more of the products and/or services that are alleged by Unwired Planet to infringe one or more of the Asserted Patents into the stream of commerce. Apple admits that it has done so with the expectation that such products and/or services will be purchased and/or used by consumers in the District of Nevada, and that such

products and/or services have been and continue to be purchased and/or used by consumers in the District of Nevada.  Apple denies the remaining allegations in Paragraph 2 of the Complaint.

3.     For purposes of this action, Apple does not challenge that venue is proper in this judicial district.  Apple denies that a substantial part of the events giving rise to Unwired Planet's claims occurred in the District of Nevada.

## PARTIES

4.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4 of the Complaint and therefore denies these allegations.

5.     Denied.

6.     Apple admits that it is a corporation organized under the laws of California, and that its principal place of business is located at 1 Infinite Loop, Cupertino, California 95014-2083.

7.     Apple admits that it makes, uses, imports into the United States, sells or offers to sell in the United States, various systems or services, servers, and mobile devices, including within this judicial district.  Apple admits that it can be served with process by serving its registered agent in Nevada, The Corporation Trust Company of Nevada, located at 311 S. Division Street, Carson City, Nevada 89703.

## BACKGROUND

8.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegation that Unwired Planet was founded in 1994 and therefore denies this allegation.  Apple denies the remaining allegations in Paragraph 8 of the Complaint.

9.     Apple denies that Unwired Planet was the first to put an internet browser into a phone.  Apple further denies Unwired Planet's allegation that "[w]hile Unwired Planet saw the need for applications and environments that could leverage emerging devices and increasing bandwidth, other technology firms were too focused on their

old way of doing business."  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9 of the Complaint, and therefore denies these allegations.

10.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 of the Complaint, and therefore denies these allegations.

11.    Apple admits that Unwired Planet's predecessor sold and offered for sale products including products titled "UP.Mail" and "UP.Browser."  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11 of the Complaint, and therefore denies these allegations.

12.    Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 of the Complaint, and therefore denies these allegations.

13.    Denied.

14.    Apple admits that in or around April 2012 Openwave Systems Inc. sold its product businesses.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14 of the Complaint, and therefore denies these allegations.

## THE PATENTS

15.    Apple admits that United States Letters Patent No. 6,317,594 ("the '594 Patent"), is entitled "System and Method for Providing Data to a Wireless Device upon Detection of Activity of the Device on a Wireless Network," lists William E. Gossman and Peter J. Hartmaier as the inventors, and lists as its issue date November 13, 2001. Apple admits that what purports to be a true and correct copy of the '594 Patent is attached as Exhibit A to the Complaint.  Apple denies that the '594 Patent was duly and legally issued, and denies that Unwired Planet is entitled to sue for past and future infringement.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15 of the Complaint, and therefore

1   denies these allegations.

2        16.    Apple admits that United States Letters Patent No. 6,317,831 ("the '831

3   Patent"), is entitled "Method and Apparatus for Establishing a Secure Connection over

4   a One-way Data Path," lists Peter F. King as the inventor, and lists as its issue date

5   November 13, 2001.  Apple admits that what purports to be a true and correct copy of

6   the '831 Patent is attached as Exhibit B to the Complaint.  Apple denies that the '831

7   Patent was duly and legally issued, and denies that Unwired Planet is entitled to sue for

8   past and future infringement.  Apple lacks knowledge or information sufficient to form

9   a belief as to the truth of the remaining allegations in Paragraph 16 of the Complaint,

10  and therefore denies these allegations.

11       17.    Apple admits that United States Letters Patent No. 6,321,092 ("the '092

12  Patent"), is entitled "Multiple Input Data Management for Wireless Location-based

13  Applications," lists James Fitch, David L. Hose, and Michael McKnight as the

14  inventors, and lists as its issue date November 20, 2001.  Apple admits that what

15  purports to be a true and correct copy of the '092 Patent is attached as Exhibit C to the

16  Complaint.  Apple denies that the '092 Patent was duly and legally issued, and denies

17  that Unwired Planet is entitled to sue for past and future infringement.  Apple lacks

18  knowledge or information sufficient to form a belief as to the truth of the remaining

19  allegations in Paragraph 17 of the Complaint, and therefore denies these allegations.

20       18.    Apple admits that United States Letters Patent No. 6,532,446 ("the '446

21  Patent"), is entitled "Server Based Speech Recognition User Interface for Wireless

22  Devices," lists Peter F. King as the inventor, and lists as its issue date March 11, 2003.

23  Apple admits that what purports to be a true and correct copy of the '446 Patent is

24  attached as Exhibit D to the Complaint.  Apple denies that the '446 Patent was duly

25  and legally issued, and denies that Unwired Planet is entitled to sue for past and future

26  infringement.  Apple lacks knowledge or information sufficient to form a belief as to

27  the truth of the remaining allegations in Paragraph 18 of the Complaint, and therefore

28  denies these allegations.

19.     Apple admits that United States Letters Patent No. 6,647,260 ("the '260 Patent"), is entitled "Method and System Facilitating Web Based Provisioning of Two-Way Mobile Communications Devices," lists Steve Dusse, Peter F. King, Bruce V. Schwartz, and Bruce K. Martin, Jr. as the inventors, and lists as its issue date November 11, 2003.  Apple admits that what purports to be a true and correct copy of the '260 Patent is attached as Exhibit E to the Complaint.  Apple denies that the '260 Patent was duly and legally issued, and denies that Unwired Planet is entitled to sue for past and future infringement.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19 of the Complaint, and therefore denies these allegations.

20.     Apple admits that United States Letters Patent No. 6,813,491 ("the '491 Patent"), is entitled "Method and Apparatus for Adapting Settings of Wireless Communication Devices in Accordance with User Proximity," lists Aldan Martin McKinney as the inventor, and lists as its issue date November 2, 2004.  Apple admits that what purports to be a true and correct copy of the '491 Patent is attached as Exhibit F to the Complaint.  Apple denies that the '491 Patent was duly and legally issued, and denies that Unwired Planet is entitled to sue for past and future infringement.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20 of the Complaint, and therefore denies these allegations.

21.     Apple admits that United States Letters Patent No. 7,020,685 ("the '685 Patent"), is entitled "Method and Apparatus for Providing Internet Content to SMS-based Wireless Devices," lists David A. Chen and Piyush Patel as the inventors, and lists as its issue date March 28, 2006.  Apple admits that what purports to be a true and correct copy of the '685 Patent is attached as Exhibit G to the Complaint.  Apple denies that the '685 Patent was duly and legally issued, and denies that Unwired Planet is entitled to sue for past and future infringement.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

1    Paragraph 21 of the Complaint, and therefore denies these allegations.

2         22.    Apple admits that United States Letters Patent No. 7,233,790 ("the '790

3    Patent"), is entitled "Device Capability Based Discovery, Packaging and Provisioning

4    of Content for Wireless Mobile Devices," lists Rikard M. Kjellberg, Sheng Liang,

5    Tomas G. Lund, William Chan, Ramakrishna Chinta, and Xinbi Chen as the inventors,

6    and lists as its issue date June 19, 2007.  Apple admits that what purports to be a true

7    and correct copy of the '790 Patent is attached as Exhibit H to the Complaint.  Apple

8    denies that the '790 Patent was duly and legally issued, and denies that Unwired Planet

9    is entitled to sue for past and future infringement.  Apple lacks knowledge or

10   information sufficient to form a belief as to the truth of the remaining allegations in

11   Paragraph 22 of the Complaint, and therefore denies these allegations.

12        23.    Apple admits that United States Letters Patent No. 7,299,033 ("the '033

13   Patent"), is entitled "Domain-Based Management of Distribution of Digital Content

14   from Multiple Suppliers to Multiple Wireless Services Subscribers," lists Rikard M.

15   Kjellberg, Sheng Liang, Tomas G. Lund, and William Chan as the inventors, and lists

16   as its issue date November 20, 2007.  Apple admits that what purports to be a true and

17   correct copy of the '033 Patent is attached as Exhibit I to the Complaint.  Apple denies

18   that the '033 Patent was duly and legally issued, and denies that Unwired Planet is

19   entitled to sue for past and future infringement.  Apple lacks knowledge or information

20   sufficient to form a belief as to the truth of the remaining allegations in Paragraph 23

21   of the Complaint, and therefore denies these allegations.

22        24.    Apple admits that United States Letters Patent No. 7,522,927 ("the '927

23   Patent"), is entitled "Interface for Wireless Location Information," lists James Fitch,

24   David Hose, and Michael McKnight as the inventors, and lists as its issue date April

25   21, 2009.  Apple admits that what purports to be a true and correct copy of the '927

26   Patent is attached as Exhibit J to the Complaint.  Apple denies that the '927 Patent was

27   duly and legally issued, and denies that Unwired Planet is entitled to sue for past and

28   future infringement.  Apple lacks knowledge or information sufficient to form a belief

as to the truth of the remaining allegations in Paragraph 24 of the Complaint, and therefore denies these allegations.

25.     Denied.

## CLAIM FOR PATENT INFRINGEMENT

26.     No response is required to Unwired Planet's incorporation by reference of paragraphs 1-25 of its Complaint.  To the extent a response is deemed required, Apple incorporates by reference its responses in Answer to Paragraphs 1-25, above.

27.     Denied.

28.     Denied.

29.     Denied.

30.     Denied.

31.     Denied.

## DEMAND FOR JURY TRIAL

A response is not required to Unwired Planet's demand for a trial by jury.  To the extent that a response is deemed required, Apple requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

A response is not required to Unwired Planet's prayer for relief.  To the extent that a response is deemed required, Apple denies that Unwired Planet is entitled to any relief whatsoever.  Apple has not infringed, directly or indirectly, any valid and enforceable claim of the Asserted Patents, and Unwired Planet is not entitled to any remedy or recovery.  Unwired Planet's prayer should therefore be denied in its entirety and with prejudice, and Unwired Planet should take nothing.

///

///

///

///

///

## AFFIRMATIVE AND OTHER DEFENSES

Further answering the Complaint and as additional answers thereto, Apple asserts the following affirmative and other defenses:

### FIRST DEFENSE – INVALIDITY

1.      One or more of the claims of the Asserted Patents are invalid and unpatentable under 35 U.S.C. § 101 at least because the claims fail to satisfy the conditions and requirements for patentability under Title 35 of the United States Code, and are not directed to a new and useful process, machine, manufacture, or composition of matter, or any new and useful improvements thereof.  One or more claims of the Asserted Patents are invalid under 35 U.S.C. §§ 102(a), 102(b), 102(c), 102(d), 102(e), 102(f), 102(g) and 103, because each element of one or more such claims is disclosed in prior art references and systems, considered alone or in combination with other references and systems, and because one or more of the named inventors did not invent the subject matter sought to be patented.  Such prior art references include, but are not limited to, the prior art referenced during prosecution of the applications for the Asserted Patents and in related patent applications.  One or more of the claims of the Asserted Patents are invalid under 35 U.S.C. § 112(a) at least because the Asserted Patents fail to provide a written description that conveys with reasonable clarity to those skilled in the art that, as of the filing dates sought, the inventors of the Asserted Patents were in possession of the invention, and because the Asserted Patents fail to enable any person reasonably skilled in the art to make and use the alleged invention claimed therein.  One or more of the claims of the Asserted Patents are invalid as indefinite under 35 U.S.C. § 112(b) for failing to particularly point out and distinctly claim the subject matter of the invention claimed therein.

### SECOND DEFENSE – NON-INFRINGEMENT

2.      Apple has not infringed and does not infringe any valid and enforceable claim of the Asserted Patents, directly or indirectly, literally or under the doctrine of equivalents.

1

### THIRD DEFENSE – LACHES/ESTOPPEL/WAIVER

2       3.      Unwired Planet's claims for relief are barred in whole or in part by the

3   equitable doctrines of laches, estoppel, and/or waiver.

4

### FOURTH DEFENSE – LIMITATION OF DAMAGES

5       4.      Unwired Planet's claim for damages is limited by 35 U.S.C. § 286.

