United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNWIRED PLANET, LLC,

             Plaintiff,

      v.

APPLE INC,

             Defendant.

Case No.  13-cv-04134-VC

**CLAIM CONSTRUCTION ORDER**

## I.  INTRODUCTION

The parties have proposed constructions for ten different terms, which appear in the following ten claims:

U.S. Patent No. 6,647,260 ('260 Patent) – claims 1 and 16

U.S. Patent No. 6,321,092 ('092 Patent) – claim 20

U.S. Patent No. 6,317,831 ('831 Patent) – claims 17, 23, and 25

U.S. Patent No. 6,532, 446 ('446 Patent) – claims 15 and 35

U.S. Patent No. 6,813,491 ('491 Patent) – claims 15 and 26

Prior to the *Markman* hearing, Unwired Planet agreed to adopt Apple's proposed construction for two of the previously-disputed terms: "second communication path," found in claims 15 and 35 of the '446 Patent, and "determining whether the mobile device is proximate to its owner," found in claim 15 of the '491 Patent. The parties agreed to construe "second communication path" as "communication path that is separate from the first communication path." The parties agreed to construe "determining whether the device is proximate to its owner" as "determining if the mobile device is, or is not, close to the individual who owns the device." The Court accepts the parties' agreed-to construction of these terms.

1    At the *Markman* hearing the parties agreed to the construction of a third term, "narrowband

2    channel," found in Claims 17, 23, and 25 of the '831 Patent. The '831 Patent discloses a

3    technology for enabling secure data transactions to occur over a narrowband channel. Unwired

4    Planet proposed construing "narrowband channel" as "channel with a lower data transfer rate or

5    bandwidth than the wideband channel," while Apple proposed adding the word "significantly" as a

6    modifier, construing the claim as "channel with a significantly lower data transfer rate or

7    bandwidth than the wideband channel." At the *Markman* hearing, the Court suggested using the

8    modifier "meaningfully" instead of "significantly," and the parties agreed. Therefore, "narrowband

9    channel" is construed as "channel with a meaningfully lower data transfer rate or bandwidth than

10   the wideband channel."

11   There are seven remaining terms to be construed.

12

13   **II.  LEGAL STANDARD**

14   Claim construction is a question of law to be determined by the Court. *Markman v.*

15   *Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The construction of "a term can

16   only be determined and confirmed with a full understanding of what the inventors actually

17   invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316

18   (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250

19   (Fed. Cir. 1998)).

20   Claim construction begins by looking to the language of the claims themselves, which

21   "define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water,*

22   *Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). A claim term

23   should be construed in a manner consistent with its "ordinary and customary meaning," which is

24   "the meaning that the term would have to a person of ordinary skill in the art in question at the

25   time of the invention." *Phillips*, 415 F.3d at 1312–13. At times, the ordinary and customary

26   meaning of a claim term can be determined solely by viewing the term within the context of the

27   claim's overall language. Further, the use of the term in other claims can provide guidance

28   regarding its proper construction, as terms are typically used consistently from one claim to the

United States District Court
Northern District of California

2

1    next. *Id.* at 1314.

2         In addition to considering the claims themselves, a Court construes the term in light of the

3    patent's specification, which "is the single best guide to the meaning of a disputed term." *Vitronics*

4    *Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). In limited circumstances, the

5    specification may be used to narrow the meaning of a claim term that otherwise would appear to

6    be susceptible to a broader reading. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.,*

7    *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).  But in general, a Court should not import limitations

8    from the specification and apply those limitations to the claim term. *See Comark Commc'ns., Inc.*

9    *v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("[W]hile…claims are to be interpreted in

10   light of the specification, it does not follow that limitations from the specification may be read into

11   the claims."). Finally, the prosecution record, as well as any statements made by the patentee to

12   the United States Patent and Trademark Office ("PTO"), can be another source of intrinsic

13   evidence.

14        In addition to intrinsic evidence, the Court may consider extrinsic evidence, such as

15   dictionaries or technical treatises, particularly if those sources are "helpful in determining 'the true

16   meaning of language used in patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52

17   F.3d at 980). But while extrinsic evidence can be useful for construing disputed terms, it cannot be

18   used to contradict the plain and ordinary meaning of a claim terms as defined within the intrinsic

19   record. *Phillips*, 415 F.3d at 1322–23.

20

21   **III.    DISCUSSION**

22       **A.  PATENT NO. 6,647,260 (the '260 Patent)**

23        The '260 Patent discloses an invention for "provisioning" the features and services that are

24   available on mobile communication devices. As the patent describes, a number of parameters on a

25   mobile device must be provisioned before that device can be used. The Background of the

26   Invention identifies two problems the '260 Patent was intended to overcome. First, at the time of

27   the invention, customers had to go to a physical store in order to provision their mobile device,

28   which could be inconvenient and subject customers to the unwanted pressures of salespeople.

United States District Court
Northern District of California

3

Second, there was a significant amount of fraud in the telecommunications industry due to the lack of security. The invention of the '260 Patent provides a solution by allowing users to provision the phone themselves, without the need to come into a store, and to do so in a secure manner. The parties dispute two terms from the '260 Patent: "provisioning" and "provisioning server," both of which appear in Claim 1 and dependent Claim 16.

    1.  "Provisioning"

The parties disagree over whether "provisioning" refers only to telecommunications capabilities, as Apple proposes, or to all services and features available to a wireless device, as Unwired Planet proposes. They also disagree about whether provisioning is limited to "enabling" those capabilities, as Apple suggests, or applies to Unwired Planet's more expansive construction of "providing, enabling, or modifying."

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| provisioning | providing, enabling, or modifying | enabling telecommunication capabilities on |

To begin, in its responsive brief Apple concedes that the claim uses "provisioning" to refer not only to the initial configuration of the mobile device, but also to subsequent modifications to the device. Therefore, Apple agrees to add the verb "modifying" to its proposed construction. The Court believes this construction more accurately reflects the process of provisioning, and because there is no compelling argument for the additional inclusion of "providing," the Court adopts the verbs "enabling or modifying."