6

### FIFTH DEFENSE – NO NOTICE

7       5.      To the extent Unwired Planet seeks damages for any alleged infringement

8   occurring prior to its giving actual notice of the alleged infringement of the Asserted

9   Patents to Apple, its claims are barred pursuant to 35 U.S.C. § 287.

10

### SIXTH DEFENSE – LICENSE/PATENT EXHAUSTION

11      6.      Unwired Planet's claims are barred, in whole or in part, to the extent

12  Apple has an express and/or implied license under one or more of the Patents-in-Suit

13  and/or by the doctrine of patent exhaustion.

14

### SEVENTH DEFENSE – COSTS BARRED

15      7.      Unwired Planet is barred from recovering costs in connection with this

16  action under 35 U.S.C. § 288.

17

### EIGTH DEFENSE – FAILURE TO STATE A CLAIM

18      8.      The Complaint fails to state any claim against Apple upon which relief

19  can be granted.

20

### NINTH DEFENSE – INEQUITABLE CONDUCT

21      9.      Each of the following patents is unenforceable because in each case

22  individuals associated with prosecution of the patent committed inequitable conduct in

23  its procurement.  The following analysis is based on Unwired Planet's apparent

24  interpretation of the scope of the claims of these patents, as evidenced by Unwired

25  Planet's Complaint, and is not necessarily based on any claim construction positions

26  that may be advanced by Apple.

27

### U.S. Patent No. 7,299,033

28      10.     During prosecution of the '033 Patent, individuals associated with the

prosecution of the '033 Patent withheld material, non-cumulative prior art from the patent examiner with intent to deceive the United States Patent and Trademark Office ("USPTO"), and furthermore made affirmative misrepresentations of material facts with the intent to deceive the USPTO.  The withheld  material, non-cumulative prior art included Unwired Planet's own commercial activity, as well as that of its predecessor-in-interest, and printed publications relating to that activity, as described below.

11.    The '033 Patent states on its face that it issued from U.S. Patent Application No. 10/601,022, filed on June 19, 2003.  The '033 Patent also states that it is related to Provisional Application Nos. 60/393,024, 60/392,383, 60/393,041, and 60/392,999, all filed on June 28, 2002.

12.    The '033 Patent on its face, and at all times during its prosecution, claims a "plurality of domains" where "each of the domains [are] assigned thereto to a particular set of digital products designed for use in wireless communication devices that are accessible to the wireless services subscribers in that domain."

13.    On or around May 29, 2002, Unwired Planet's predecessor Openwave Systems, Inc. acquired a company called Ellipsus Systems, Inc. ("Ellipsus").

14.    On information and belief, Ellipsus was founded originally by Rikard M. Kjellberg, the first named inventor of the '033 Patent.

15.    On information and belief, more than one year before June 28, 2002, Ellipsus released three products related to mobile applications: infiniteMAP, infiniteMASS, and Enterprise Application Adapters ("EAA") (combined, the "Ellipsus Products").

16.    On information and belief, on or around February 12, 2001, Ellipsus published white papers describing each of the Ellipsus Products.  On information and belief, more than one year before June 28, 2002, Ellipsus published user manuals, technical support documents, and other documents describing the Ellipsus Products.

17.    The only Ellipsus-published document before the examiner of the '033

Patent was a 10-page white paper describing the infiniteMAP product ("infiniteMAP white paper"). Exhibit 4. White papers describing infiniteMASS and EAA (Exhibits 1 and 2, respectively), on which Mr. Kjellberg was a co-author, were never identified or provided to the examiner. Nor were any other documents describing the Ellipsus Products, including user manuals or technical support documents, identified or provided to the examiner.

18.     On June 28, 2005, the examiner of the '033 Patent rejected the application as being anticipated by the infiniteMAP white paper. The infiniteMAP white paper had not been disclosed by Unwired Planet to the examiner. Instead, the examiner had independently located the prior art reference in a November 22, 2004 Information Disclosure Statement filed by Unwired Planet in a co-pending application that was later issued as the '790 Patent. The co-pending application was not cross-referenced in the '033 Patent application.

19.     The examiner explained in his rejection that the infiniteMAP white paper disclosed a "plurality of domains," because "it is inherent that there would be multiple domains based on different devices capabilities and user profiles." Office Action dated June 28, 2005.

20.     The examiner further stated that "[i]n view of the inability of the Examiner to obtain any additional Ellipsus information, as the company has been acquired by the current assignee, Openwave Systems Inc., the Examiner is requesting any additional information that Applicants may have access to that would be material to the examination of the application." *Id.*

21.     On September 30, 2005, in response to the examiner's request for additional information, the applicants for the '033 Patent, including Mr. Kjellberg, stated that they were "not aware of any other information that may be material to the examination of this application, other than the materials which have already been cited and the materials which are being cited concurrently with the filing of this amendment." Amendment dated September 30, 2005.

22.     On information and belief, Mr. Kjellberg, the founder of Ellipsus and first named inventor on the '033 Patent, was aware that other documents regarding the Ellipsus Products existed, including white papers describing infiniteMASS and EAA (Exhibits 1 and 2, respectively), of which Mr. Kjellberg was a co-author, and further including user manuals, technical support documents, and other documents describing the Ellipsus Products in Unwired Planet's possession.  On information and belief, Mr. Kjellberg further knew that the withheld art plainly disclosed a "plurality of domains." Mr. Kjellberg's statement in the September 30, 2005 Amendment therefore was an affirmative misrepresentation of material fact made with intent to deceive the USPTO.

23.     The examiner issued two more rejections of the application as being anticipated by the infiniteMAP white paper, on December 20, 2005, and May 5, 2006, for the reason that the infiniteMAP white paper inherently discloses a "plurality of domains."

24.     In traversing both rejections, the applicants for the '033 Patent, including Mr. Kjellberg, stated that through Unwired Planet's acquisition of Ellipsus Systems, Unwired Planet was "thoroughly familiar with the product disclosed in the [infiniteMAP white paper] and [is] more-than-qualified to comment on the extent of that reference's disclosure."  Amendment dated July 18, 2006; *see also* Amendment dated October 10, 2006 ("Applicants respectfully maintain all of their previously submitted arguments regarding the prior art rejections").  Mr. Kjellberg and the other applicants traversed the examiner's assertion of inherency and claimed that, due to Unwired Planet's familiarity with the Ellipsus product, "the Examiner is not in a position to dispute Applicants' arguments regarding the Ellipsus reference, absent clear evidence which confirms the Examiner's assertion of inherency."  Amendment dated July 18, 2006.

25.     Contrary to Mr. Kjellberg's and the applicants' assertions, and unbeknownst to the examiner, a white paper describing infiniteMASS co-authored by Mr. Kjellberg and in the possession of Unwired Planet was material to the examination

of the application, as it disclosed a "plurality of domains," for example in describing infiniteMASS as being "positioned in the enterprise information technology (IT) infrastructure between the content server and the wireless network, and links end users with the content.  The content can be delivered to the largest possible user population, since infiniteMASS provides the bridge between the multitude of mobile devices and a content source, such as an enterprise portal or e-commerce server.  This is possible since infiniteMASS supports both the content formatting and wireless communication protocol functionality, providing a number of 'distribution channels' between a content source and users."  Exhibit 1 at 2.

26.    Further contrary to Mr. Kjellberg's and the applicants' assertions, and unbeknownst to the examiner, a white paper describing EAA co-authored by Mr. Kjellberg and in the possession of Unwired Planet was material to the examination of the application, as it disclosed a "plurality of domains," for example in describing EAA as allowing "infiniteMASS [to] dispatch messages to the appropriate channel (RMI, CORBA, DCOM or SOAP) based on the structure of the incoming request from the mobile device.  This request is in the form of a Unified Resource Locator (URL), which will typically indicate channel, object, method and parameters."  Exhibit 2 at 4.

27.    Further, on information and belief, user manuals, technical support documents, and other documentation describing the Ellipsus Products existed and were in the possession of Unwired Planet, and were material to the examination of the application.  For example, on information and belief, such documentation discloses and/or renders obvious a "plurality of domains."

28.    None of the withheld Ellipsus documents are cumulative of the infiniteMAP white paper.  The infiniteMASS and EAA white papers disclose a "plurality of domains," a limitation that the examiner stated was only inherently disclosed by the infiniteMAP white paper and that Mr. Kjellberg and the applicants argued was missing from the infiniteMAP white paper.  On information and belief, other documents describing the Ellipsus Products, including user manuals and

-14-

technical support documents, were not cumulative of the infiniteMAP white paper and disclosed explicitly a "plurality of domains."

29.     Mr. Kjellberg's September 30, 2005 statement that he was "not aware of any other information that may be material to the examination of this application" was an affirmative misrepresentation of material fact as, on information and belief, Mr. Kjellberg, the founder of Ellipsus and co-author of the infiniteMASS and EAA white papers, was aware of the documents in Unwired Planet's possession describing the Ellipsus Products, including the white papers describing the infiniteMASS and the EAA products and user manuals and technical support documents for all of the Ellipsus Products.

30.     On information and belief, Mr. Kjellberg withheld the Ellipsus Products documents with the intent to deceive the USPTO in order to secure issuance of the '033 Patent.  On information and belief, Mr. Kjellberg knew that had the examiner been aware of the Ellipsus Products documents, including the infiniteMASS and the EAA white papers and other supporting documents, the examiner would have rejected the claims of the application for the '033 Patent and would not have allowed those claims to issue.

31.     Because of the inequitable conduct committed by Mr. Kjellberg in connection with the '033 Patent, the '033 Patent is unenforceable, and Unwired Planet may not obtain any relief regarding it.

## U.S. Patent No. 7,233,790

32.     During prosecution of the '790 Patent, individuals associated with prosecution of the patent withheld material, non-cumulative prior art from the patent examiner with intent to deceive the USPTO.  This material prior art included Unwired Planet's own commercial activity, as well as that of its predecessor-in-interest, and printed publications relating to that activity, as described below.

33.     The '790 Patent states on its face that it issued from U.S. Patent Application No. 10/600,746, filed on June 19, 2003.  The '790 Patent also states that it

is related to Provisional Applications No. 60/393,024, 60/392,383, 60/393,041, and 60/392,999, all filed on June 28, 2002.

34.    The '790 Patent on its face, and at all times during its prosecution, claims "receiving . . . a plurality of different implementations of at least one of the items of content, where each implementation of any given item of content corresponds to a different set of device capabilities . . . ."  This limitation was cited by the examiner in the reasons for allowance as being missing from the prior art of record.

35.    More than one year before this Provisional Application was filed, Ellipsus, which was acquired by Unwired Planet before the '790 Patent's earliest priority date, had offered for sale and put into public use the Ellipsus Products, each of which involved and disclosed each element of at least one claim of the '790 Patent.

36.    For example, the Ellipsis Products are described in the following publications, each of which was published before June 28, 2001:

- White Paper – infiniteMASS, Ellipsus' Mobile Application Server Suite (*see* Exhibit 1);
- White Paper – EAA, Ellipsus' EAA (*see* Exhibit 2); and
- Ellipsus System Unveils First 100%-Java Wireless Web Services Platform (June 2001 press release) (*see* Exhibit 3).

On information and belief, user manuals, technical support documents and other documents related to the infiniteMAP, the infiniteMASS, and the EAA systems.

37.    Neither infiniteMASS nor EAA, nor any of the publications named above, are disclosed anywhere on the face of the '790 Patent or in the patent's prosecution history.

38.    Each of the infiniteMASS and EAA systems is prior art to the '790 Patent under 35 U.S.C. §§ 102(a) and 102(b).  Each of the publications named above is prior art to the '790 Patent under 35 U.S.C. §§ 102(a) and 102(b).

39.    Each of the infiniteMASS and EAA systems is material prior art to the '790 Patent and is not cumulative of any prior art of record.  Each of the publications

named above is material prior art to the '790 Patent and is not cumulative of any prior art of record.