The remaining dispute is the primary one: *what* is enabled or modified – only telecommunications capabilities, or all mobile device capabilities? Claim 1 describes a "method for provisioning a two-way mobile communications device having a display and user interface," and concludes with the step of "provisioning the two-way mobile communications device with a feature or service." '260 Patent (Claim 1) 9:16–17, 38–39. Here, an examination of the claims is not particularly helpful, because they make no attempt to define "provisioning" and provide little guidance as to what "provisioning" refers to. Rather, because "provisioning" appears so often and

4

almost always without context, it appears the Patent assumes that the user of the invention will know what "provisioning" means, which suggests that the term had a well-understood, ordinary meaning in the art. This notion is further supported by the prosecution history, which lacks any indication that Unwired Planet or the Patent Examiner attempted to define "provisioning" or disputed its meaning.

Citing to its expert as well as to two technical dictionaries provided by both Apple and Unwired Planet, Apple claims that "provisioning" was well understood in the telecom industry at the time of the invention to refer to supplying telecommunication capabilities, and that since the Patent itself assumed that "provisioning" has a well-understood meaning in the art, this extrinsic evidence should play a key role in the claim construction process.

Unwired Planet counters that the relevant field is not the telecommunications industry, as Apple suggests, but rather the field of two-way mobile communication devices. Therefore, according to Unwired Planet's expert, the telecommunications dictionaries cited by Apple are unnecessarily limiting and even irrelevant, as their definitions of provisioning are "clearly focused on providing physical, wired service to a customer location" rather than to a wireless mobile communication device, as envisioned by the '260 Patent. Unwired Planet Opening Brief, Decl. of Mark Jones, ¶ 15. And, Unwired Planet argues, it is particularly problematic to use these definitions since the invention occurred at a time when the field of wireless mobile communication devices was undergoing dramatic changes and wireless devices were able to access a range of services and features, not just those pertaining to telecommunications.

While Unwired Planet has convincingly argued that Apple's extrinsic evidence is not precisely on point – particularly the definitions provided by the telecom technical dictionaries – it has failed to offer any compelling evidence of its own to support its much broader construction. In fact, other than citing to the *same* dictionaries used by Apple, the only extrinsic evidence provided by Unwired Planet are general purpose dictionaries, which provide less assistance in understanding the way "provisioning" is used in the '260 Patent.

More importantly, the specification – the one piece of intrinsic evidence that is helpful – supports a construction of "provisioning" that more closely aligns with Apple's proposal. The

5

specification uniformly states that "provisioning" is related to enabling or modifying the communication services and features of a mobile device. In the Background of the Invention, the patent identifies why a mobile device needs to be provisioned: "Before a consumer can use one of these devices, a number of parameters must be provisioned in order to enable *communication* services and applications and in order to distinguish the device from others within the *communications* network." '260 Patent 1:32-37 (emphases added). The next sentence continues, "[i]n addition to provisioning the two-way mobile communications device, it is also necessary to provision network elements in the communications network which are responsible for effecting mobile communications services and applications (e.g., billing plan, voice mail, call forwarding, email, information services, etc.)." *Id.* 1:37-42. These provisioned capabilities are communication capabilities, and the same is true when "provisioning" is used at other points throughout the specification. *See, e.g.*, *id.* 1:56-59, 1:62-66, 2:40-43.

Unwired Planet points to two places in the specification to argue that "provisioning" was intended to include more than just telecommunication capabilities. First, it cites to a sentence that describes the provisioning content, which "takes the form of software modules, which modify the resident features of mobile device or activation information required to initialize previously installed non-operational applications." *Id.* 6:51-55. But this sentence does not undermine Apple's proposed construction. It simply identifies the type of content that can be included in a provisioning package. The examples given – "software modules" and "activation information" – could be used to enable telecommunication capabilities to the device.

Second, Unwired Planet directs the Court to the third paragraph of the Background of the Invention, which describes the type of software applications that run on a mobile device: "Examples of software applications used in these devices include micro-browsers, address books, and email clients. Additionally, this generation of two-way mobile communication devices has access to a plurality of services via the Internet and Intranets." *Id.* 1:28-32. Unwired Planet contends that these software applications are the types of things that are enabled through the provisioning process, and therefore "provisioning" is not limited to only telecommunications capabilities. But this seems incorrect, as this paragraph appears to refer to the types of applications

6

that *exist* on these mobile communication devices, not the types of applications that are enabled through the provisioning process.

As a final matter, even though the Court is inclined to adopt Apple's proposed construction, the Court finds that the phrase "communication capabilities," rather than Apple's proposed language of "telecommunication capabilities," is more accurate for describing the type of content that is provisioned onto mobile devices, as the specification consistently uses the term "communication" rather than "telecommunication."  The Court therefore adopts the following construction of "provisioning": "enabling or modifying communication capabilities."

2.   "Provisioning Server"

The second term in dispute from Claim 1 of the '260 Patent is "provisioning server," with the parties disagreeing over its functionality. Unwired Planet argues that the "provisioning server" is the server which receives the provisioning request, whereas Apple contends that it has a more specific role, namely, that it generates and delivers the provisioning content.

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| provisioning server | server that receives the provisioning request | server that generates the provisioning content and delivers it to the two-way mobile communications device |

The term "provisioning server" clearly needs to be construed. The parties seem to agree that it does not have a precise, technical meaning outside the context of the '260 Patent, and without a claim construction the jury would likely be uncertain of its meaning. Further, the claims and the specification distinguish the provisioning server from other servers – such as the proxy server or the service server – suggesting that the 260' Patent ascribes a specific meaning to the provisioning server.

Claim 1, which, as indicated above, describes a method for provisioning a two-way mobile communications device, references the "provisioning server" in two places. The method described by Claim 1 consists of the mobile communications device (1) "establishing a communications link with the *provisioning server*," *id.* (Claim 1) 9:30-31, and (2) "sending the provisioning request to

the *provisioning server* over the communications link," *id.* (Claim 1) 9:35-36.