40.    On information and belief, the examiner of the '790 Patent was not aware of infiniteMASS or EAA, or any of the publications named above relating thereto.  On information and belief, the examiner was not aware of the publications named above relating to infiniteMAP (the "withheld infiniteMAP documents").  *See* Exhibit 4. Had the examiner been aware of infiniteMASS or EAA or any of these publications, including the withheld infiniteMAP documents, the examiner would have rejected the claims of the '790 Patent and would not have allowed them to issue, because the infiniteMASS and EAA systems and each of these publications disclosed or rendered obvious each and every limitation of the claims of the '790 Patent.

41.    For example, with respect to Claim 1 of the '790 Patent, infiniteMASS and EAA performed methods of providing access to content for use in wireless communication devices, including receiving and storing a plurality of different implementations of at least one of the items of content, where each implementation of any given item of content corresponds to a different set of device capabilities, and maintaining a product catalog containing a description of the items of content with a reference to each implementation of said item of content.  Had the examiner been aware of infiniteMASS, EAA, or any of the publications named above, the examiner would have rejected Claim 1 under 35 U.S.C. §§ 102 and 103.

42.    On information and belief, the withheld infiniteMAP documents disclose the method of providing access to content for use in wireless communication devices, including receiving and storing a plurality of different implementations of at least one of the items of content, where each implementation of any given item of content corresponds to a different set of device capabilities, and maintaining a product catalog containing a description of the items of content with a reference to each implementation of said item of content.  Had the examiner been aware of the withheld infiniteMAP documents, the examiner would have rejected Claim 1 under 35 U.S.C.

§§ 102 and 103.

43.  On information and belief, individuals associated with prosecution of the '790 Patent, including at least named inventor Rikard M. Kjellberg, withheld the infiniteMASS and EAA prior art (including Ellipsus's offers for sale and public use of these systems) from the examiner, with intent to deceive the USPTO.  On information and belief, Mr. Kjellberg withheld the withheld infiniteMAP documents from the examiner with intent to deceive the USPTO.

44.  Mr. Kjellberg was a co-founder of Ellipsus Systems and a co-author of the infiniteMASS and EAA white papers.

45.  Mr. Kjellberg therefore knew that the infiniteMASS and EAA systems, and each of the publications named above, including the withheld infiniteMAP documents, were prior art to, and disclosed the limitations of the claims of, the application for the '790 Patent.  Yet Mr. Kjellberg did not disclose the infiniteMASS and EAA systems, or any of the publications named above, including the withheld infiniteMAP documents, to the examiner of the '790 Patent.

46.  During prosecution of the '033 Patent, with regards to a similar white paper on Ellipsus's infiniteMAP product, Mr. Kjellberg and the other applicants of the '033 Patent stated that as a result of Unwired Planet's acquisition of Ellipsus, "[Unwired Planet is] thoroughly familiar with the product disclosed in the [infiniteMAP white paper] and are more-than-qualified to comment on the extent of that reference's disclosure."  Amendment dated July 18, 2006. Mr. Kjellberg's claim of thorough familiarity with infiniteMAP demonstrates his knowledge of the withheld infiniteMAP documents.

47.  On information and belief, Mr. Kjellberg withheld from the examiner of the '790 Patent the infiniteMASS and EAA systems and each of the publications named above, including the withheld infiniteMAP documents, with intent to deceive the USPTO.  On information and belief, Mr. Kjellberg knew that had the examiner been aware of the withheld art, the examiner would have rejected the claims of the

1    application for the '790 Patent and would not have allowed those claims to issue.

2        48.    Thus, by withholding the infiniteMAP and EAA systems, and each of the

3    publications named above, from the examiner, Mr. Kjellberg deceived the examiner

4    and the USPTO in order to obtain issuance of the '790 Patent.

5        49.    Because of the inequitable conduct committed by Mr. Kjellberg in

6    connection with the '790 Patent, the '790 Patent is unenforceable, and Unwired Planet

7    may not obtain any relief regarding it.

8                            **U.S. Patent No. 7,020,685**

9        50.    During prosecution of the '685 Patent, Unwired Planet and individuals

10   associated with prosecution of the patent withheld material, non-cumulative prior art

11   from the patent examiner with intent to deceive the USPTO.  This material prior art

12   included Unwired Planet's own commercial activity, printed publications relating to

13   that activity, and at least one prior art patent reference, as described below.

14       51.    The '685 Patent states on its face that it issued from U.S. Patent

15   Application No. 09/640,902, filed on August 16, 2000.  The '685 Patent also states that

16   it is related to Provisional Application No. 60/158,694, filed on October 8, 1999.

17                          *UP.Link and PocketNet*

18       52.    More than one year before the Provisional Application to the '685 Patent

19   was filed, Unwired Planet had offered for sale and put into public use the UP.Link and

20   PocketNet systems, each of which involved and disclosed each element of at least one

21   claim of the '685 Patent.

22       53.    The UP.Link and/or PocketNet systems are described in the following

23   exemplary publications, each of which was published before October 8, 1998:

24       • UP.Link Developer's Guide, Version 1.0 (*see* Exhibit 5);

25       • Using the UP.Browser, Version 1.01 (*see* Exhibit 6);

26       • HDTP Specification, Version 1.1 (*see* Exhibit 7);

27       • Unwired Planet Announces UP.Link Platform 2.0 (press release dated July 8,

28         1997) (*see* Exhibit 8);

- Unwired Planet Brings the Web to Cellular Telephones and Pagers (press release dated July 15, 1996) (*see* Exhibit 9;

- Using UP.Mail (July 1997) (*see* Exhibit 10); and

- Developing Applications for the PocketNet Phone (1996 White Paper) (*see* Exhibit 11).

Collectively, the UP.Link and PocketNet systems, including any publications describing those systems, will be referred to herein as the "UP.Link and PocketNet Prior Art."

54.   None of the UP.Link and PocketNet Prior Art is disclosed anywhere on the face of the '685 Patent or in its prosecution history.

55.   The UP.Link and PocketNet Prior Art is prior art to the '685 Patent under 35 U.S.C. §§ 102(a) and 102(b).  The UP.Link and/or PocketNet systems, and/or each of the publications named above, is prior art to the '685 Patent under 35 U.S.C. §§ 102(a) and 102(b).

56.   Each of the UP.Link and PocketNet Prior Art is material prior art to the '685 Patent and is not cumulative of any prior art of record.  Each of the publications named above is material prior art to the '685 Patent and is not cumulative of any prior art of record.

57.   On information and belief, the examiner of the '685 Patent was not aware of the UP.Link and PocketNet Prior Art.  Had the examiner been aware of the UP.Link and PocketNet Prior Art, the examiner would have rejected the claims of the '685 Patent and would not have allowed them to issue, because the UP.Link and PocketNet Prior Art disclosed or rendered obvious each and every limitation of the claims of the '685 Patent.

58.   For example, with respect to Claim 1 of the '685 Patent, UP.Link and PocketNet performed methods of providing content from a network to a wireless device, including retrieving content from a resource on a network according to a hypermedia protocol with which the wireless device was not compliant, and converting

the content to a message compliant with a message requirement of the wireless device. As explained by the UP.Link Developer's Guide, the UP.Link system retrieved network content using the HTTP protocol, with which UP.Phone wireless devices were not compliant.  Then the UP.Link system converted the retrieved content to a message compliant with UP.Phone wireless devices.  *See, e.g.*, Exhibit 5 (UP.Link Developer's Guide, v. 1.0) at v.  *See also* Exhibit 11 (Developing Applications for the PocketNet Phone, 1996 White Paper) at 3 (showing "PocketNet Information Flow" in which an "UPLink [sic] Gateway" retrieves network content using the HTTP protocol and then converts the retrieved content to a "HDML Command" message compliant with "UPLink-enabled Phone[s]").

59.    Had the examiner been aware of the UP.Link and PocketNet Prior Art, the examiner would have rejected Claim 1 under 35 U.S.C. §§ 102 and 103, because the UP.Link and PocketNet Prior Art disclosed or rendered obvious each and every limitation of Claim 1.

60.    On information and belief, individuals associated with prosecution of the '685 Patent, including at least named inventor David A. Chen and prosecution counsel Jordan Becker, withheld the UP.Link and PocketNet Prior Art (including Unwired Planet's offers for sale and public use of these systems) from the examiner of the application for the '685 Patent, with intent to deceive the USPTO.

61.    On information and belief, Mr. Chen was employed by Unwired Planet at least as early as April 1998, more than one year before the filing of the Provisional Application to which the '685 Patent purports to claim priority.  On information and belief, Mr. Chen was a Senior Product Manager for Unwired Planet's Mobile Browser business, and was involved in Unwired Planet's prior-art commercial activity including the sale, offer for sale, or public use of the UP.Link or PocketNet Systems or related systems.  For example, a page on the website LinkedIn regarding Mr. Chen states that he "[d]rove mobile browser product through company's [Unwired Planet's] first volume rollout across multiple handset OEMs and US and Japanese wireless

operators" and "[l]ed production of industry's first WAP-standard mobile browser for worldwide use."  *See* Exhibit 12, http://www.linkedin.com/profile/view?id=2045186 (last visited Nov. 27, 2012).

62.     On information and belief, Mr. Chen knew about the UP.Link and PocketNet Prior Art because of his work on Unwired Planet's Mobile Browser business, and knew that they were prior art to, and disclosed the limitations of the claims of, the application for the '685 Patent.  Yet Mr. Chen did not disclose the UP.Link and PocketNet Prior Art to the examiner of the '685 Patent.

63.     Mr. Becker prosecuted multiple patent applications for Unwired Planet, including several other applications that were pending before or during the pendency of the '685 Patent.  Those other applications included applications that related to Unwired Planet's Mobile Browser business, including to the UP.Link and PocketNet systems.  On information and belief, Mr. Becker knew about the UP.Link and PocketNet Prior Art at least via his work on patent applications filed by Unwired Planet, and knew that they were prior art to, and disclosed the limitations of the claims of, the application for the '685 Patent.  Yet Mr. Becker did not disclose the UP.Link and PocketNet Prior Art to the examiner of the '685 Patent.

64.     For example, Mr. Becker was involved in prosecution of U.S. Patent No. 6,742,127, entitled "Method and Apparatus for Maintaining Security in a Push System" ("the '127 Patent").  The '127 Patent issued to Unwired Planet's predecessor Openwave Systems, Inc. on May 25, 2004, while the '685 Patent was still pending. The '127 Patent discusses an "UP.Link Gateway" that converts between hypermedia formats.  *See, e.g.*, '127 patent, Fig. 1, col. 4:4-13.  On information and belief, Mr. Becker was aware of the "UP.Link Gateway" disclosed in the '127 Patent (which he was involved in prosecuting), was aware that it related to Unwired Planet's UP.Link system, and was aware that the UP.Link system was on sale and in public use before October 8, 1998.

65.     For further example, Mr. Becker was involved in the prosecution of U.S.

Patent No. 6,665,711, entitled "Method and Apparatus for Integrating Narrowband and Wideband Data Transports" ("the '711 Patent").  The '711 Patent issued to Unwired Planet's predecessor Openwave Systems, Inc. on December 16, 2003, while the '685 Patent was still pending.  The '711 Patent discusses the UP.Link Gateway and also discusses a wireless device obtaining access to information from "www.att.com/PocketNet."  *See, e.g.*, '711 Patent, Fig. 1, col. 9:5-6.  On information and belief, Mr. Becker was aware of the PocketNet discussion in the '711 Patent (which he was involved in prosecuting), was aware that it related to Unwired Planet's commercial activity regarding the PocketNet system, and was aware that the PocketNet system was on sale and in public use before October 8, 1998.

66.     On information and belief, both Mr. Becker and Mr. Chen withheld from the examiner of the '685 Patent the UP.Link and PocketNet systems and each of the publications named above with intent to deceive the USPTO.  On information and belief, Mr. Becker and Mr. Chen each knew that had the examiner been aware of the UP.Link and PocketNet Prior Art, the examiner would have rejected the claims of the application for the '685 Patent and would not have allowed those claims to issue.