Unwired Planet proposes construing "provisioning server" as "server that receives the provisioning request." But this would be a superfluous construction, because rather than adding clarity it would simply repeat the same limitation already found in Claim 1, which already teaches that the mobile communications device sends the provisioning request to the provisioning server. *See, e.g.*, *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330–31 (Fed. Cir. 2008); *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005). Further, not only would Unwired Planet's construction be redundant, but it would arguably be inaccurate. In nonasserted Claims 7 and 8,[1] a "proxy server" sits between the mobile communications device and the provisioning server; in Claim 7, the proxy server is used to establish the communication link, and in Claim 8, "the proxy server acts as a gateway to bridge communications between an airnet with which the two-way mobile communications device communicates and the wide area communications network with which the provisioning server communicates." *Id.* (Claim 8) 9:60-64. In this embodiment, as well as in embodiments described in the specification and illustrated by Figure 1 below, it is the proxy server, not the provisioning server, that receives the provisioning request from the mobile communications device. Therefore, Unwired Planet's construction that the provisioning server receives the provisioning request would be both redundant and potentially inappropriately limiting.

---

[1] Claim 8 is dependent on Claim 7, which is dependent on Claim 6, which is dependent on Claim 5. Claim 5 is dependent on Claim 1, so all of the claims are dependent on Claim 1.

United States District Court
Northern District of California



*Id.*, Fig 1.

Apple's construction assigns a more active role to the provisioning server. Under Apple's proposed construction, the provisioning server (1) generates the provisioning content and then (2) delivers that content to the mobile communications device. With respect to the second role – delivering the provisioned content to the device – Apple's construction is incorrect for the same reason that Unwired Planet's is: in certain embodiments, including the one depicted by Figure 1 above and in Claims 7 and 8, the proxy server, not the provisioning server, delivers the provisioned content. While the provisioning server may send the provisioned content to the proxy server, it is the proxy server that ultimately delivers that content to the mobile device. And because the specification and claims use "provisioning server" in such a way that suggests it has a specific, defined role throughout the patent, a construction of provisioning server which excludes certain

1    embodiments is not correct. *See, e.g.*, *Phillips*, 415 F.3d at 1314–15 ("Because claim terms are

2    normally used consistently throughout the patent, the usage of a term in one claim can often

3    illuminate the meaning of the same term in other claims."); *Broadcom v. Emulex Corp.*, 732 F.3d

4    1325, 1333 (Fed. Cir. 2013) ("This court has clarified that an interpretation which 'excludes a

5    [disclosed] embodiment from the scope of the claim is rarely, if ever, correct.'")(internal quotation

6    marks omitted).

7           The first part of Apple's proposed construction identifies the provisioning server as the

8    server that generates the provisioning content. The Abstract states, "The provisioning server

9    device processes the received information and generates provisioning packages, registration

10   requests, and notifications for the subject mobile device and for any associated server device

11   providing services." '260 Patent, Abstract. Further, the Summary of the Invention describes the

12   provisioning server in essentially the same way: "The provisioning server device processes the

13   received information and generates provisioning content and notifications for the subject mobile

14   device and for any associated server device providing service(s)." *Id.* 2:13-16.

15          Without question, the provisioning server *can* generate provisioning content. The question,

16   however, is whether this is always the task of the provisioning server, as used in Claim 1. Unwired

17   Planet makes two arguments against this aspect of Apple's proposed construction. First, it claims

18   that Apple's construction improperly limits the claim term by importing a limitation from an

19   embodiment. In particular, Unwired Planet argues that when the specification describes the

20   provisioning server as generating the provisioning content, it does so in a paragraph that begins,

21   "According to one aspect of the present invention…." *Id.* 2:1. But this introductory phrase does

22   not modify the role of the provisioning server. In fact, in the very next paragraph, which begins,

23   "[a]ccording to another aspect of the present invention," the provisioning server is described in the

24   exact same way – as the server that "processes the received information and generates

25   provisioning packages and notifications." 2:38-39. In each embodiment described in the Summary

26   of the Invention, the provisioning server generates the provisioning content.

27          Second, Unwired Planet argues that Apple's proposed construction would improperly

28   exclude a disclosed embodiment, as the specification describes how the provisioning content may

be located on a server that is not the provisioning server. *Id.* 6:45-48 ("It is important to note at this point that the provisioning content required to process the request may be resident on the provisioning server receiving the request or on any server device accessible via landnet."), 7:25-27 ("The content relating to the features and services listed in database **542** need not be resident on provisioning server **530**."). According to Unwired Planet, the specification also describes how the service server, not the provisioning server, may generate the provisioning content. Unwired Planet points to the following language from the specification:

> User information and information relating to requested services is stored in database **642**. The information is forwarded to service server **660** where it is stored in storage **668** and used to register the user for the requested services. Acknowledgments regarding the user's registration and provisioning content **672** (e.g. passwords security information, etc.) are forwarded to provisioning server **630** by a register kernel **664** via message send manager **674** and message receive manager **646**. Provisioning server **630** forwards the provisioning content and any related notifications to the requesting mobile device.

*Id.* 7:52-62. This method is illustrated by the following figure.



*Fig. 6*

1    Apple and Unwired Planet dispute the technical details of the method illustrated by this

2    figure. Unwired Planet argues that the service server is generating the provisioning content,

3    whereas Apple argues that the provisioning server still generates the content but is accessing

4    information needed to generate that content from the service server. In its responsive brief, Apple

5    offered a modified construction of provisioning server which seems to satisfy both parties'

6    interpretation: "server that generates *or obtains* the provisioning content."

7    In the embodiment described above, as well as in every embodiment throughout the

8    specification and the claims, this construction accurately captures the role of the provisioning

9    server. Therefore, "provisioning server," as used in Claim 1, is construed as follows: "<u>server that</u>

10   <u>generates or obtains the provisioning content</u>."

11

12   **B.  PATENT NO. 6,321,092 (the '092 Patent)**

13   This patent discloses an improved technology for identifying the location of a wireless

14   station, such as a cell phone or pager. In order to more accurately locate a wireless station, the

15   invention gathers inputs about the location of the wireless station from multiple Location Finding

16   Equipment, or LFEs (such as GPS, time difference of arrival, etc), and then responds to a location

17   request by providing the location information that is responsive to the request.

18   The parties dispute three terms from the '092 Patent, all of which appear in Claim 20:

19   "wireless station," "location input," and "selectively retrieving data from said memory based on

20   said device independent location request."