67.     For example, the examiner of the '685 Patent repeatedly rejected all claims over U.S. Patent No. 6,473,609 ("the '609 Patent"), explaining that the '609 Patent discloses or renders obvious (in combination with other references) all limitations of the claims of the application for the '685 Patent.  *See* U.S Patent Application 09/640,902, Office Actions dated November 14, 2003, and April 26, 2004. In response, Unwired Planet (in filings by Mr. Becker) represented to the examiner that the '609 Patent was not prior art to the application for the '685 Patent because the subject matter was owned by or subject to an obligation of assignment to the same person (Unwired Planet's predecessor Phone.com) at the time of the alleged invention. *See id.*, Amendments dated February 17, 2004, and June 17, 2004.  The examiner then withdrew the rejections for anticipation and obviousness, and instead issued a rejection for double patenting over the '609 Patent.  *See id.*, Office Action dated July 29, 2004.

1    Unwired Planet was able to overcome this double-patenting rejection by filing a

2    terminal disclaimer, resulting in a notice of allowance. *See id.*, Amendment and

3    Terminal Disclaimer dated August 10, 2004 and Notice of Allowance dated October 7,

4    2004.

5         68.    Had the examiner been informed about the UP.Link and PocketNet Prior

6    Art, the examiner would have rejected the claims of the '685 Patent over that art as

7    well, as it disclosed the very same limitations that the examiner found disclosed by the

8    '609 Patent.  And Unwired Planet would not have been able to rely on the common-

9    ownership provision of the Patent Act to overcome such a rejection.  For example, the

10   examiner's November 14, 2003 rejection explained that the '609 Patent discloses a

11   "method of providing content from a network to a wireless device" including the steps

12   of "receiving the content from a resource on the network according to a hypermedia

13   protocol, wherein the wireless device is not compliant with the hypermedia protocol,"

14   and "converting the content to a message compliant with a message requirement of the

15   wireless device."  *Id.* at 2.  As explained above, the UP.Link and PocketNet systems

16   disclosed these very same limitations.  For example, the UP.Link Developer's Guide

17   explains that the UP.Link system retrieved network content via the HTTP protocol and

18   converted the content to a message compliant with message requirements of UP.Link

19   Phone wireless devices.

20        69.    The common-ownership provision does not exempt art that qualifies

21   under section 102(b), including prior public use, offers for sale, and printed

22   publications such as the UP.Link and PocketNet Prior Art.  *See* 35 U.S.C. § 103(c).

23        70.    Thus, by withholding the UP.Link and PocketNet Prior Art from the

24   examiner, Mr. Becker and Mr. Chen deceived the examiner into allowing claims that

25   should not have been allowed, and deceived the USPTO into issuing the '685 Patent.

26   On information and belief, Mr. Becker and Mr. Chen withheld the UP.Link and

27   PocketNet Prior Art with intent to so deceive the examiner and the USPTO.

28   ///

1

*U.S. Patent 6,094,587 ("Armanto")*

2      71.    United States Patent No. 6,094,587 ("Armanto") is prior art to the '685

3   Patent under 35 U.S.C. § 102(e).  *See* Exhibit 13.

4      72.    Armanto discloses a method of sending a ringtone to a wireless device by

5   converting the ringtone into an SMS message and sending the SMS message to the

6   wireless device.

7      73.    Armanto is not cited on the face of the '685 Patent or in the prosecution

8   history of the '685 Patent.

9      74.    Armanto is material to the claims of the '685 Patent, and is not cumulative

10  of the art of record.

11      75.    On information and belief, the examiner of the '685 Patent was not aware

12  of Armanto.  Had the examiner been aware of Armanto, the examiner would have

13  rejected the claims of the '685 Patent and would not have allowed them to issue,

14  because Armanto disclosed or rendered obvious each and every limitation of the

15  claims of the '685 Patent.

16      76.    For example, Armanto discloses the following element of Claim 1 of the

17  '685 Patent, which Unwired Planet contended was a distinction over the prior art:

18  converting the content to a message compliant with a message requirement of the

19  wireless device, including generating a message including the content.  *See, e.g.*,

20  Exhibit 13 (Armanto), Abstract (disclosing a method in which a "ringing tone is

21  transformed into characters containing specifications of notes and the characters are

22  sent to the telephone, e.g., in a short message").  Had the examiner been aware of

23  Armanto, the examiner would have rejected Claim 1 under 35 U.S.C. §§ 102 and 103.

24      77.    On information and belief, individuals associated with the prosecution of

25  the '685 Patent, including at least named inventor David A. Chen and prosecution

26  counsel Jordan Becker, withheld Armanto from the examiner of the application for the

27  '685 Patent with intent to deceive the USPTO.

28      78.    Mr. Becker was aware of Armanto by the time that that Mr. Becker was

prosecuting the application that issued as the '685 Patent.  For example, Mr. Becker submitted Armanto to the USPTO as part of an Information Disclosure Statement filed by Mr. Becker on November 4, 1995 in the prosecution of U.S. Patent App. No. 09/999,656.

79.    Despite having been aware of Armanto and having submitted it to the USPTO in connection with a different patent application, Mr. Becker did not submit Armanto to the USPTO in connection with the prosecution of the '685 Patent.

80.    On information and belief, Mr. Becker was aware that Armanto was material to the application for the '685 Patent, and withheld Armanto from the examiner with intent to deceive the examiner and the USPTO into allowing the '685 Patent to issue when it should not have been allowed.

81.    On information and belief, Mr. Chen was also aware of Armanto, for example from Mr. Becker's submission of Armando to the USPTO in connection with the prosecution of U.S. Patent App. No. 09/999,656, on which Mr. Chen was named as an inventor.  On information and belief, Mr. Chen was aware that Armanto was material to the application for the '685 Patent, and withheld Armanto from the examiner with intent to deceive the examiner and the USPTO into allowing the '685 Patent to issue when it should not have been allowed.

82.     Because of the inequitable conduct committed by Mr. Chen and Mr. Becker in connection with the '685 Patent, the '685 Patent is unenforceable, and Unwired Planet may not obtain any relief regarding it.

### U.S. Patent No. 6,647,260

83.    During prosecution of the '260 Patent, Unwired Planet and individuals associated with prosecution of the patent withheld material, non-cumulative prior art from the patent examiner with intent to deceive the USPTO.  This material prior art included Unwired Planet's own commercial activity, printed publications relating to that activity, and at least one prior art patent reference, as described below.

84.    The '260 Patent states on its face that it issued from U.S. Patent

Application No. 09/289,559, filed on April 9, 1999.

*UP.Link and PocketNet*

85.     More than one year before this application was filed, Unwired Planet had offered for sale and put into public use the UP.Link and PocketNet systems, each of which involved and disclosed each element of at least one claim of the '260 Patent.

86.     For example, the UP.Link and/or PocketNet systems are described in the following publications, each of which was published before April 9, 1998:

- UP.Link Developer's Guide, Version 1.0 (*see* Exhibit 5);
- Using the UP.Browser, Version 1.01 (*see* Exhibit 6);
- HDTP Specification, Version 1.1 (*see* Exhibit 7);
- Unwired Planet Announces UP.Link Platform 2.0 (press release dated July 8, 1997) (*see* Exhibit 8);
- Unwired Planet Brings the Web to Cellular Telephones and Pagers (press release dated July 15, 1996) (*see* Exhibit 9);
- Using UP.Mail (July 1997) (*see* Exhibit 10); and
- Developing Applications for the PocketNet Phone (1996 White Paper) (*see* Exhibit 11).

Collectively, the UP.Link and PocketNet systems, including any publications describing those systems, will be referred to herein as the "UP.Link and PocketNet Prior Art."

87.     None of the UP.Link and PocketNet Prior Art is disclosed anywhere on the face of the '260 Patent or in its prosecution history.  Neither the UP.Link or PocketNet systems, nor any of the publications named above, is disclosed anywhere on the face of the '260 Patent or in its prosecution history.

88.     Each of the UP.Link and PocketNet Prior Art is prior art to the '260 Patent under 35 U.S.C. §§ 102(a) and 102(b).  Each of the publications named above is prior art to the '260 Patent under 35 U.S.C. §§ 102(a) and 102(b).

89.     Each of the UP.Link and PocketNet Prior Art is material prior art to the

'260 Patent and is not cumulative of any prior art of record.  Each of the UP.Link and PocketNet systems, and each of the publications named above, is material prior art to the '260 Patent and is not cumulative of any prior art of record.

90.    On information and belief, the examiner of the '260 Patent was not aware of the UP.Link or PocketNet Prior Art.  Had the examiner been aware of the UP.Link or PocketNet Prior Art, the examiner would have rejected the claims of the '260 Patent and would not have allowed them to issue, because the UP.Link and PocketNet Prior Art disclosed or rendered obvious each and every limitation of the claims of the '260 Patent.

91.    For example, with respect to Claim 1 of the '260 Patent, UP.Link and PocketNet performed methods of provisioning a two-way mobile communications device having a display and a user interface, with the mobile communications device receiving user information, displaying a list of selectable identifiers on the display, receiving a user's selection of an identifier, generating a provisioning request comprising the user information and the selection, establishing a communication link and authenticating with a remote server, sending the provisioning request to the provisioning server, receiving a reply, and provisioning the two-way communications device with a feature or service based on the reply.  Had the examiner been aware of the UP.Link and PocketNet Prior Art, the examiner would have rejected Claim 1 under 35 U.S.C. §§ 102 and 103.

92.    On information and belief, individuals associated with prosecution of the '260 Patent, including at least named inventors Peter F. King, Bruce V. Schwartz, and Bruce K. Martin, Jr., withheld the UP.Link and PocketNet Prior Art (including Unwired Planet's offers for sale and public use of these systems) from the examiner of the application for the '260 Patent, with intent to deceive the USPTO.

93.    On information and belief, Mr. King was employed by Openwave Systems and its precursors Phone.com and Unwired Planet at least as early as 1995, more than one year before the filing of the Application which led to the '260 Patent.

On information and belief, Mr. King was Director of Technology of Openwave, and was involved in Unwired Planet's prior-art commercial activity including the sale, offer for sale, or public use of the UP.Link or PocketNet Systems or related systems. On information and belief, Mr. King knew about the UP.Link and PocketNet Prior Art because of his work on Openwave's Mobile Browser business, including UP.Link specifically, and because he was in charge of managing Unwired Planet's patent process in 1997 and 1998, and knew that they were prior art to, and disclosed the limitations of the claims of, the application for the '260 Patent.  On information and belief, Mr. King was particularly aware of the HDTP Specification 1.0 (*see* Exhibit 7) because he authored it.  Yet Mr. King did not disclose the UP.Link and PocketNet Prior Art to the examiner of the '260 Patent.

94.    On information and belief, Mr. Schwartz was employed by Openwave Systems and its precursors Phone.com and Unwired Planet at least as early as November 1994, more than one year before the filing of the Application which led to the '260 Patent.  On information and belief, Mr. Schwartz was Co-Founder of Phone.com and a Member of Technical Staff at Phone.com and Openwave, and was involved in Unwired Planet's prior-art commercial activity including the sale, offer for sale, or public use of the UP.Link or PocketNet Systems or related systems.  On information and belief, Mr. Schwartz knew about the UP.Link and PocketNet Prior Art because of his work on Openwave's Mobile Browser business, and knew that they were prior art to, and disclosed the limitations of the claims of, the application for the '260 Patent.  Yet Mr. Schwartz did not disclose the UP.Link and PocketNet Prior Art to the examiner of the '260 Patent.

95.    On information and belief, Mr. Martin was employed by Openwave Systems and its precursors Phone.com and Unwired Planet at least as early as 1995, more than one year before the filing of the Application which led to the '260 Patent. On information and belief, Mr. Martin was Chief Technology Officer of Openwave, and was involved in Unwired Planet's prior-art commercial activity including the sale,

offer for sale, or public use of the UP.Link or PocketNet Systems or related systems.
On information and belief, Mr. Martin knew about the UP.Link and PocketNet Prior
Art because of his work on Openwave's Mobile Browser business, and knew that they
were prior art to, and disclosed the limitations of the claims of, the application for the
'260 Patent.  Yet Mr. Martin did not disclose the UP.Link and PocketNet Prior Art to
the examiner of the '260 Patent.