21

22   1.  "<u>Wireless Station</u>"

23   The first dispute over Claim 20 of the '092 patent concerns the phrase "wireless station,"

24   which appears in the preamble of Claim 20. As an initial matter, the parties dispute whether

25   "wireless station" limits the scope of Claim 20 since it appears in the preamble of the claim.

26   Because the term "wireless station" is critical for understanding the limitations in the body of the

27   claim, it limits the claim scope even though it appears in the preamble. *See, e.g.*, *Catalina Mktg*

28   *Intern. v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("[W]hen the preamble is essential

United States District Court
Northern District of California

12

1   to understand limitations or terms in the claim body, the preamble limits claim scope.");

2   *Seachange Inter., Inc. v. C-Cor, Inc.*, 413 F.3d 136, 1376 (Fed. Cir. 2005) ("The preamble

3   provides the only antecedent basis and thus the context essential to understand the meaning of [a

4   term at issue that appears in claim body].").

5          With respect to their proposed constructions, both parties agree that a wireless station has

6   "wireless voice and/or data communication capabilities," but they disagree on two points. First,

7   and most important, they disagree on whether a wireless station, as used in claim 20, is always

8   mobile, with Apple arguing that is and Unwired Planet that it is not. Second, they disagree over

9   whether to refer to a wireless station as a terminal, as Apple proposes, or as a device, as Unwired

10  Planet proposes.

11

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|------|----------------------------|-------------------------------|
| wireless station | device with wireless voice and/or data communication capabilities | mobile terminal with wireless voice and/or data communication capabilities |

          a.   *Whether wireless stations are mobile*

15         In terms of the first dispute, the Court agrees with Apple: wireless stations, as used in

16  claim 20 of the '092 patent, are mobile.

17         Asserted claim 20 uses "wireless stations" as follows: "A method for use in a wireless

18  network to obtain requested location information regarding a *wireless station* and provide the

19  requested location information to a wireless location application, the wireless network being

20  associated with location finding equipment for providing information regarding locations of

21  *wireless stations* in a network service area" '092 Patent (Claim 20) 16:12-18 (emphases added). In

22  Claim 20 the wireless station needs to be found, which implies that a wireless station is mobile.

23  Unwired Planet has offered no compelling argument as to why the invention disclosed by the '092

24  Patent would be used to find the location of a fixed, rather than mobile, object.

25         Other claims of the '092 patent confirm this same understanding of "wireless stations." For

26  instance, nonasserted Claims 5, 11, and 17 refer to the travel speed, travel direction, and

27  movement of wireless stations. These claims, much like Claim 20, only make sense if a wireless

28

United States District Court
Northern District of California

1   station is mobile. Because the same term is normally used in the same way throughout the patent,

2   claims 5, 11, and 17 add further support for construing "wireless station" in claim 20 as mobile.

3   *See, e.g.*, *Phillips*, 415 F.3d at 1303' *Catalina Mktg.*, 289 F.3d at 808.

4        Unwired Planet treats Claim 11 differently. In Claim 11, a dependent claim of Claim 1, the

5   location output includes "one of a speed of travel and direction of travel for the wireless station."

6   '092 Patent (Claim 11) 14:28-30. According to Unwired Planet, because Claim 20 does *not* include

7   this same limitation regarding speed and direction, that suggests the "wireless station" in Claim 20

8   is not necessarily mobile. But this distinction between the two claims simply means that the

9   location output for finding the wireless station in Claim 20 may not use speed or direction. It in no

10  way suggests that Claim 20's wireless station is not mobile.

11       Reading the claim term in light of the specification further confirms this. The specification

12  includes many examples of tracking a wireless station and improving its location accuracy. *Id.*

13  2:39-40, 2:47, 3:27, 3:34. At one point, the specification even substitutes the term "mobile station"

14  for "wireless station." 3:52-61.[2] Unwired Planet agrees that the specification teaches that some

15  wireless stations are mobile, yet it argues that "those particular embodiments should not be read

16  into the claims to the exclusion of other embodiments." Unwired Planet Responsive Brief, 8. But

17  there are no embodiments of non-mobile wireless stations. Every example the Patent gives of a

18  wireless station is mobile. This is true beginning with the first sentence with the Background of

19  the Invention, which reads, "Wireless communications networks generally allow for voice and/or

20  data communication between wireless stations, e.g. wireless telephones (analog, digital cellular

21  and PCS), pagers or data terminals that communicate using RF signals" – all of which are mobile

22  – and remains the case throughout the patent. '092 Patent, 16-19.

23       Unwired Planet directs the court to technical dictionaries, which define "station" as a

24  device and are agnostic as to whether that device is mobile or not. But as Apple points out, the

25

26  _____

27  [2] "The associated method includes the steps of receiving a first LFE input including second location information for the wireless station, and using the first and second inputs to derive tracking information for the *wireless station*. The tracking information preferably includes

28  information regarding the *mobile station's* speed of travel and direction of travel." *Id.* 3:52-61 (emphases added).

singular term "station" is irrelevant since the term at issue is "wireless station," and, even if the defined term was relevant, the dictionary definition would still be unhelpful in this case because extrinsic evidence cannot be used to overcome intrinsic evidence. *See Phillips*, 415 F.3d at 1322-23. Unwired Planet also points to Apple's product literature for Apple's own AirPort router – a non-mobile device which Apple described in its literature as a "wireless base station" – to make the case that a wireless station can be non-mobile. Again, though, this argument is irrelevant since Apple's AirPort router is not related to the claim at issue. Further, the AirPort product description could in fact undermine Unwired Planet's argument, because Apple's literature describes the router not as a "wireless station," but as a "wireless *base* station." Unwired Planet Opening Brief, Ex. 1 at 2, AirPort Technical Fact Sheet (1999) (emphasis added). The use of the term "base" could be understood to mean that the router is not mobile; at a minimum, it distinguishes the description of the AirPort router from the phrase "wireless station" as used in the '092 Patent.