96.     On information and belief, Messrs. King, Schwartz, and Martin
withheld from the examiner of the '260 Patent the UP.Link and PocketNet Prior Art
with intent to deceive the USPTO.  On information and belief, Messrs. King,
Schwartz, and Martin each knew that had the examiner been aware of the UP.Link and
PocketNet Prior Art, the examiner would have rejected the claims of the application
for the '260 Patent and would not have allowed those claims to issue.

97.     For example, the examiner of the '260 Patent initially rejected all claims
over U.S. Patent No. 6,031,830 ("the '830 Patent"), explaining that the '830 Patent
discloses or renders obvious (in combination with other references) all limitations of
the claims of the application for the '260 Patent.  *See* U.S Patent Application
09/289,559, Office Action dated July 31, 2001.  In response, Unwired Planet
represented to the examiner that the limitation of the '260 Patent whereby the user
input is received by the device was not present in the '830 Patent.  Similarly, the
examiner of the '260 Patent then rejected all claims over U.S. Patent No. 5,812,953
("the '953 Patent"), explaining that the '953 Patent discloses or renders obvious (in
combination with other references) all limitations of the claims of the application for
the '260 Patent.  *See* U.S Patent Application 09/289,559, Office Action dated January
16, 2002.  In response, Unwired Planet represented to the examiner that the limitation
of the '260 Patent whereby the selections available to the user are displayed and the
user selects one of the displayed selections was not present in the '953 Patent.

98.     Based on Unwired Planet's representations as to the prior art's missing
limitations, the examiner allowed the '260 Patent to issue.  Had the examiner been

informed about the UP.Link and PocketNet Prior Art, the examiner would have rejected the claims of the '260 Patent over that prior art, as it disclosed the very same limitations that Unwired Planet argued were not present in the '830 or '953 patents. The UP.Link and PocketNet phones, for example, clearly disclosed receiving user input by the device, which Unwired Planet argued was missing from the '830 Patent, since UP.Link and PocketNet phones displayed users a list of choices which could be selected.  *See* Exhibit 5 (UP.Link Developer's Guide, v. 1.0) at 25.  Similarly, UP.Link and PocketNet phones disclosed displaying selections and receiving a selection of those displayed, which Unwired Planet argued was missing from the '953 Patents, when displaying lists of choices to the user for selection.  *Id.*

99.    Thus, by withholding the UP.Link and PocketNet Prior Art from the examiner, Messrs. King, Schwartz, and Martin deceived the examiner into allowing claims that should not have been allowed, and deceived the USPTO into issuing the '260 Patent.  On information and belief, Messrs. King, Schwartz, and Martin withheld the UP.Link and PocketNet Prior Art with intent to so deceive the examiner and the USPTO.

100.    Because of the inequitable conduct committed by Messrs. King, Schwartz, and Martin in connection with the '260 Patent, the '260 Patent is unenforceable, and Unwired Planet may not obtain any relief regarding it.

## RIGHT TO ALLEGE FURTHER DEFENSES
## AS SUPPORTED BY THE EVIDENCE

101.    Apple reserves the right to assert additional defenses that become known through the course of discovery and investigation of this case, including but not limited to additional defenses relating to inequitable conduct.

///

///

///

///

-31-

1

**COUNTERCLAIM**

2       Counterclaimant Apple, by and through its attorneys, asserts the following

3   Counterclaim against Counterdefendant Unwired Planet.

4       1.      Apple re-alleges and incorporates by reference each and every allegation

5   contained in paragraphs 1-100 inclusive of its Affirmative and Other Defenses, as if

6   fully set forth herein.

7       2.      Apple is a corporation duly organized and existing under the laws of

8   California and has its principal place of business at 1 Infinite Loop, Cupertino,

9   California 95014.

10      3.      On information and belief, Unwired Planet is a Nevada entity having its

11  principal place of business at 226 California Avenue, Reno, Nevada 89509.

12      4.      In its Counterclaims, Apple seeks declarations of invalidity and non-

13  infringement of the Asserted Patents.  This Court has jurisdiction pursuant to the

14  Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, under federal question

15  jurisdiction pursuant to 28 U.S.C. § 1331, and pursuant to the Patent Laws of the

16  United States, 35 U.S.C. § 1 *et seq*., and pursuant to 28 U.S.C. § 1332.

17      5.      This Court has personal jurisdiction over Unwired Planet at least because

18  it has submitted to the jurisdiction of this Court.

19      6.      Venue is proper under 28 U.S.C. §§ 1391 and 1400(b).

20      7.      On or about September 19, 2012, Unwired Planet filed its Complaint for

21  Patent Infringement, alleging that Unwired Planet is the owner by assignment of the

22  entire right, title and interest in and to the Asserted Patents.

23      8.      In its Complaint, Unwired Planet named Apple as Defendant and asserted

24  claims of patent infringement against Defendants under 35 U.S.C. §§ 271, 271(b) and

25  271(c).  As a result of at least the allegations contained in Unwired Planet's Complaint

26  and Apple's denial of such allegations, an actual and justiciable controversy exists.

27      9.      The Asserted Patents are invalid for failure to meet the conditions of

28  patentability and/or patent eligibility specified in Title 35 of the United States Code,

including, without limitation, sections 101, 102, 103, and 112, as set forth in paragraph 1 of Apple's Affirmative and Other Defenses.

10.    Apple has not infringed and is not infringing the Asserted Patents, willfully or otherwise, directly, contributorily or by inducement, either literally or by application of the doctrine of equivalents.

11.    Unwired Planet's claims against Apple under the '033, '790, '685, and '260 Patents are barred because these patents are unenforceable due to inequitable conduct, as set forth herein:

### U.S. Patent No. 7,299,033

12.    During prosecution of the '033 Patent, individuals associated with the prosecution of the '033 Patent withheld material, non-cumulative prior art from the patent examiner with intent to deceive the United States Patent and Trademark Office ("USPTO"), and furthermore made affirmative misrepresentations of material facts with the intent to deceive the USPTO.  The withheld  material, non-cumulative prior art included Unwired Planet's own commercial activity, as well as that of its predecessor-in-interest, and printed publications relating to that activity, as described below.

13.    The '033 Patent states on its face that it issued from U.S. Patent Application No. 10/601,022, filed on June 19, 2003.  The '033 Patent also states that it is related to Provisional Application Nos. 60/393,024, 60/392,383, 60/393,041, and 60/392,999, all filed on June 28, 2002.

14.    The '033 Patent on its face, and at all times during its prosecution, claims a "plurality of domains" where "each of the domains [are] assigned thereto to a particular set of digital products designed for use in wireless communication devices that are accessible to the wireless services subscribers in that domain."

15.    On or around May 29, 2002, Unwired Planet's predecessor Openwave Systems, Inc. acquired a company called Ellipsus Systems, Inc. ("Ellipsus").

16.    On information and belief, Ellipsus was founded originally by Rikard M.

1    Kjellberg, the first named inventor of the '033 Patent.

2         17.    On information and belief, more than one year before June 28, 2002,

3    Ellipsus released three products related to mobile applications: infiniteMAP,

4    infiniteMASS, and Enterprise Application Adapters ("EAA") (combined, the "Ellipsus

5    Products").

6         18.    On information and belief, on or around February 12, 2001, Ellipsus

7    published white papers describing each of the Ellipsus Products.  On information and

8    belief, more than one year before June 28, 2002, Ellipsus published user manuals,

9    technical support documents, and other documents describing the Ellipsus Products.

10        19.    The only Ellipsus-published document before the examiner of the '033

11   Patent was a 10-page white paper describing the infiniteMAP product ("infiniteMAP

12   white paper").  Exhibit 4.  White papers describing infiniteMASS and EAA (Exhibits 1

13   and 2, respectively), on which Mr. Kjellberg was a co-author, were never identified or

14   provided to the examiner.  Nor were any other documents describing the Ellipsus

15   Products, including user manuals or technical support documents, identified or

16   provided to the examiner.

17        20.    On June 28, 2005, the examiner of the '033 Patent rejected the application

18   as being anticipated by the infiniteMAP white paper.  The infiniteMAP white paper

19   had not been disclosed by Unwired Planet to the examiner.  Instead, the examiner had

20   independently located the prior art reference in a November 22, 2004 Information

21   Disclosure Statement filed by Unwired Planet in a co-pending application that was

22   later issued as the '790 Patent.  The co-pending application was not cross-referenced in

23   the '033 Patent application.

24        21.    The examiner explained in his rejection that the infiniteMAP white paper

25   disclosed a "plurality of domains," because "it is inherent that there would be multiple

26   domains based on different devices capabilities and user profiles."  Office Action dated

27   June 28, 2005.

28        22.    The examiner further stated that "[i]n view of the inability of the

Examiner to obtain any additional Ellipsus information, as the company has been acquired by the current assignee, Openwave Systems Inc., the Examiner is requesting any additional information that Applicants may have access to that would be material to the examination of the application." *Id.*

23.     On September 30, 2005, in response to the examiner's request for additional information, the applicants for the '033 Patent, including Mr. Kjellberg, stated that they were "not aware of any other information that may be material to the examination of this application, other than the materials which have already been cited and the materials which are being cited concurrently with the filing of this amendment." Amendment dated September 30, 2005.

24.     On information and belief, Mr. Kjellberg, the founder of Ellipsus and first named inventor on the '033 Patent, was aware that other documents regarding the Ellipsus Products existed, including white papers describing infiniteMASS and EAA (Exhibits 1 and 2, respectively), of which Mr. Kjellberg was a co-author, and further including user manuals, technical support documents, and other documents describing the Ellipsus Products in Unwired Planet's possession. On information and belief, Mr. Kjellberg further knew that the withheld art plainly disclosed a "plurality of domains." Mr. Kjellberg's statement in the September 30, 2005 Amendment therefore was an affirmative misrepresentation of material fact made with intent to deceive the USPTO.

25.     The examiner issued two more rejections of the application as being anticipated by the infiniteMAP white paper, on December 20, 2005, and May 5, 2006, for the reason that the infiniteMAP white paper inherently discloses a "plurality of domains."

26.     In traversing both rejections, the applicants for the '033 Patent, including Mr. Kjellberg, stated that through Unwired Planet's acquisition of Ellipsus Systems, Unwired Planet was "thoroughly familiar with the product disclosed in the [infiniteMAP white paper] and [is] more-than-qualified to comment on the extent of that reference's disclosure." Amendment dated July 18, 2006; *see also* Amendment

1    dated October 10, 2006 ("Applicants respectfully maintain all of their previously

2    submitted arguments regarding the prior art rejections").  Mr. Kjellberg and the other

3    applicants traversed the examiner's assertion of inherency and claimed that, due to

4    Unwired Planet's familiarity with the Ellipsus product, "the Examiner is not in a

5    position to dispute Applicants' arguments regarding the Ellipsus reference, absent clear

6    evidence which confirms the Examiner's assertion of inherency."  Amendment dated

7    July 18, 2006.

8         27.   Contrary to Mr. Kjellberg's and the applicants' assertions, and

9    unbeknownst to the examiner, a white paper describing infiniteMASS co-authored by

10   Mr. Kjellberg and in the possession of Unwired Planet was material to the examination

11   of the application, as it disclosed a "plurality of domains," for example in describing

12   infiniteMASS as being "positioned in the enterprise information technology (IT)

13   infrastructure between the content server and the wireless network, and links end users

14   with the content.  The content can be delivered to the largest possible user population,

15   since infiniteMASS provides the bridge between the multitude of mobile devices and a

16   content source, such as an enterprise portal or e-commerce server.  This is possible

17   since infiniteMASS supports both the content formatting and wireless communication

18   protocol functionality, providing a number of 'distribution channels' between a content

19   source and users."  Exhibit 1 at 2.

20        28.   Further contrary to Mr. Kjellberg's and the applicants' assertions, and

21   unbeknownst to the examiner, a white paper describing EAA co-authored by Mr.