Unwired Planet also makes a textual argument by pointing to the following language from the specification: "Because wireless stations are generally mobile, an additional element of uncertainty is introduced." '092 Patent, 8:63-67. This sentence, Unwired Planet argues, proves that wireless stations are not always mobile since the term "generally" allows for the possibility of immobile wireless stations. But this argument ignores the context of this section of the specification, which focuses on how wireless stations are typically in different places at different points in time, and how the "multi-input processing facility" can reduce location uncertainty of the wireless station by taking time into account. The use of "generally mobile" is not an indication of the fundamental nature of a wireless station, such as whether it is mobile or not. Rather, it means that wireless stations are typically on the move, rather than sitting still.

Neither the claims nor the specification of the '092 patent provide any reference to or examples of a "wireless station" that is not mobile. Wireless station, as used in this patent, are those devices that need to be located. Apple's construction is consistent with that use.

*b.   "terminals" or "devices"*

The parties dispute whether wireless stations should be construed as "terminals" or as "devices." While this distinction seems somewhat inconsequential, as Apple has pointed out, the

15

term "device" appears elsewhere in Claim 20 and therefore might be misleading to a jury. Because "terminal" does not have this same problem and is not unduly limiting, the Court adopts Apple's full proposed construction for "wireless station": "mobile terminal with wireless voice and/or data communication capabilities."

2.  "Location inputs"

Unlike other claims at issue, here the parties appear to mostly agree on what "location inputs" in Claim 20 actually are. Their disagreement is over the best way to describe them. Apple proposes that location inputs should be construed as "determinations of the location of the mobile terminal," while Unwired Planet suggests that "determinations" is too narrow, and instead proposes "information regarding a wireless station's location."

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|------|---------------------------|-------------------------------|
| location inputs | information regarding a wireless station's location | determinations of the location of a mobile terminal |

To begin, because the Court has construed the phrase "wireless station," and because its construction provides more clarity and explanation than the simple term "mobile terminal," the Court will adopt the term "wireless station." The only remaining disagreement, therefore, is the primary one: whether location inputs are "determinations of the location" or "information regarding…location."

Both parties cite to the same examples of "location inputs" to make their case. A location input can be any number of inputs to help identify the location of the wireless station; an input may be "a sector identifier or coordinates," "a sector identifier or coordinates and a radius," "angular measurements and corresponding cell site identifiers/coordinates," "multiple hyperbolae," or "geographic coordinates." 7:30-41. Different location inputs are more helpful than others in identifying the location of the wireless station.

As Apple acknowledges in its brief, some location inputs referenced in the patent are only "partial determinations" of location, and may not specify the location of the mobile terminal with complete accuracy. But Apple's proposed construction – "determinations of the location of a

16

1   mobile terminal" – suggests a definiteness which might be misleading to a jury and result in

2   excluding certain embodiments. Not all location inputs determine the location of the wireless

3   terminal. Rather, they contain information about the location of the terminal, and, collectively, can

4   be used to determine the terminal's location. This is precisely what Unwired Planet's construction

5   suggests.

6        Apple argues that because Unwired Planet, in its brief, interprets the phrase

7   "regarding…location" to include any information that "can be used" to determine location, that

8   Unwired Planet's construction "would read the term 'location' out of the claim phrase 'location

9   inputs.'" Apple Responsive Brief, 11. But this concern is misplaced. "Information regarding

10  location" is a straightforward phrase that a jury would understand. A location input offers

11  information about the location of the wireless station. If the input does not provide information

12  about a wireless station's location then it is not a location input.

13       The Court adopts the following construction for "location inputs": "<u>information regarding a</u>

14  <u>wireless station's location</u>."

15

16  3.   "<u>Selectively retrieving data…</u>"

17       The final disputed term from the '092 Patent, also found in Claim 20, is "selectively

18  retrieving data from said memory based on said device independent location request." Apple's

19  proposed construction would place a number of limitations on the claim term, while Unwired

20  Planet's proposed construction would essentially repeat the same language already present in the

21  claim.

22

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| selectively retrieving data from said memory based on said device independent location request | selectively retrieving data from the memory based on a location request that is independent of the type of location finding equipment used | Choosing from the stored location data only the data that conform to the location request |

27       Unwired Planet's proposed construction does not serve the purpose of claim construction,

28  which is to "determin[e] the meaning and scope of the patent claims asserted to be infringed."

United States District Court
Northern District of California

1    *Markman*, 52 F.3d at 976. It merely repeats language already found in the claim, replacing "said

2    device independent location request" with "a location request that is independent of the type of

3    location finding equipment used." But the claim already explains what a "device independent

4    location request" is, so Unwired Planet's construction does not offer any additional clarity. Further,

5    and importantly, Unwired Planet's construction does not explain what it means to selectively

6    retrieve data based on a location request. In its responsive brief and at the *Markman* hearing,

7    Unwired Planet indicated that it was amenable to replacing the phrase "selectively retrieving" with

8    "choosing," but without also clarifying *which* data is chosen, or *how* it is chosen – in other words,

9    since it did not construe the phrase "based on" – Unwired Planet's substitution of "choosing" for

10   "selectively retrieving" does not offer greater clarity.

11           Apple's proposed construction is more helpful than Unwired Planet's in that it provides a

12   construction that explains the meaning and scope of the phrase and thus would be useful for the

13   jury. But Apple has offered no real support for its construction, and it appears to be unduly

14   limiting. Apple suggests that the claim term means that *only* the data that *conforms* to the location

15   request is retrieved, but this construction is problematic for several reasons. First, there is nothing

16   in the claim or the specification to suggest that the method described in Claim 20 requires

17   "conformance" with the location request. Apple points to the following language in the Summary

18   of the Invention:

             [T]he location request may include a specification regarding the desired location
19           information, for example, indicating how recent or how accurate the information
             should be. If the memory includes information conforming to the specification,
20           then such information is received and output to the requesting location.

21   '092 Patent, 2:62-3:1. Apple seems to suggest that this description from the Summary of the

22   Invention describes the same method contemplated by Claim 20. But this language actually

23   undermines Apple's argument. It indicates that the location request may include a specification or

24   parameter, and that the information is received if it conforms with the particular specification or

25   parameter. Claim 20, however, does *not* include a specification or parameter limitation. Rather,

26   those limitations are included in nonasserted Claims 1 and 7, with Claim 7 requiring conformance

27   with the parameter. *Id.* (Claim 7) 14:11-15 ("A method as set for in claim 1, wherein said step of

28

1   obtaining comprises identifying said parameter of the location request regarding the desired

2   location information and determining whether the stored data includes information conforming to

3   the parameter."). Because the only time the Patent uses the "conformance" limitation is with

4   respect to a specification or parameter, and because Claim 20 does not include a specification or

5   parameter limitation, Apple's attempt to require "conformance" in Claim 20 is misplaced.