22   Kjellberg and in the possession of Unwired Planet was material to the examination of

23   the application, as it disclosed a "plurality of domains," for example in describing

24   EAA as allowing "infiniteMASS [to] dispatch messages to the appropriate channel

25   (RMI, CORBA, DCOM or SOAP) based on the structure of the incoming request from

26   the mobile device.  This request is in the form of a Unified Resource Locator (URL),

27   which will typically indicate channel, object, method and parameters."  Exhibit 2 at 4.

28        29.   Further, on information and belief, user manuals, technical support

-36-

1    documents, and other documentation describing the Ellipsus Products existed and were

2    in the possession of Unwired Planet, and were material to the examination of the

3    application.  For example, on information and belief, such documentation discloses

4    and/or renders obvious a "plurality of domains."

5           30.    None of the withheld Ellipsus documents are cumulative of the

6    infiniteMAP white paper.  The infiniteMASS and EAA white papers disclose a

7    "plurality of domains," a limitation that the examiner stated was only inherently

8    disclosed by the infiniteMAP white paper and that Mr. Kjellberg and the applicants

9    argued was missing from the infiniteMAP white paper.  On information and belief,

10    other documents describing the Ellipsus Products, including user manuals and

11    technical support documents, were not cumulative of the infiniteMAP white paper and

12    disclosed explicitly a "plurality of domains."

13           31.    Mr. Kjellberg's September 30, 2005 statement that he was "not aware of

14    any other information that may be material to the examination of this application" was

15    an affirmative misrepresentation of material fact as, on information and belief, Mr.

16    Kjellberg, the founder of Ellipsus and co-author of the infiniteMASS and EAA white

17    papers, was aware of the documents in Unwired Planet's possession describing the

18    Ellipsus Products, including the white papers describing the infiniteMASS and the

19    EAA products and user manuals and technical support documents for all of the

20    Ellipsus Products.

21           32.    On information and belief, Mr. Kjellberg withheld the Ellipsus Products

22    documents with the intent to deceive the USPTO in order to secure issuance of the

23    '033 Patent.  On information and belief, Mr. Kjellberg knew that had the examiner

24    been aware of the Ellipsus Products documents, including the infiniteMASS and the

25    EAA white papers and other supporting documents, the examiner would have rejected

26    the claims of the application for the '033 Patent and would not have allowed those

27    claims to issue.

28           33.    Because of the inequitable conduct committed by Mr. Kjellberg in

connection with the '033 Patent, the '033 Patent is unenforceable, and Unwired Planet may not obtain any relief regarding it.

### U.S. Patent No. 7,233,790

34.    During prosecution of the '790 Patent, individuals associated with prosecution of the patent withheld material, non-cumulative prior art from the patent examiner with intent to deceive the USPTO.  This material prior art included Unwired Planet's own commercial activity, as well as that of its predecessor-in-interest, and printed publications relating to that activity, as described below.

35.    The '790 Patent states on its face that it issued from U.S. Patent Application No. 10/600,746, filed on June 19, 2003.  The '790 Patent also states that it is related to Provisional Applications No. 60/393,024, 60/392,383, 60/393,041, and 60/392,999, all filed on June 28, 2002.

36.    The '790 Patent on its face, and at all times during its prosecution, claims "receiving . . . a plurality of different implementations of at least one of the items of content, where each implementation of any given item of content corresponds to a different set of device capabilities . . . ."  This limitation was cited by the examiner in the reasons for allowance as being missing from the prior art of record.

37.    More than one year before this Provisional Application was filed, Ellipsus, which was acquired by Unwired Planet before the '790 Patent's earliest priority date, had offered for sale and put into public use the Ellipsus Products, each of which involved and disclosed each element of at least one claim of the '790 Patent.

38.    For example, the Ellipsis Products are described in the following publications, each of which was published before June 28, 2001:

- White Paper – infiniteMASS, Ellipsus' Mobile Application Server Suite (*see* Exhibit 1);
- White Paper – EAA, Ellipsus' EAA (*see* Exhibit 2); and
- Ellipsus System Unveils First 100%-Java Wireless Web Services Platform (June 2001 press release) (*see* Exhibit 3).

On information and belief, user manuals, technical support documents and other documents related to the infiniteMAP, the infiniteMASS, and the EAA systems.

39.     Neither infiniteMASS nor EAA, nor any of the publications named above, are disclosed anywhere on the face of the '790 Patent or in the patent's prosecution history.

40.     Each of the infiniteMASS and EAA systems is prior art to the '790 Patent under 35 U.S.C. §§ 102(a) and 102(b).  Each of the publications named above is prior art to the '790 Patent under 35 U.S.C. §§ 102(a) and 102(b).

41.     Each of the infiniteMASS and EAA systems is material prior art to the '790 Patent and is not cumulative of any prior art of record.  Each of the publications named above is material prior art to the '790 Patent and is not cumulative of any prior art of record.

42.     On information and belief, the examiner of the '790 Patent was not aware of infiniteMASS or EAA, or any of the publications named above relating thereto.  On information and belief, the examiner was not aware of the publications named above relating to infiniteMAP (the "withheld infiniteMAP documents").  *See* Exhibit 4. Had the examiner been aware of infiniteMASS or EAA or any of these publications, including the withheld infiniteMAP documents, the examiner would have rejected the claims of the '790 Patent and would not have allowed them to issue, because the infiniteMASS and EAA systems and each of these publications disclosed or rendered obvious each and every limitation of the claims of the '790 Patent.

43.     For example, with respect to Claim 1 of the '790 Patent, infiniteMASS and EAA performed methods of providing access to content for use in wireless communication devices, including receiving and storing a plurality of different implementations of at least one of the items of content, where each implementation of any given item of content corresponds to a different set of device capabilities, and maintaining a product catalog containing a description of the items of content with a reference to each implementation of said item of content.  Had the examiner been

1   aware of infiniteMASS, EAA, or any of the publications named above, the examiner

2   would have rejected Claim 1 under 35 U.S.C. §§ 102 and 103.

3          44.    On information and belief, the withheld infiniteMAP documents disclose

4   the method of providing access to content for use in wireless communication devices,

5   including receiving and storing a plurality of different implementations of at least one

6   of the items of content, where each implementation of any given item of content

7   corresponds to a different set of device capabilities, and maintaining a product catalog

8   containing a description of the items of content with a reference to each

9   implementation of said item of content.  Had the examiner been aware of the withheld

10  infiniteMAP documents, the examiner would have rejected Claim 1 under 35 U.S.C.

11  §§ 102 and 103.

12         45.    On information and belief, individuals associated with prosecution of the

13  '790 Patent, including at least named inventor Rikard M. Kjellberg, withheld the

14  infiniteMASS and EAA prior art (including Ellipsus's offers for sale and public use of

15  these systems) from the examiner, with intent to deceive the USPTO.  On information

16  and belief, Mr. Kjellberg withheld the withheld infiniteMAP documents from the

17  examiner with intent to deceive the USPTO.

18         46.    Mr. Kjellberg was a co-founder of Ellipsus Systems and a co-author of the

19  infiniteMASS and EAA white papers.

20         47.    Mr. Kjellberg therefore knew that the infiniteMASS and EAA systems,

21  and each of the publications named above, including the withheld infiniteMAP

22  documents, were prior art to, and disclosed the limitations of the claims of, the

23  application for the '790 Patent.  Yet Mr. Kjellberg did not disclose the infiniteMASS

24  and EAA systems, or any of the publications named above, including the withheld

25  infiniteMAP documents, to the examiner of the '790 Patent.

26         48.    During prosecution of the '033 Patent, with regards to a similar white

27  paper on Ellipsus's infiniteMAP product, Mr. Kjellberg and the other applicants of the

28  '033 Patent stated that as a result of Unwired Planet's acquisition of Ellipsus,

1  "[Unwired Planet is] thoroughly familiar with the product disclosed in the

2  [infiniteMAP white paper] and are more-than-qualified to comment on the extent of

3  that reference's disclosure."  Amendment dated July 18, 2006. Mr. Kjellberg's claim

4  of thorough familiarity with infiniteMAP demonstrates his knowledge of the withheld

5  infiniteMAP documents.

6       49.    On information and belief, Mr. Kjellberg withheld from the examiner of

7  the '790 Patent the infiniteMASS and EAA systems and each of the publications

8  named above, including the withheld infiniteMAP documents, with intent to deceive

9  the USPTO.  On information and belief, Mr. Kjellberg knew that had the examiner

10  been aware of the withheld art, the examiner would have rejected the claims of the

11  application for the '790 Patent and would not have allowed those claims to issue.

12       50.    Thus, by withholding the infiniteMAP and EAA systems, and each of the

13  publications named above, from the examiner, Mr. Kjellberg deceived the examiner

14  and the USPTO in order to obtain issuance of the '790 Patent.

15       51.    Because of the inequitable conduct committed by Mr. Kjellberg in

16  connection with the '790 Patent, the '790 Patent is unenforceable, and Unwired Planet

17  may not obtain any relief regarding it.

18  **U.S. Patent No. 7,020,685**

19       52.    During prosecution of the '685 Patent, Unwired Planet and individuals

20  associated with prosecution of the patent withheld material, non-cumulative prior art

21  from the patent examiner with intent to deceive the USPTO.  This material prior art

22  included Unwired Planet's own commercial activity, printed publications relating to

23  that activity, and at least one prior art patent reference, as described below.

24       53.    The '685 Patent states on its face that it issued from U.S. Patent

25  Application No. 09/640,902, filed on August 16, 2000.  The '685 Patent also states that

26  it is related to Provisional Application No. 60/158,694, filed on October 8, 1999.

27  *UP.Link and PocketNet*

28       54.    More than one year before the Provisional Application to the '685 Patent

was filed, Unwired Planet had offered for sale and put into public use the UP.Link and PocketNet systems, each of which involved and disclosed each element of at least one claim of the '685 Patent.

55.    The UP.Link and/or PocketNet systems are described in the following exemplary publications, each of which was published before October 8, 1998:

- UP.Link Developer's Guide, Version 1.0 (*see* Exhibit 5);
- Using the UP.Browser, Version 1.01 (*see* Exhibit 6);
- HDTP Specification, Version 1.1 (*see* Exhibit 7);
- Unwired Planet Announces UP.Link Platform 2.0 (press release dated July 8, 1997) (*see* Exhibit 8);
- Unwired Planet Brings the Web to Cellular Telephones and Pagers (press release dated July 15, 1996) (*see* Exhibit 9);
- Using UP.Mail (July 1997) (*see* Exhibit 10); and
- Developing Applications for the PocketNet Phone (1996 White Paper) (*see* Exhibit 11).

Collectively, the UP.Link and PocketNet systems, including any publications describing those systems, will be referred to herein as the "UP.Link and PocketNet Prior Art."

56.    None of the UP.Link and PocketNet Prior Art is disclosed anywhere on the face of the '685 Patent or in its prosecution history.

57.    The UP.Link and PocketNet Prior Art is prior art to the '685 Patent under 35 U.S.C. §§ 102(a) and 102(b).  The UP.Link and/or PocketNet systems, and/or each of the publications named above, is prior art to the '685 Patent under 35 U.S.C. §§ 102(a) and 102(b).

58.    Each of the UP.Link and PocketNet Prior Art is material prior art to the '685 Patent and is not cumulative of any prior art of record.  Each of the publications named above is material prior art to the '685 Patent and is not cumulative of any prior art of record.

59.     On information and belief, the examiner of the '685 Patent was not aware of the UP.Link and PocketNet Prior Art.  Had the examiner been aware of the UP.Link and PocketNet Prior Art, the examiner would have rejected the claims of the '685 Patent and would not have allowed them to issue, because the UP.Link and PocketNet Prior Art disclosed or rendered obvious each and every limitation of the claims of the '685 Patent.

60.     For example, with respect to Claim 1 of the '685 Patent, UP.Link and PocketNet performed methods of providing content from a network to a wireless device, including retrieving content from a resource on a network according to a hypermedia protocol with which the wireless device was not compliant, and converting the content to a message compliant with a message requirement of the wireless device. As explained by the UP.Link Developer's Guide, the UP.Link system retrieved network content using the HTTP protocol, with which UP.Phone wireless devices were not compliant.  Then the UP.Link system converted the retrieved content to a message compliant with UP.Phone wireless devices.  *See, e.g.*, Exhibit 5 (UP.Link Developer's Guide, v. 1.0) at v.  *See also* Exhibit 11 (Developing Applications for the PocketNet Phone, 1996 White Paper) at 3 (showing "PocketNet Information Flow" in which an "UPLink [sic] Gateway" retrieves network content using the HTTP protocol and then converts the retrieved content to a "HDML Command" message compliant with "UPLink-enabled Phone[s]").