6         Further, even if Claim 20 did require conformance, it is not clear why "selectively retrieve"

7   means that *only* the data that conforms to the location request would be chosen. At various points

8   the specification discusses how the invention processes numerous location inputs even if certain

9   inputs may not match a request. There is no evidence that Claim 20 excludes those inputs. Without

10   question, the word "selectively" must mean that not all data is retrieved, but it does not necessarily

11   mean that *only* the data that *conforms* to a location request is retrieved.

12         Therefore, because Unwired Planet's proposed construction is unhelpful, and because

13   Apple's proposed construction is unsupported and unduly limiting,[3] the Court declines to construe

14   the phrase at this juncture. If either of the parties believes that construction is necessary for any

15   dispositive motions, they should offer a new proposed construction in conjunction with the

16   dispositive motion, or at any time that construction of this phrase is necessary for resolving the

17   infringement claim.[4]

18

19   **C.  PATENT NO. 6,532,446 (the '446 Patent)**

20         The '446 Patent discloses an invention for extending speech recognition capabilities to

21   mobile devices without requiring additional computing resources to be added to the device. This is

22   accomplished by the mobile device connecting to an outside server system and sending the user's

23

24   [3] Unwired Planet also argues that Apple's proposed construction is incorrect because the words
"stored location data" (1) do not have an antecedent basis in Claim 20 and thus would be

25   confusing to the jury, and (2) suggest that the only data in memory are location determinations
rather than data that is based on location inputs. The Court does not think these words would be

26   confusing to a jury, and because it has construed "location inputs" as "information regarding a
wireless station's location," Unwired Planet's second concern is mitigated.

27   [4] The parties may want to consider construing the phrase as "choosing from the stored location

28   data only the data that are responsive to the location request."

United States District Court
Northern District of California

1   voice input to the server, which the server then translates into a data file and sends back to the

2   mobile device.

3       1.  "*Voice input*"

4       The one disputed term from the '446 Patent is "voice input," which appears in Claim 15, a

5   dependent claim of Claim 1, and Claim 35, a dependent claim of Claim 31. Unwired Planet argues

6   this is a straightforward and well-understood term that does not need construing, or could simply

7   be construed as "speech input." Apple, on the other hand, contends that "voice input" always

8   travels over a voice channel, and argues for a construction which provides for this stipulation:

9   "speech provided over a voice channel."

10

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| voice input | plain and ordinary meaning, no construction necessary<br><br>Or: speech input | speech provided over a voice channel |

14      The issue turns on how the Court interprets language from the specification. While the

15  specification generally cannot be used to limit the meaning of claim terms that otherwise

16  command a broader reading, there is an exception when statements referencing "the present

17  invention" limit the scope of the claim terms and when the patent does not disclose any alternative

18  embodiments. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holding Corp.*, 503 F.3d 1295, 1308 (Fed.

19  Cir. 2007) ("When the patent thus describes the features of the 'present invention' as a whole, this

20  description limits the scope of the invention."); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 425 F.3d

21  1312, 1318 (Fed. Cir. 2006) ("We agree with the district court that the claim term 'fuel injection

22  system component' is limited to a fuel filter…On at least four occasions, the written description

23  refers to the fuel filter as 'this invention' or 'the present invention'…").

24      The first paragraph of the Summary of the Invention describes "the present invention" as

25  follows:

26

27      The present invention relates to a wireless communication system that utilizes a
    remote speech recognition server system to translate voice input received from
28      mobile devices into a symbolic data file (e.g. alpha-numeric or control characters)

United States District Court
Northern District of California

1

that can be processed by the mobile devices. The translation process begins by

2

establishing a voice communication channel between a mobile device and the

3

speech recognition server. A user of the mobile device then begins speaking in a

4

fashion that may be detected by the speech recognition server system. Upon

5

detecting the user's speech, the speech recognition server system translates the speech into a symbolic data file, which is then sent to the user through a separate data communication channel. The user, upon receiving the symbolic data file at the mobile device, reviews and edits the content of the symbolic data file and further utilizes the file as desired. For example a user could use the symbolic data file to fill in fields in an email or a browser request field.

6

7

'446 Patent, 2:45-63.

8

In both *Verizon* and *Honeywell*, the "present invention" language referred to the precise

9

claim term at issue and added limitations to that term.[5] Here, by contrast, the "present invention"

10

refers to the overall wireless communication system that performs the work of translating voice

11

input into a data file. The task of "establishing a voice communication channel" – which is

12

presumably used to send the voice input from the mobile device to the server – is one element of

13

that process. The question, then, is whether this particular task falls within the scope of the

14

"present invention" language and thus limits the scope of the claim term.

15

The Court believes that it does. The patent consistently maintains the distinction between

16

voice input being sent over a voice channel to the server device, and a data file which is then sent

17

back to the mobile device over a data channel. As Apple points out in its brief, "utilizing and

18

establishing the 'voice channel' or 'voice communication channel' is mentioned no less than 16

19

times throughout the specification." Apple Opening Brief, 25. And the Patent never discloses an

20

embodiment that would be excluded by the voice channel limitation.

21

Unwired Planet relies on claim differentiation by pointing to nonasserted Claims 21 and

22

23. These claims include the same voice channel limitation that Apple seeks to ascribe to asserted

23

Claims 1 and 31. Claim 21, which describes a method of providing speech recognition services to

24

25

26

27

28

_____

[5] In *Verizon*, the specification language stated, "Thus, in one aspect, the present invention relates to a localized wireless gateway system." The same paragraph then went on to describe "localized wireless gateway system," which was the disputed term, as having a particular limitation. *Verizon*, 503 F.3d at 1308. In *Honeywell*, the specification language stated, "This invention relates to a fuel filter for use in a fuel line that delivers fuel to a motor vehicle engine." This led the Federal Circuit to conclude "that a fuel filter is the only 'fuel injection system component' that the claims cover." *Honeywell*, 425 F.3d at 1318.