61.     Had the examiner been aware of the UP.Link and PocketNet Prior Art, the examiner would have rejected Claim 1 under 35 U.S.C. §§ 102 and 103, because the UP.Link and PocketNet Prior Art disclosed or rendered obvious each and every limitation of Claim 1.

62.     On information and belief, individuals associated with prosecution of the '685 Patent, including at least named inventor David A. Chen and prosecution counsel Jordan Becker, withheld the UP.Link and PocketNet Prior Art (including Unwired Planet's offers for sale and public use of these systems) from the examiner of the

application for the '685 Patent, with intent to deceive the USPTO.

63.    On information and belief, Mr. Chen was employed by Unwired Planet at least as early as April 1998, more than one year before the filing of the Provisional Application to which the '685 Patent purports to claim priority.  On information and belief, Mr. Chen was a Senior Product Manager for Unwired Planet's Mobile Browser business, and was involved in Unwired Planet's prior-art commercial activity including the sale, offer for sale, or public use of the UP.Link or PocketNet Systems or related systems.  For example, a page on the website LinkedIn regarding Mr. Chen states that he "[d]rove mobile browser product through company's [Unwired Planet's] first volume rollout across multiple handset OEMs and US and Japanese wireless operators" and "[l]ed production of industry's first WAP-standard mobile browser for worldwide use."  *See* Exhibit 12, http://www.linkedin.com/profile/view?id=2045186 (last visited Nov. 27, 2012).

64.    On information and belief, Mr. Chen knew about the UP.Link and PocketNet Prior Art because of his work on Unwired Planet's Mobile Browser business, and knew that they were prior art to, and disclosed the limitations of the claims of, the application for the '685 Patent.  Yet Mr. Chen did not disclose the UP.Link and PocketNet Prior Art to the examiner of the '685 Patent.

65.    Mr. Becker prosecuted multiple patent applications for Unwired Planet, including several other applications that were pending before or during the pendency of the '685 Patent.  Those other applications included applications that related to Unwired Planet's Mobile Browser business, including to the UP.Link and PocketNet systems.  On information and belief, Mr. Becker knew about the UP.Link and PocketNet Prior Art at least via his work on patent applications filed by Unwired Planet, and knew that they were prior art to, and disclosed the limitations of the claims of, the application for the '685 Patent.  Yet Mr. Becker did not disclose the UP.Link and PocketNet Prior Art to the examiner of the '685 Patent.

66.    For example, Mr. Becker was involved in prosecution of U.S. Patent No.

6,742,127, entitled "Method and Apparatus for Maintaining Security in a Push System" ("the '127 Patent"). The '127 Patent issued to Unwired Planet's predecessor Openwave Systems, Inc. on May 25, 2004, while the '685 Patent was still pending. The '127 Patent discusses an "UP.Link Gateway" that converts between hypermedia formats. *See, e.g.*, '127 patent, Fig. 1, col. 4:4-13. On information and belief, Mr. Becker was aware of the "UP.Link Gateway" disclosed in the '127 Patent (which he was involved in prosecuting), was aware that it related to Unwired Planet's UP.Link system, and was aware that the UP.Link system was on sale and in public use before October 8, 1998.

67.     For further example, Mr. Becker was involved in the prosecution of U.S. Patent No. 6,665,711, entitled "Method and Apparatus for Integrating Narrowband and Wideband Data Transports" ("the '711 Patent"). The '711 Patent issued to Unwired Planet's predecessor Openwave Systems, Inc. on December 16, 2003, while the '685 Patent was still pending. The '711 Patent discusses the UP.Link Gateway and also discusses a wireless device obtaining access to information from "www.att.com/PocketNet." *See, e.g.*, '711 Patent, Fig. 1, col. 9:5-6. On information and belief, Mr. Becker was aware of the PocketNet discussion in the '711 Patent (which he was involved in prosecuting), was aware that it related to Unwired Planet's commercial activity regarding the PocketNet system, and was aware that the PocketNet system was on sale and in public use before October 8, 1998.

68.     On information and belief, both Mr. Becker and Mr. Chen withheld from the examiner of the '685 Patent the UP.Link and PocketNet systems and each of the publications named above with intent to deceive the USPTO. On information and belief, Mr. Becker and Mr. Chen each knew that had the examiner been aware of the UP.Link and PocketNet Prior Art, the examiner would have rejected the claims of the application for the '685 Patent and would not have allowed those claims to issue.

69.     For example, the examiner of the '685 Patent repeatedly rejected all claims over U.S. Patent No. 6,473,609 ("the '609 Patent"), explaining that the '609

Patent discloses or renders obvious (in combination with other references) all limitations of the claims of the application for the '685 Patent. *See* U.S Patent Application 09/640,902, Office Actions dated November 14, 2003, and April 26, 2004. In response, Unwired Planet (in filings by Mr. Becker) represented to the examiner that the '609 Patent was not prior art to the application for the '685 Patent because the subject matter was owned by or subject to an obligation of assignment to the same person (Unwired Planet's predecessor Phone.com) at the time of the alleged invention. *See id.*, Amendments dated February 17, 2004, and June 17, 2004. The examiner then withdrew the rejections for anticipation and obviousness, and instead issued a rejection for double patenting over the '609 Patent. *See id.*, Office Action dated July 29, 2004. Unwired Planet was able to overcome this double-patenting rejection by filing a terminal disclaimer, resulting in a notice of allowance. *See id.*, Amendment and Terminal Disclaimer dated August 10, 2004 and Notice of Allowance dated October 7, 2004.

70.     Had the examiner been informed about the UP.Link and PocketNet Prior Art, the examiner would have rejected the claims of the '685 Patent over that art as well, as it disclosed the very same limitations that the examiner found disclosed by the '609 Patent. And Unwired Planet would not have been able to rely on the common-ownership provision of the Patent Act to overcome such a rejection. For example, the examiner's November 14, 2003 rejection explained that the '609 Patent discloses a "method of providing content from a network to a wireless device" including the steps of "receiving the content from a resource on the network according to a hypermedia protocol, wherein the wireless device is not compliant with the hypermedia protocol," and "converting the content to a message compliant with a message requirement of the wireless device." *Id.* at 2. As explained above, the UP.Link and PocketNet systems disclosed these very same limitations. For example, the UP.Link Developer's Guide explains that the UP.Link system retrieved network content via the HTTP protocol and converted the content to a message compliant with message requirements of UP.Link

1    Phone wireless devices.

2         71.   The common-ownership provision does not exempt art that qualifies

3    under section 102(b), including prior public use, offers for sale, and printed

4    publications such as the UP.Link and PocketNet Prior Art.  *See* 35 U.S.C. § 103(c).

5         72.   Thus, by withholding the UP.Link and PocketNet Prior Art from the

6    examiner, Mr. Becker and Mr. Chen deceived the examiner into allowing claims that

7    should not have been allowed, and deceived the USPTO into issuing the '685 Patent.

8    On information and belief, Mr. Becker and Mr. Chen withheld the UP.Link and

9    PocketNet Prior Art with intent to so deceive the examiner and the USPTO.

10                  *U.S. Patent 6,094,587 ("Armanto")*

11        73.   United States Patent No. 6,094,587 ("Armanto") is prior art to the '685

12   Patent under 35 U.S.C. § 102(e).  *See* Exhibit 13.

13        74.   Armanto discloses a method of sending a ringtone to a wireless device by

14   converting the ringtone into an SMS message and sending the SMS message to the

15   wireless device.

16        75.   Armanto is not cited on the face of the '685 Patent or in the prosecution

17   history of the '685 Patent.

18        76.   Armanto is material to the claims of the '685 Patent, and is not cumulative

19   of the art of record.

20        77.   On information and belief, the examiner of the '685 Patent was not aware

21   of Armanto.  Had the examiner been aware of Armanto, the examiner would have

22   rejected the claims of the '685 Patent and would not have allowed them to issue,

23   because Armanto disclosed or rendered obvious each and every limitation of the

24   claims of the '685 Patent.

25        78.   For example, Armanto discloses the following element of Claim 1 of the

26   '685 Patent, which Unwired Planet contended was a distinction over the prior art:

27   converting the content to a message compliant with a message requirement of the

28   wireless device, including generating a message including the content.  *See, e.g.,*

1   Exhibit 13 (Armanto), Abstract (disclosing a method in which a "ringing tone is

2   transformed into characters containing specifications of notes and the characters are

3   sent to the telephone, e.g., in a short message").  Had the examiner been aware of

4   Armanto, the examiner would have rejected Claim 1 under 35 U.S.C. §§ 102 and 103.

5        79.    On information and belief, individuals associated with the prosecution of

6   the '685 Patent, including at least named inventor David A. Chen and prosecution

7   counsel Jordan Becker, withheld Armanto from the examiner of the application for the

8   '685 Patent with intent to deceive the USPTO.

9        80.    Mr. Becker was aware of Armanto by the time that that Mr. Becker was

10  prosecuting the application that issued as the '685 Patent.  For example, Mr. Becker

11  submitted Armanto to the USPTO as part of an Information Disclosure Statement filed

12  by Mr. Becker on November 4, 1995 in the prosecution of U.S. Patent App. No.

13  09/999,656.

14       81.    Despite having been aware of Armanto and having submitted it to the

15  USPTO in connection with a different patent application, Mr. Becker did not submit

16  Armanto to the USPTO in connection with the prosecution of the '685 Patent.

17       82.    On information and belief, Mr. Becker was aware that Armanto was

18  material to the application for the '685 Patent, and withheld Armanto from the

19  examiner with intent to deceive the examiner and the USPTO into allowing the '685

20  Patent to issue when it should not have been allowed.

21       83.    On information and belief, Mr. Chen was also aware of Armanto, for

22  example from Mr. Becker's submission of Armando to the USPTO in connection with

23  the prosecution of U.S. Patent App. No. 09/999,656, on which Mr. Chen was named as

24  an inventor.  On information and belief, Mr. Chen was aware that Armanto was

25  material to the application for the '685 Patent, and withheld Armanto from the

26  examiner with intent to deceive the examiner and the USPTO into allowing the '685

27  Patent to issue when it should not have been allowed.

28       84.     Because of the inequitable conduct committed by Mr. Chen and Mr.

Becker in connection with the '685 Patent, the '685 Patent is unenforceable, and Unwired Planet may not obtain any relief regarding it.

### U.S. Patent No. 6,647,260

85.    During prosecution of the '260 Patent, Unwired Planet and individuals associated with prosecution of the patent withheld material, non-cumulative prior art from the patent examiner with intent to deceive the USPTO.  This material prior art included Unwired Planet's own commercial activity, printed publications relating to that activity, and at least one prior art patent reference, as described below.

86.    The '260 Patent states on its face that it issued from U.S. Patent Application No. 09/289,559, filed on April 9, 1999.

*UP.Link and PocketNet*

87.    More than one year before this application was filed, Unwired Planet had offered for sale and put into public use the UP.Link and PocketNet systems, each of which involved and disclosed each element of at least one claim of the '260 Patent.

88.    For example, the UP.Link and/or PocketNet systems are described in the following publications, each of which was published before April 9, 1998:

- UP.Link Developer's Guide, Version 1.0 (*see* Exhibit 5);
- Using the UP.Browser, Version 1.01 (*see* Exhibit 6);
- HDTP Specification, Version 1.1 (*see* Exhibit 7);
- Unwired Planet Announces UP.Link Platform 2.0 (press release dated July 8, 1997) (*see* Exhibit 8);
- Unwired Planet Brings the Web to Cellular Telephones and Pagers (press release dated July 15, 1996) (*see* Exhibit 9);
- Using UP.Mail (July 1997) (*see* Exhibit 10); and
- Developing Applications for the PocketNet Phone (1996 White Paper) (*see* Exhibit 11).