United States District Court
Northern District of California

a wireless device, includes the following steps: "establishing a voice communication channel between the wireless communication device and the server device associated with the retrieved contact information; receiving input from a user using the wireless communication device, at least a portion of the input including a voice component." '446 Patent (Claim 21) 16:53-58. The same is true for Claim 23, which reads, "A method as recited in claim 21, wherein the voice communication channel is established on a wireless network." *Id.* (Claim 23) 17:6-8.

By contrast, asserted Claims 1 and 31 do not explicitly include this voice channel limitation. Claim 31 includes no information about the path over which voice input travel. And Claim 1 in fact includes a different limitation about the path over which voice input travels: "receiving a voice input signal associated with the request from a first communication path." *Id.* (Claim 1) 15:33-34. According to Unwired Planet, because Claims 21 and 23 include the voice channel limitations, and because Claim 1 includes a different comparable limitation and Claim 31 includes no such limitation, the Court should not construe voice input in Claims 1 and 31 as having the voice channel limitation.

But when comparing two independent claims, "claim differentiation as an interpretative principle is often of limited importance." *Ancora Techs. v. Apple, Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014). That is especially true here, as nonasserted Claim 21 does not even use the disputed term "voice input." More importantly, claim differentiation cannot be used to improperly broaden the scope of claims beyond that suggested by the intrinsic record. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998). Here, the intrinsic record – most particularly, the statement describing the "present invention" – suggests that voice input always travels over a voice channel.

Unwired Planet also argues that requiring the voice channel limitation would improperly exclude an embodiment. It points to a part of the specification which describes wireless carrier networks, which the patent teaches are used to establish the connection between the mobile device and the server system. The relevant portion of the specification reads as follows:

Wireless carrier network **104** may be any of the well known wireless communications network (e.g. cellular digital packet data (CDPD) network,

1

> Global System for Mobile Communications (GSM) network, Code Division Multiple Access (CDMA) network, Personal Handy Phone System (PHS) or Time Division Multiple Access (TDMA) network).

2

3    Unwired Planet claims that when voice input is sent over CDPD, as contemplated by the language

4    above, it is sent as data packets over a data channel rather than over a voice channel. But as Apple

5    pointed out, CDPD technology was overlaid with existing cellular infrastructure, and thus

6    networks with CDPD technology had both voice and data capabilities. Therefore, voice input

7    would still be sent over voice channels. As demonstrated by the following figure from the '446

8    Patent, Apple's argument on this point seems correct.

9

10



11

12

13

14

15

16

17

18

19

20

21

22

23   As the specification describes, line 126 in the figure above represents the voice channel. *Id.*

24   6:20-21 ("The voice communication channel previously described is generally represented by

25   voice channel 126."). Therefore, even if wireless carrier network 104 is CDPD, voice input is still

26   sent to voice recognition server system 109 over voice channel 126. Accordingly, there is nothing

27   about the use of CDPD as a wireless carrier network which suggests that voice input is not

28   transmitted via a voice channel.

United States District Court
Northern District of California

1    Finally, Unwired Planet makes much of the fact that Apple argued in its brief that a voice

2  channel is the same channel used to make telephone calls, and since the patent clearly

3  contemplates wireless communication devices which *do not* make phone calls – including palm

4  sized computing devices and PDAs – there should be no requirement that voice input travels over

5  a voice channel. But just because these devices do not make phone calls does not mean they do not

6  make use of voice channels. Indeed, the relevant section of the specification states, "Mobile

7  devices…may be taken from a group, which includes mobile phones, palm sized computing

8  devices and personal digital assistants *with voice transmission and/or reception capabilities*." *Id.*

9  4:67-5:3 (emphasis added).

10    The specification describing "the present invention" includes the limitation that voice input

11  travels over a voice channel, and this limitation is present in all embodiments. Accordingly, the

12  limitation should be included in Claims 1 and 31, so the Court adopts the following construction

13  of "voice input": "<u>speech provided over a voice channel</u>."

14

15    **D.  PATENT NO. 6,813,491 (the '491 Patent)**

16    The '491 Patent discloses an invention for adapting the settings of a mobile device based

17  on whether that device is proximate to a user or owner, which, among other methods, can be

18  determined based on whether the device is in motion or not. The Patent discusses settings that a

19  user may prefer depending on whether the device is proximate to a user, such as whether the

20  device is in vibrate-mode or ring-mode, and, if in ring-mode, the volume level of the ringer. The

21  parties initially disputed two terms from the '491 Patent, but Unwired Planet agreed to Apple's

22  proposed construction of "determining whether the mobile device is proximate to its owner," so

23  the only remaining dispute is over the term "stationary/active preferences," which is present in

24  asserted Claim 26, a dependent claim of Claim 21.

25

26    1.  "<u>Stationary preferences and active preferences</u>"

27    The parties dispute two aspects of the terms "stationary preferences" and "active

28  preferences." First, they disagree over whether they are limited to user-selectable settings, as

United States District Court
Northern District of California

24

Apple proposes, or any type of settings regardless of whether a user can select them, as Unwired Planet proposes. Second, they disagree over when the stationary and active preferences are set, with Apple arguing that it's when the device is actually stationary or active, and Unwired Planet arguing that it is once the device makes a determination that it is stationary or not.

| Term | UP's Proposed Construction | Apple's Proposed Construction |
| --- | --- | --- |
| stationary preferences/active preferences | configuration of settings that may be set when the mobile device determines that it has been/has not been stationary | configuration of user-selectable settings the user wants when the device is stationary/active |

### a.   Whether stationary/active preferences are user-selectable

Claim terms should be given their ordinary and customary meaning as understood by someone skilled in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–1313. The term "preferences" appears to have had a clear meaning in the art: those aspects of a device or program that a user can tailor to her desired configuration. This understanding of "preferences" creates "an objective baseline from which to begin claim interpretation." *Id.* at 1313. And in this instance, that baseline suggests that Apple's construction, which is consistent with the well-understood definition of "preferences," is correct.