Collectively, the UP.Link and PocketNet systems, including any publications describing those systems, will be referred to herein as the "UP.Link and PocketNet

Prior Art."

89.    None of the UP.Link and PocketNet Prior Art is disclosed anywhere on the face of the '260 Patent or in its prosecution history.  Neither the UP.Link or PocketNet systems, nor any of the publications named above, is disclosed anywhere on the face of the '260 Patent or in its prosecution history.

90.    Each of the UP.Link and PocketNet Prior Art is prior art to the '260 Patent under 35 U.S.C. §§ 102(a) and 102(b).  Each of the publications named above is prior art to the '260 Patent under 35 U.S.C. §§ 102(a) and 102(b).

91.    Each of the UP.Link and PocketNet Prior Art is material prior art to the '260 Patent and is not cumulative of any prior art of record.  Each of the UP.Link and PocketNet systems, and each of the publications named above, is material prior art to the '260 Patent and is not cumulative of any prior art of record.

92.    On information and belief, the examiner of the '260 Patent was not aware of the UP.Link or PocketNet Prior Art.  Had the examiner been aware of the UP.Link or PocketNet Prior Art, the examiner would have rejected the claims of the '260 Patent and would not have allowed them to issue, because the UP.Link and PocketNet Prior Art disclosed or rendered obvious each and every limitation of the claims of the '260 Patent.

93.    For example, with respect to Claim 1 of the '260 Patent, UP.Link and PocketNet performed methods of provisioning a two-way mobile communications device having a display and a user interface, with the mobile communications device receiving user information, displaying a list of selectable identifiers on the display, receiving a user's selection of an identifier, generating a provisioning request comprising the user information and the selection, establishing a communication link and authenticating with a remote server, sending the provisioning request to the provisioning server, receiving a reply, and provisioning the two-way communications device with a feature or service based on the reply.  Had the examiner been aware of the UP.Link and PocketNet Prior Art, the examiner would have rejected Claim 1 under

35 U.S.C. §§ 102 and 103.

94.   On information and belief, individuals associated with prosecution of the '260 Patent, including at least named inventors Peter F. King, Bruce V. Schwartz, and Bruce K. Martin, Jr., withheld the UP.Link and PocketNet Prior Art (including Unwired Planet's offers for sale and public use of these systems) from the examiner of the application for the '260 Patent, with intent to deceive the USPTO.

95.   On information and belief, Mr. King was employed by Openwave Systems and its precursors Phone.com and Unwired Planet at least as early as 1995, more than one year before the filing of the Application which led to the '260 Patent. On information and belief, Mr. King was Director of Technology of Openwave, and was involved in Unwired Planet's prior-art commercial activity including the sale, offer for sale, or public use of the UP.Link or PocketNet Systems or related systems. On information and belief, Mr. King knew about the UP.Link and PocketNet Prior Art because of his work on Openwave's Mobile Browser business, including UP.Link specifically, and because he was in charge of managing Unwired Planet's patent process in 1997 and 1998, and knew that they were prior art to, and disclosed the limitations of the claims of, the application for the '260 Patent. On information and belief, Mr. King was particularly aware of the HDTP Specification 1.0 (*see* Exhibit 7) because he authored it. Yet Mr. King did not disclose the UP.Link and PocketNet Prior Art to the examiner of the '260 Patent.

96.   On information and belief, Mr. Schwartz was employed by Openwave Systems and its precursors Phone.com and Unwired Planet at least as early as November 1994, more than one year before the filing of the Application which led to the '260 Patent. On information and belief, Mr. Schwartz was Co-Founder of Phone.com and a Member of Technical Staff at Phone.com and Openwave, and was involved in Unwired Planet's prior-art commercial activity including the sale, offer for sale, or public use of the UP.Link or PocketNet Systems or related systems. On information and belief, Mr. Schwartz knew about the UP.Link and PocketNet Prior Art

because of his work on Openwave's Mobile Browser business, and knew that they were prior art to, and disclosed the limitations of the claims of, the application for the '260 Patent.  Yet Mr. Schwartz did not disclose the UP.Link and PocketNet Prior Art to the examiner of the '260 Patent.

97.    On information and belief, Mr. Martin was employed by Openwave Systems and its precursors Phone.com and Unwired Planet at least as early as 1995, more than one year before the filing of the Application which led to the '260 Patent. On information and belief, Mr. Martin was Chief Technology Officer of Openwave, and was involved in Unwired Planet's prior-art commercial activity including the sale, offer for sale, or public use of the UP.Link or PocketNet Systems or related systems. On information and belief, Mr. Martin knew about the UP.Link and PocketNet Prior Art because of his work on Openwave's Mobile Browser business, and knew that they were prior art to, and disclosed the limitations of the claims of, the application for the '260 Patent.  Yet Mr. Martin did not disclose the UP.Link and PocketNet Prior Art to the examiner of the '260 Patent.

98.    On information and belief, Messrs. King, Schwartz, and Martin withheld from the examiner of the '260 Patent the UP.Link and PocketNet Prior Art with intent to deceive the USPTO.  On information and belief, Messrs. King, Schwartz, and Martin each knew that had the examiner been aware of the UP.Link and PocketNet Prior Art, the examiner would have rejected the claims of the application for the '260 Patent and would not have allowed those claims to issue.

99.    For example, the examiner of the '260 Patent initially rejected all claims over U.S. Patent No. 6,031,830 ("the '830 Patent"), explaining that the '830 Patent discloses or renders obvious (in combination with other references) all limitations of the claims of the application for the '260 Patent. *See* U.S Patent Application 09/289,559, Office Action dated July 31, 2001.  In response, Unwired Planet represented to the examiner that the limitation of the '260 Patent whereby the user input is received by the device was not present in the '830 Patent.  Similarly, the

examiner of the '260 Patent then rejected all claims over U.S. Patent No. 5,812,953 ("the '953 Patent"), explaining that the '953 Patent discloses or renders obvious (in combination with other references) all limitations of the claims of the application for the '260 Patent. *See* U.S Patent Application 09/289,559, Office Action dated January 16, 2002. In response, Unwired Planet represented to the examiner that the limitation of the '260 Patent whereby the selections available to the user are displayed and the user selects one of the displayed selections was not present in the '953 Patent.

100. Based on Unwired Planet's representations as to the prior art's missing limitations, the examiner allowed the '260 Patent to issue. Had the examiner been informed about the UP.Link and PocketNet Prior Art, the examiner would have rejected the claims of the '260 Patent over that prior art, as it disclosed the very same limitations that Unwired Planet argued were not present in the '830 or '953 patents. The UP.Link and PocketNet phones, for example, clearly disclosed receiving user input by the device, which Unwired Planet argued was missing from the '830 Patent, since UP.Link and PocketNet phones displayed users a list of choices which could be selected. *See* Exhibit 5 (UP.Link Developer's Guide, v. 1.0) at 25. Similarly, UP.Link and PocketNet phones disclosed displaying selections and receiving a selection of those displayed, which Unwired Planet argued was missing from the '953 Patents, when displaying lists of choices to the user for selection. *Id.*

101. Thus, by withholding the UP.Link and PocketNet Prior Art from the examiner, Messrs. King, Schwartz, and Martin deceived the examiner into allowing claims that should not have been allowed, and deceived the USPTO into issuing the '260 Patent. On information and belief, Messrs. King, Schwartz, and Martin withheld the UP.Link and PocketNet Prior Art with intent to so deceive the examiner and the USPTO.

102. Because of the inequitable conduct committed by Messrs. King, Schwartz, and Martin in connection with the '260 Patent, the '260 Patent is unenforceable, and Unwired Planet may not obtain any relief regarding it.

* * *

103.   Pursuant to 28 U.S.C. § 2201(a), and as a result of Unwired Planet's allegations of infringement against Apple, an actual and justiciable controversy has arisen and exists between Apple and Unwired Planet.  Apple is entitled to a judicial determination and declaration that it has not infringed and is not infringing the Asserted Patents and that the Asserted Patents are invalid and unenforceable.

104.   On information and belief, when Unwired Planet brought this action, it knew, or should have known, that the claims of the Asserted Patents are invalid and that Apple has not infringed and does not infringe any valid and enforceable claim of the Asserted Patents.

105.   This counterclaim presents exceptional circumstances within the meaning of 35 U.S.C. § 285, and Apple is thus entitled to an award of its reasonable attorneys' fees.

## **DEMAND FOR JURY TRIAL**

Apple demands a jury trial on all of its Counterclaims and on all other issues that may be tried by a jury.

WHEREFORE, Defendant and Counterclaimant Apple prays as follows:

A.     That the Complaint against Apple be dismissed in its entirety with prejudice and that a judgment be entered in favor of Apple and against Unwired Planet;

B.     That Unwired Planet take nothing by reason of its Complaint;

C.     That the Court enter an order denying any and all of Unwired Planet's requests for injunctive relief against Apple;

D.     That the Court enter a judgment declaring that Apple has not infringed and does not infringe, directly, contributorily or by inducement, any claim of the Asserted Patents;

E.     That the Court enter a judgment declaring that each and every claim of the Asserted Patents is invalid;

1    F.    That the Court enter a judgment declaring that the '033, '790, '685, and

2    '260 Patents are unenforceable;

3    G.    That the Court enter an order under 35 U.S.C. § 285, awarding Apple its

4    reasonable attorneys' fees and costs of suit incurred in this litigation, as Unwired

5    Planet's conduct as set forth above renders this an exceptional case; and

6    H.    That the Court enter an order awarding Apple all such other and further

7    relief as the Court deems proper.

8    Dated: this 29th day of November, 2012.

9
                              By: /s/ Jonathan W. Fountain
10                            Jonathan W. Fountain
                              Nevada Bar No. 10351
11                            JFountain@LRLaw.com
                              LEWIS AND ROCA LLP
12                            3993 Howard Hughes Pkwy.
                              Suite 600
13                            Las Vegas, NY 89169-5996
                              Telephone: (702) 949-8340
14                            Facsimile: (702) 949-8374

15                            E. Leif Reid
                              Nevada Bar No. 5750
16                            LReid@LRLaw.com
                              LEWIS AND ROCA LLP
17                            50 West Liberty Street
                              Suite 410
18                            Reno, NY 89501-1922
                              Telephone: (775) 321-3415
19                            Facsimile: (775) 823-2929

20                            Josh Krevitt (Admitted *Pro Hac Vice*)
                              GIBSON, DUNN & CRUTCHER LLP
21                            200 Park Avenue
                              New York, NY  10166-0193
22                            Telephone: 212.351.4000
                              Fax: 212.351.4035

23                            H. Mark Lyon (Admitted *Pro Hac Vice*)
                              Y. Ernest Hsin (Admitted *Pro Hac Vice*)
24                            GIBSON, DUNN & CRUTCHER LLP
                              1881 Page Mill Road
25                            Palo Alto, CA  94304-1211
                              Telephone: 650.849.5300
26                            Fax: 650.849.5333

27
                              Attorneys for Defendant Apple Inc.
28

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I, hereby certify that on November 29, 2012, I filed a true and accurate copy of

3

the foregoing document entitled, ANSWER TO COMPLAINT FOR PATENT

4

INFRINGEMENT, AFFIRMATIVE AND OTHER DEFENSES, AND

5

COUNTERCLAIM, with the Clerk of the Court via the Court's CM/ECF system,

6

which will send electronic notice of the same to the following CM/ECF participants:

7

- Theodore Stevenson III (tstevenson@mckoolsmith.com);

8

- Kevin L. Burgess (kburgess@mckoolsmith.com);

9

- Pierre J. Hubert (phubert@mckoolsmith.com);

10

- Michael D. Rounds (mrounds@watsonrounds.com); and

11

- Adam K. Yowell (ayowell@watsonrounds.com)

12

Dated: this 29th day of November, 2012.

13

14

     /s/ Jonathan W. Fountain
An employee of Lewis and Roca LLP

15

16

17

18

19

20

21

22

23

24

25

26

27

28