Unwired Planet argues that construing stationary and active preferences in this way is inconsistent with the intrinsic evidence, as it both excludes an embodiment and imports a limitation from an embodiment.  First, Unwired Planet points to the claims themselves and argues that, under the principle of claim differentiation, the stationary/active preferences in Claim 26 need not be user selectable. Claim 24 and Claim 29, which, like Claim 26, are dependent claims of Claim 21, require "user-determined preferences." Claim 24, for instance, reads: "A method as recited in claim 21, wherein the stationary preferences and the active preferences are user-determined preferences for the one or more mobile device settings." '491 Patent (Claim 21) 12:64-67. According to Unwired Planet, because this limitation is not found in Claim 26 (or independent Claim 21), and because a limitation in a dependent claim creates the presumption that the limitation is not present in the independent claim, the stationary and active preferences in Claim 26 are not necessarily user-selectable. *See Phillips*, 415 F.3d at 1314–15 ("[T]he presence of a

1   dependent claim that adds a particular limitation gives rise to a presumption that the limitation in

2   question is not present in the independent claim.").

3          This argument would be persuasive if Apple had proposed that stationary and active

4   preferences be construed as "a configuration of user-*determined* settings." But that is not Apple's

5   proposed construction. Rather, Apple's proposed construction allows the user to select the

6   stationary and active preferences, but does not require that the user do so. This construction is

7   consistent with the claims.

8          The same rationale applies to Unwired Planet's embodiment argument that relies on

9   language from the specification, rather than the claims. Unwired Planet points to several examples

10  from the specification to make this same point:

11          In one embodiment, the stationary preferences and the active preferences can be
12          user provided. For example, a user of the mobile device can interact with the
            mobile device to set the stationary and active preferences.

13  *Id.* at 7:46-47
14

15          The stationary preferences can, for example, be user provided.

16  *Id.* at 7:21-22.

17          This language could be interpreted in one of two ways. One possibility is that it describes

18  an embodiment in which *it is possible* for the user to provide the stationary and active preferences,

19  in which case Apple's construction would improperly import a limitation from this particular

20  embodiment into Claim 26. Alternatively, the examples describe an embodiment in which the

21  stationary and active preferences *are* provided by the user, meaning that Apple's construction is

22  not unduly limiting, as it does not require that the settings in fact be provided by the user, but only

23  that the user has the *option* to select them. The Court acknowledges that both interpretations of

24  these examples could be correct. But given the remainder of the intrinsic evidence, as well as the

25  strong presumption that the term "preferences" implies that users can select them, the Court

26  believes the latter interpretation is most appropriate.[6]

27  _____

28  [6] Unwired Planet also makes an embodiment argument by citing the following language from the
    specification: "The settings of the wireless communication device that are adapted can vary. In one
    embodiment, one or more of the settings pertain to user preferences." *Id.* 3:67-4:1. This language

United States District Court
Northern District of California

1    After all, the '491 Patent consistently uses the term "preferences" to refer to those settings

2    that are user-selectable, such as "ringer mode, voice mail greeting, call forwarding, email

3    forwarding, etc." *Id.* 4:4-5. The Patent never uses the term "preferences" in a way that suggests it

4    should be interpreted differently from its ordinary meaning, namely, as favoring one set of

5    configurations over another. In fact, the only way to both adopt Unwired Planet's construction and

6    also stay true to the well-understood definition of "preferences" is to interpret stationary and active

7    preferences as referring to the preferences *of the device itself*. But this not only defies logic, it is

8    also inconsistent with the claims and the specification, which consistently use "preferences" to

9    mean the preferences of the user, not the device.

10    Apple's construction has further support because Claim 21 distinguishes between "settings"

11    and "preferences." The method in Claim 21 describes "(c) setting one or more mobile device

12    *settings* to stationary *preferences*" and "(d) setting one or more mobile device *settings* to active

13    *preferences*." *Id.* (Claim 21) 12:48-49, 12:52-53. In this Claim, the terms "settings" and

14    "preferences" seem to have different meanings. *See Applied Med.* 448 F. 3d at 1333 n.3 ("[T]he

15    use of two terms in a claim requires that they connote different meanings."). But under Unwired

16    Planet's construction they would mean the same thing, as it replaces "preferences" with "settings

17    that may be set." If the inventor intended to describe a method in which the configuration of the

18    phone while stationary or active could not be chosen by the user, there was a clear option

19    available: "setting one or more mobile device settings to stationary/active *settings*." This is not the

20    language the inventor used. The term preferences must be given effect, and therefore the Court

21    adopts the construction of "user-selectable settings the user wants."

22    *b.  When stationary/active preferences are set*

23    The second dispute is whether the stationary and active preferences are set when the device

24    is stationary or active, as Apple argues, or when the device determines that it has been or has not

25    been stationary, as Unwired Planet argues. Clearly, the preferences are set when the device itself

26

27    would be helpful for Unwired Planet if the sentence had read, "In one embodiment, one or more of
the *preferences* pertain to user preferences." Indeed, if the sentence had been constructed as such,

28    it would have indicated that not all preferences are user selectable. But, as is, it merely suggests
that not all settings are user selectable, which does not undermine Apple's proposed construction.

1    makes a determination, as both parties seem to acknowledge. Apple argues, however, that

2    Unwired Planet's construction would be redundant because this fact is already explicit in Claim

3    21, which reads, "setting one or more mobile device settings to stationary preferences when said

4    determining (b) determines that the mobile device has been stationary for at least the first

5    predetermined period of time." *Id.* (Claim 21) 12: 48-49. But this is not the exact same

6    requirement, as the Claim language discusses the device determining it has been stationary after a

7    period of time. The additional clarity offered by a construction which explicitly states that the

8    stationary or active preferences are triggered by the device's determination may be helpful to a

9    jury.

10           Accordingly, the Court adopts the following construction of "stationary/active

11    preferences": "<u>configuration of user-selectable settings the user wants when the device determines</u>

12    <u>that it is/is not stationary</u>."

13

14           **IT IS SO ORDERED.**

15    Dated:  November 3, 2014

16                                         _____

17                                         VINCE CHHABRIA
                                           United States District Judge
18

19

20

21

22

23

24

25

26

27

28