JOSH KREVITT, SBN 208552
jkrevitt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000

H. MARK LYON, SBN 162061
mlyon@gibsondunn.com
Y. ERNEST HSIN, SBN 201668
ehsin@gibsondunn.com
STUART M. ROSENBERG, SBN 239926
srosenberg@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone:    650.849.5300

BROOKE MYERS WALLACE, SBN 259169
bwallace@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:    213.229.7000

*Attorneys for Defendant Apple Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| Unwired Planet, LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>Apple Inc.,<br><br>                    Defendant. | CASE NO. 4:13-cv-4134-VC<br><br>**MOTION TO EXCLUDE UNWIRED PLANET'S SURVEY EXPERT DR. GREG M. ALLENBY, DAMAGES EXPERT MR. ROBERT MILLS, AND THE "EXPERT" DISCLOSURE OF MR. TIM ROBBINS**<br><br>**REDACTED**<br><br>**Hearing:**<br>Date:        April 22, 2015<br>Time:        10:00 AM<br>Place:       Courtroom 4<br>Judge:       Hon. Vince Chhabria |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INDEX OF EXHIBITS .............................................................................................. v

I.  INTRODUCTION ......................................................................................... 1

II.  LEGAL STANDARDS .................................................................................. 3

III.  DR. ALLENBY'S SURVEY AND MEASURES OF VALUE ARE FATALLY FLAWED ....................................................................................................... 3

    A.  The Allenby Survey and Analysis Violate Settled Apportionment Principles by Incorrectly Defining the Technology at Issue ................................. 4

        1.  The '260 Patent does not claim "content sharing" ............................ 4

        2.  The '092 Patent does not claim *how* the location is input into the accused devices ...................................................................... 5

        3.  The '446 Patent does not claim displaying or editing transcribed text ........... 6

    B.  Dr. Allenby's EPP Model Is Unreliable Because Its Assumptions Are Not Valid In This Case ................................................................. 8

IV.  MR. MILLS'S DAMAGES THEORIES SHOULD BE EXCLUDED ................................... 9

    A.  Mr. Mills's Allenby Theory Should Be Excluded Because It Depends on the Allenby Survey ................................................................. 9

    B.  Mr. Mills's Willingness Theory Should Be Excluded ................................. 9

        1.  Mr. Mills's Willingness Theory should be excluded for its reliance on the Allenby Survey ................................................................. 10

        2.  Mr. Mills's Willingness Theory should be excluded for its reliance on a Non-Comparable Agreement and Mr. Robbins's "Expert Disclosure" ......... 10

            a.  Federal Circuit law requires reliance on comparable licenses ........... 10

            b.  The Lenovo Agreement is not comparable, and Mr. Mills's adjustments to it are based on Mr. Robbins's "Expert Disclosure," which should be excluded ......................................... 11

            c.  UP's Microsoft license is the most comparable license in the record ........................................................................ 13

    C.  Mr. Mills's Reliance on the SimpleAir Settlement to Determine a Royalty for the '831 Patent Should Be Excluded ................................................. 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

V.     ADMISSIBILITY OF MR. ROBBINS'S "EXPERT" TESTIMONY ................................... 15

VI.    CONCLUSION ............................................................................................................. 15

CASE NO. 3:12-CV-4134-VC
APPLE'S *DAUBERT* MOTION

# TABLE OF AUTHORITIES

**Page**

## Cases

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014) ........................................................................... 3, 12

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   2014 WL 794328 (N.D. Cal. Feb. 25, 2014) .............................................................. 12

*AVM Techs., LLC v. Intel Corp.*,
   927 F.Supp.2d 139 (D. Del. 2013) ............................................................................ 14

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .................................................................................................... 3

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) ............................................................................... 3, 7

*Finjan Inc. v. Secure Comp. Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) ................................................................................. 10

*Fractus, S.A. v. Samsung*,
   2011 WL 7563820 (E.D. Tex. Apr. 29, 2011) ............................................................. 4

*LaserDynamics, Inc. v. Quanta Comp., Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ............................................... 4, 10, 11, 12, 14, 15

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ........................................................................... 10, 11

*NetAirus Techs., LLC v. Apple, Inc.*,
   No. 10-cv-03257 (C.D. Cal. Oct. 23, 2013) ................................................................ 8

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ........................................................................ 3, 4, 7, 14

*Rude v. Westcott*,
   130 U.S. 152 (1889) .................................................................................................. 14

*Sentius Int'l v. Microsoft Corp.*,
   2015 WL 451950 (N.D. Cal. Jan. 27, 2015) ............................................................. 15

*Smartflash LLC v. Apple, Inc.*,
   No. 13-CV-447 (E.D. Tex. Dec. 23, 2014) .................................................................. 7

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .................................................................................. 3

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) ....................................................... 3, 7, 8, 9, 10, 15

*XpertUniverse Inc. v. Cisco Sys., Inc.*,
   2015 WL 249616 (Fed. Cir. 2015) ........................................................................ 3, 12

## Other Authorities

Shari Diamond, "Reference Guide on Survey Research," REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Fed. Judicial Ctr. 3d ed.) ................................................................................................. 8

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| A | Excerpts of Deposition Transcript of Greg M. Allenby, Ph.D., Feb. 19, 2015 |
| B | Excerpts of Deposition Transcript of Robert Mills, Feb. 26, 2015 |
| C | Order, *NetAirus Techs., LLC v. Apple, Inc.* |
| D | Expert Report of Dr. Greg M. Allenby, Dec. 3, 2014 |
| E | Excerpts of Deposition Transcript of Mark Jones, Ph.D., Feb. 5, 2015 |
| F | Excerpts of Opening Expert Report of Dr. Mark Jones, Appendices A, B, and D, Dec. 3, 2014 |
| G | Order, *Smartflash LLC v. Apple, Inc.* |
| H | Allenby, Greg M. et al., Economic Valuation of Product Features, *Quant Mark Econ* (2014) (*attached as* Ex. 1 to Expert Report of Dr. Greg M. Allenby, Dec. 3, 2014) |
| I | Rebuttal Expert Report of Lynne J. Weber, Ph.D., Jan. 19, 2015 |
| J | Apple iPhone Financials (APL-UP_00196908) |
| K | Excerpts of Deposition Transcript of Unwired Planet 30(b)(6) Timothy Robbins, Oct. 22, 2014 |
| L | Excerpts of Deposition Transcript of Unwired Planet 30(b)(6) Timothy Robbins, Oct. 23, 2014 |
| M | Excerpts of Deposition Transcript of Timothy Robbins, Feb. 12, 2015 |
| N | Excerpts of Expert Report of Robert Mills, Dec. 3, 2014 |
| O | Allenby, Greg M. et al., Valuation of Patented Product Features, *Journal of Law and Economics* (vol. 57, Aug. 2014) (*attached as* Ex. 1 to Expert Report of Dr. Greg M. Allenby, Dec. 3, 2014) |
| P | Shari Diamond, "Reference Guide on Survey Research," REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 383-85, 407-08 (Fed. Judicial Ctr. 3d ed.) |
| Q | Unwired Planet Patent "Scorecard" (UPA_0217331) |
| R | "Unwired Planet's CEO Presents at Patent Purchase Agreement Conference (Transcript)," Seeking Alpha, Jan. 10, 2013, <http://seekingalpha.com/article/1107451-unwired-planets-ceo-presents-at-patent-purchase-agreement-conference-transcript> |
| S | T. Robbins Rule 26(A)(2)(C) Disclosure, Dec. 3, 2014 ("corrected" version, served by UP on Feb. 11, 2015) |

# I.  INTRODUCTION

The opinions of Unwired Planet's ("UP's") experts, Dr. Greg Allenby and Mr. Robert Mills, fail to meet the Federal Circuit's standards for admissible expert testimony in a patent case.  As a result, they are unreliable and should be excluded in their entirety.

First, UP's survey expert, Dr. Allenby, seeks to offer testimony about a "conjoint" survey he conducted that purports to measure the value of the inventive features of the '092, '260, and '446 Patents' asserted claims. But Dr. Allenby neither surveyed features tailored to the claimed inventions nor applied a reliable valuation method to the features he did survey. The failure to survey features limited to the footprint of the asserted claims is undisputed, as UP's own technical expert, Dr. Mark Jones, admits the features Dr. Allenby identified to his survey participants are *not* covered by the claimed inventions, but rather differ significantly from – and include technologies that are *outside the scope of* – the claims. On this basis alone, Dr. Allenby's opinions should be excluded in their entirety.

From this flawed survey, Dr. Allenby then calculates several measures of "value" for each of the surveyed features, including what he calls an "equilibrium price premium" ("EPP"), which supposedly represents the amount that Apple would be willing to pay to include each of the features in its products. But Dr. Allenby's EPP is not a measure of value generally accepted in patent damages analysis and, more importantly, depends on assumptions that are wholly unsupported by, and that actually *contradict*, the facts in this case.

For his part, Mr. Mills, UP's principal damages expert, presents two different theories for deriving the reasonable royalty that UP and Apple would have hypothetically negotiated for the '092, '260, and '446 Patents, and one theory for deriving the reasonable royalty for the '831 Patent. His first theory pertaining to the '092, '260, and '446 Patents relies explicitly and entirely on Dr. Allenby's survey results and EPP calculations (the "Allenby Theory"). Because those survey results and EPP calculations are *contrary* to the accused features of the '092, '260, and '446 Patents and the facts of this case, Mr. Mills's Allenby Theory is unusable and should be excluded.

Mr. Mills's second theory pertaining to the '092, '260, and '446 Patents relies on two inputs to frame the appropriate range of a reasonable royalty for those patents: (1) what Apple would have been "willing to pay" to license them, and (2) what UP would have been "willing to receive" as a

license royalty (the "Willingness Theory"). The first input to this theory is fatally flawed because, like the Allenby Theory, it is derived wholesale from Dr. Allenby's survey results and EPP figures, which, as discussed above, are based on the *wrong surveyed features*. Without this first input, Mr. Mills's Willingness Theory lacks one of its two necessary starting points and is therefore unreliable.

Further, Mr. Mills's calculation of the second input – what UP would have been "willing to receive" for a license – is also wrong ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████       ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████. The lack of comparability of this Lenovo license is confirmed by the fact that Mr. Mills is forced to employ a tortuous six-step "adjustment process" to transform the Lenovo license into an allegedly comparable license for the patents at issue in this case. Moreover, Mr. Mills's basis for making each of these adjustments consists primarily of self-serving statements from UP's own Vice President of Licensing, Timothy Robbins. In fact, much of Mr. Mills's basis for his six-step adjustment stems explicitly from statements disclosed for the first time in an "Expert Disclosure" that UP submitted three weeks after the close of fact discovery for Mr. Robbins under Fed. R. Civ. P. 26(a)(2)(C). Ex. S. But during his "expert" deposition, Mr. Robbins admitted that he is *not* qualified to provide *and is not providing* expert testimony in this case. Thus, Mr. Robbins's "Expert Disclosure" should be disregarded and stricken in its entirety, and the facts and opinions contained therein cannot form the basis for Mr. Mills's six-step adjustment. Without them, Mr. Mills has no basis for his adjustments, and his Willingness Theory falls apart.

Finally, Mr. Mills presents a theory concerning the '831 Patent (which was not surveyed by Dr. Allenby) that is unreliable because it rests entirely upon a settlement agreement between Apple and SimpleAir that has critical economic differences from this case, for which Mr. Mills fails to account. The Federal Circuit has held that reliance on a settlement agreement to determine a

---

[1] SEPs are patents that would "necessarily [be] infringed" by use of a technology that is required to comply with certain technical standards. Ex. K, 77:9-25.

reasonable royalty is unsound and unduly prejudicial where the analysis does not account for such differences, and where another comparable license agreement can be used instead, as is the case here. Thus, Mr. Mills's theory based on the SimpleAir agreement is unsalvageable and should be excluded.

## II. LEGAL STANDARDS

The trial court is the gatekeeper for expert testimony pursuant to Fed. R. Evid. 702, tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993). The Federal Circuit has explained that gatekeeping under *Daubert* is particularly important with respect to damages in a patent case, where the patentee bears the burden of proving damages and is *required* to "give evidence tending to separate or apportion . . . the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). "To properly carry this burden, the patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Id.* (quoting *Daubert*, 509 US at 591); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("trial court must carefully tie proof of damages to the claimed invention's footprint in the market place"). To avoid overvaluing a patent's contribution to a multi-component product (like the accused iOS devices here), the Federal Circuit requires that the "ultimate combination of royalty base and royalty rate . . . reflect the value attributable to the *infringing* features of the product, *and no more*." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (emphasis supplied). A damages methodology that fails to comport with "settled principles of apportionment," or that is based upon unreliable principles or methods, or legally insufficient facts and data is unsound, unreliable, and should not be presented to a jury. *E.g., VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014); *see also XpertUniverse Inc. v. Cisco Sys., Inc.*, 2015 WL 249616, at *6 (Fed. Cir. 2015) (non-precedential) (rejecting expert testimony "predicated upon patentee's management's 'irrationally exuberant' opinions).

## III. DR. ALLENBY'S SURVEY AND MEASURES OF VALUE ARE FATALLY FLAWED

Dr. Allenby's survey and purported measures of "value" should be excluded because he failed

to measure the value of *the claimed inventions*. Like other evidence put forth to determine a reasonable royalty, survey evidence is inadmissible when the survey does not measure the value of technology tied "directly" to the footprint of the claimed invention, because such evidence "confuses the issues" and "[a]llowing the jury to hear such evidence . . . risks 'compensation for infringement [that] punishes beyond the reach of the statute.'" *See Fractus, S.A. v. Samsung*, 2011 WL 7563820 at *1 (E.D. Tex. Apr. 29, 2011) (quoting *ResQNet*, 594 F.3d at 869). Moreover, Dr. Allenby's and Mr. Mills's failure to remove the value of *admittedly non-infringing technology* captured in Dr. Allenby's results is an independent basis for exclusion under the Court's role as a gatekeeper for expert testimony. *See LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).[2]

**A.    The Allenby Survey and Analysis Violate Settled Apportionment Principles by Incorrectly Defining the Technology at Issue**

**1.    The '260 Patent does not claim "content sharing"**

Dr. Allenby's survey measured the value of "content sharing," which he defined as a method of "transferring songs, movies, and applications, across devices (e.g., phone, table, desktop computer) owned by the user." Ex. D, 25. In particular, Dr. Allenby measured the value of transferring the content "automatically," as opposed to "manually," which was defined as "requir[ing] a physical connection between the devices (e.g., a cable)." *Id.*; Ex. A, 212:2-12. But this is *not* what this Court has explained is the subject of the asserted '260 Patent claims – namely, "an invention for 'provisioning' the features and services that are available on mobile communication devices." *Markman* at 3. This "provisioning" is further defined to mean "enabling or modifying communications capabilities." *Markman* at 7. As such, the '260 Patent does not extend to enabling the different and significantly more comprehensive "content sharing" feature, as measured by Dr. Allenby.[3]

---

[2]    Dr. Allenby uses his survey results to calculate Apple's "willingness-to-pay," a "willingness-to-buy," and an equilibrium price premium ("EPP"). Ex. D, 7-8. Mr. Mills relies on Dr. Allenby's "willingness-to-buy" calculations in his analysis of *Georgia-Pacific* Factor 13. Ex. N, 188-200. If Dr. Allenby's survey is found to be unreliable, then so are each of these measurements.

[3]    Notably, after the Court's construction limited "provisioning" to "communications capabilities," UP dropped its prior allegations against the iTunes Store and iCloud, and now only contends that the '260 Patent is infringed by use of the App Store to download apps that allegedly enable or modify communications capabilities. Ex. F, app. B, 41.

The gross overbreadth of Dr. Allenby's "content sharing" definition is confirmed by at least the following:  *First*, UP's technical expert, Dr. Jones, admits that the asserted claims of the '260 Patent *do not even relate* to the general concept of "content sharing," let alone to the "sharing" of *songs and movies*, which UP no longer accuses of infringement. Ex. E, 151:13-17, 153:17-22, 154:5-13, 155:9-19, 157:2-10, 159:10-14. In fact, Dr. Jones admits that Dr. Allenby's definition of "content sharing" is "inaccurate" "to the extent it is taken to mean Apple's infringing [the '260 Patent] . . . by transferring songs and movies." *Id.* 157:24-158:7.[4] *Second*, while Dr. Allenby verified that the transfer of *all* applications is within the scope of the surveyed feature (Ex. A, 210:6-211:17, 222:23-223:10), Dr. Jones admits that only applications that enable or modify communications capabilities are within the scope of the asserted claims. Ex. E, 145:23-25. *Third*, UP has effectively admitted that Dr. Allenby measured the value of a feature UP does not even accuse of infringement: While Dr. Allenby measured transferring content between *all* devices, including desktop computers, regardless of operating system (Ex. A, 211:18-212:7, 212:15-214:3, 225:10-226:9), Dr. Jones testified that transferring songs, applications, or movies from a user's iOS device to any other type of device, like a desktop computer, is *neither* disclosed in the '260 Patent *nor* accused of infringement. Ex. E, 147:3-148:17, 153:17-22, 154:5-13. And for his part, Mr. Mills admits that he did *not* attempt to subtract out the value of these admittedly non-infringing features from the measures of "value" calculated by Dr. Allenby. Ex. B, 206:13-19, 207:7-208:23. For at least these reasons, Dr. Allenby's survey and analysis of the '260 Patent are not tied to the claimed invention's footprint and should be excluded.

**2.    The '092 Patent does not claim *how* the location is input into the accused devices**

Dr. Allenby's survey measured the value of "location availability" as follows: "[t]he ability of a smartphone to automatically determine its own location," as opposed to requiring users to "input

---

[4]  Nevertheless, Dr. Allenby's inaccurate description of the patent is precisely the scope of coverage on which Dr. Allenby *intended* survey takers to base their answers. Ex. A, 207:4-208:25, 209:21-210:5, 220:6-221:21, 222:7-223:10, 224:11-225:9. In fact, Dr. Allenby testified that he defined the "content sharing" attribute to "specifically talk about a method of transferring songs" because that definition was "so much more concrete" and was "so much more understandable" than a previous definition that had not included such language. *Id.* 203:4-204:12. Regardless, UP has admitted that transferring songs and movies is *not* within the scope of the asserted claims, and therefore any measurement of a user's interest in transferring songs or movies cannot be probative of the value of the asserted claims of the '260 Patent.

their location . . . manually," so that when automatically available, "the [user's] location can . . . be used by mapping, camera, social and other applications." Ex. D, 25. Dr. Allenby admits that his survey distinguished between manual and automatic input of location *regardless* of whether *multiple* sources of location finding equipment ("LFEs") were used. Ex. A, 232:18-234:6; 236:7-21. But again, this is *not* what the asserted claim of the '092 Patent actually covers – namely, a method for locating a mobile device where "the invention gathers inputs about the location of the [device] from *multiple* [LFEs]" like GPS, etc. *Markman* at 12 (emphasis added). Manual versus automatic input of information is irrelevant. Dr. Allenby's definition is also inconsistent with UP's own characterization of the asserted claim: one which *requires* the use of *multiple* LFEs. *E.g.*, Ex. D, 16. Dr. Jones verified that under the '092 Patent, a user's location would be "automatically" available so long as any one location input was available (Ex. E, 73:20-74:1), but the *use of only one location input would not infringe*. *Id.* 66:16-20, 67:5-9, 67:23-68:1. Furthermore, Mr. Mills admits that he did not attempt to subtract out the value of the location information being made available automatically to the camera or a map application (Ex. B, 215:10-216:17), even though that technology is encompassed by the survey definition, but is not accused of infringement. For at least these reasons, Dr. Allenby's survey and analysis of the '092 Patent are not tied to the claimed invention's footprint and should be excluded.

### 3. The '446 Patent does not claim displaying or editing transcribed text

Dr. Allenby testified unequivocally that his survey *exclusively* measured the value to the consumer of *displaying and using* the text that had been transcribed from the user's speech input. Ex. A, 228:19-23; Ex. D, 26. But that is *not* what this Court has explained the asserted claims of the '446 Patent cover: namely, a remote speech recognition application that is accessed by a mobile device over a "voice channel" where the speech is transcribed into a data file and sent back to the mobile device over a data channel. *See Markman* at 19-24. Indeed, Dr. Jones confirms that what Dr. Allenby says he measured – displaying the transcribed text and the ability to use or edit the text – is *not* within the scope of the asserted claims. Ex. E, 333:4-9, 333:21-25. Moreover, although Dr. Jones acknowledges that the Court's claim construction requires the speech to be sent over a "voice channel" (*Id.* 332:4-21), Dr. Allenby did not survey the value of using only a voice channel. Ex. A, 229:23-231:9. In fact, Dr. Allenby admits that whether the application "used a voice channel to

communicate with the remote server versus a data channel" was "*literally meaningless to an average smartphone user.*" Ex. A, 230:24-231:9 (emphasis supplied). In addition, while the "asserted claims require that the . . . speech recognition take place on a server" (Ex. E, 328:7-21; Ex. F, app. D, 6-7), both Dr. Allenby and Dr. Jones admit that the use of a server is *not* what Dr. Allenby surveyed. Ex. A, 228:25-229:20; Ex. E, 330:21-332:3. According to Dr. Jones, "[a] user doesn't perceive that a remote server is involved in the speech recognition process, period." Ex. E, 331:17-19. Dr. Allenby concurred, admitting that this critical component of the asserted claims is, in fact, "invisible to the respondent." Ex. A, 229:14-20.[5] Again, for his part, Mr. Mills admits that he did *not* subtract out the value of the technology that enables making transcribed text available for editing in a display, or the ability to edit that text, from the measures of "value" calculated by Dr. Allenby (Ex. B, 213:3-8, 213:17-23, 215:10-13), even though Dr. Jones admits that such technology is *not* within the scope of the asserted claims. Ex. E, 333:4-9, 333:21-25.

In sum, the measures of "value" Dr. Allenby calculates for the '260, '092, and '446 Patents based on his survey results, including the EPP, are overbroad, and should be excluded. *See Ericsson*, 773 F.3d at 1226; *ResQNet*, 594 F.3d at 869. Moreover, because neither Dr. Allenby nor Mr. Mills apportioned the value of the patented technology from the non-patented technology included in the surveyed features, their opinions clearly violate the Federal Circuit's "settled principles of apportionment" and should not be presented to the jury. *See VirnetX*, 767 F.3d at 1328; Ex. G (Order at 5, *Smartflash LLC v. Apple, Inc.*, No. 13-CV-447 (E.D. Tex. Dec. 23, 2014) (D.I. 374) (excluding Mr. Mills's opinion where he had "admitted that he did not apportion between the contribution of the patents and other complementary assets in the accused devices")).

---

[5] It can be argued that both Dr. Allenby's and Dr. Jones's testimony conclusively confirm the lack of *any* value to a consumer of sending the speech over a voice channel rather than a data channel. Therefore, Dr. Allenby *intentionally* defined his survey attribute to be meaningful to the survey takers – in this case, consumers – while disregarding the need to tie the survey attribute to the asserted claims. Indeed, Dr. Allenby confirmed that he would have had to survey different people (*e.g.*, engineers operating the back-end servers and systems) if he had wanted to measure value of the claimed invention. Ex. A, 230:6-231:9.

**B.      Dr. Allenby's EPP Model Is Unreliable Because Its Assumptions Are Not Valid In This Case[6]**

Federal Circuit law requires validation of the assumptions underlying a damages expert's analysis to the facts of the case. *See VirnetX*, 767 F.3d at 1332. But the reliability of Dr. Allenby's EPP model, which is a new model entirely of his own creation (Ex. A, 36:2-3, 39:2-13, 41:1-43:16), depends on a number of assumptions that have not been and cannot be validated under the facts of this case. *First*, Dr. Allenby assumes that smartphone makers optimize prices to maximize profits according to static "Nash Price Competition." Ex. H, 425; Ex. D, 48. There is no indication that either Dr. Allenby or Mr. Mills attempted to justify the use of this game theory, or any of the premises on which the theory itself relies.[7] *Second*, Dr. Allenby assumes that smartphone sellers are able to (and do) set prices to maximize profits when the surveyed features are introduced. Ex. A, 276:23-277:2. In reality a smartphone seller's ability to unilaterally increase prices to maximize profits is limited because retail prices for smartphones with a contract are set in conjunction with carriers, which Dr. Allenby fails to take into account. Ex. I, 94. *Third*, Dr. Allenby assumes that all of the smartphones in his survey have a constant marginal cost of $100. Ex. H, 425; Ex. D, 48. This is incorrect at least in the case of iPhone 5s, the Apple model Dr. Allenby surveyed, ███████████████████████████████ ███████████████████████. Ex. J; Ex. A, 278:5-7. *Fourth*, Dr. Allenby assumes that each smartphone seller sells only one smartphone model at a time (Ex. H, 425; Ex. D, 48), which is

---

[6]   Dr. Allenby's analysis suffers from additional deficiencies that seriously undermine the validity of his results, including an admitted failure to analyze nonresponse bias (*compare* Ex. A, 140:18-141:3, 158:7-13, 161:18-162:6, 164:19-165:12, *with* Ex. C (Order at 5, *NetAirus Techs., LLC v. Apple, Inc.*, No. 10-cv-03257 (C.D. Cal. Oct. 23, 2013) (D.I. 524) *and* Shari Diamond, "Reference Guide on Survey Research," Reference Manual on Scientific Evidence, 383-85, 407-08 (Fed. J. Ctr. 3d ed.) (Ex. P)), and an admitted failure to verify that the survey respondents were drawn from a representative population (*compare* Ex. A, 109:5-8, 109:15-110:12, 112:2-10, 117:12-119:14, *with* Ex. O, 13 (Dr. Allenby writing, "No survey evidence should be considered admissible or relevant unless evidence of representativeness is provided.") *and* Ex. P, 377-79).

[7]   Nash Price Competition is a "game theoretic method of finding an equilibrium" price that "define[s] the way in which the players in the game take turns and . . . what it is they know about each other." *See* Ex. A, 276:13, 281:22-282:23. Dr. Allenby acknowledged that there were other "rules of engagement" like a "Bertrand solution or Cournot" or other "different forms" of game theoretic methods available for finding an equilibrium price (*id.*), but at no point did Dr. Allenby or Mr. Mills attempt to justify the game theoretic method Dr. Allenby chose to employ in this case. *See id.*; Ex. B, 219:23-220:11. Thus, adopting the Nash theory without justification for why it should be used in this case is arbitrary, and runs afoul of Federal Circuit law. *See, e.g.*, *VirnetX*, 767 F.3d at 1332.

8

1   simply incorrect. Ex. I, 92 (█████████████████████████

2   █████████████████████████████████████████████████

3       Dr. Allenby makes no effort to ensure that any of the above assumptions fit the facts of this

4   case and, as noted, many simply do not. By failing to establish the accuracy of the underlying

5   assumptions of Dr. Allenby's economic model, and by relying on incorrect assumptions generally,

6   neither Dr. Allenby nor Mr. Mills can establish that Dr. Allenby's EPP calculations are sound.

7   Indeed, Dr. Allenby admits that *he does not know* what would happen to his model or his results if his

8   assumptions – and, in particular, his assumptions regarding whether the firms "employ[ed] a Nash

9   solution" or used "some other game theoretic method of finding an equilibrium point" – were wrong.

10  Ex. A, 279:2-16; *see also* Ex. A, 275:21-276:13. Dr. Allenby himself has written that his EPP

11  "calculations are accurate only if we can estimate the industry demand system, measure the marginal

12  cost of feature enhancement, and correctly characterize the nature and extent of competition in the

13  industry." Ex. O, 2. As a result, Dr. Allenby's EPP model runs afoul of not only Federal Circuit law

14  (*see VirnetX*, 767 F.3d at 1328), but also Dr. Allenby's own scholarship. Because Dr. Allenby and

15  Mr. Mills have failed to ensure that Dr. Allenby's model yields accurate, reliable results, Dr.

16  Allenby's EPP calculations, and any reliance thereon, should be excluded.

### IV.    MR. MILLS'S DAMAGES THEORIES SHOULD BE EXCLUDED

**A.    Mr. Mills's Allenby Theory Should Be Excluded Because It Depends on the Allenby Survey**

19      Mr. Mills's Allenby Theory relies explicitly and entirely on Dr. Allenby's survey and EPP

20  figures to calculate a reasonable royalty for the '092, '260, and '446 Patents. Ex. N, 228-31. As

21  discussed above, Dr. Allenby's survey and measures of value are unsound and should be excluded.

22  Consequently, the Court should also exclude Mr. Mills's Allenby Theory.

**B.    Mr. Mills's Willingness Theory Should Be Excluded**

24      Mr. Mills's Willingness Theory must be excluded because it relies on two unreliable inputs as

25  its foundation. If either of the two inputs, either Dr. Allenby's EPP figures or UP's 2014 license with

26  Lenovo (and Mr. Robbins's adjustments thereto), are not "known," or reliable, Mr. Mills admits that

27  his Willingness Theory cannot stand. *See* Ex. B, 113:14-117:3.

28

1.     **Mr. Mills's Willingness Theory should be excluded for its reliance on the Allenby Survey**

The first input to Mr. Mills's Willingness Theory is what Apple purportedly would have been "willing to pay" UP for a license to the '092, '260, and '446 Patents. Ex. N, 212-28. For this, Mr. Mills adopted Dr. Allenby's EPP figures, which depend on the Allenby Survey. *Id.* 212-13; Ex. B, 113:14-117:3. For the reasons discussed in Part III.A, the Court should exclude Dr. Allenby's survey and his flawed analysis. Consequently, the Court should also exclude Mr. Mills' Willingness Theory.

2.     **Mr. Mills's Willingness Theory should be excluded for its reliance on a Non-Comparable Agreement and Mr. Robbins's "Expert Disclosure"**

The second input to Mr. Mills's Willingness Theory is what UP purportedly would have been "willing to receive" or accept for a license to the '092, '260, and '446 Patents. Ex. N, 214. For this, Mr. Mills looks to UP's past licenses. Mr. Mills *admits* that the most comparable license in the record, UP's 2011 license with Microsoft, is "instructive as to the value associated with the patents-in-suit to Apple." *Id.* 66. Inexplicably, Mr. Mills then *ignores* the Microsoft license completely in favor of relying on a non-comparable license, UP's 2014 license with Lenovo, in an obvious effort to inflate his damages estimates beyond the value of the claimed inventions. This is improper and prejudicial, and his opinions should be excluded.

a.     **Federal Circuit law requires reliance on comparable licenses**

It is settled law that any licenses or settlements relied upon in a reasonable royalty analysis must be "sufficiently comparable to the hypothetical license at issue." *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1325 (Fed. Cir. 2009). Indeed, "[a]ctual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *LaserDynamics,* 694 F.3d at 79. Where they involve different patents from those asserted and/or different parties from those at the hypothetical negotiation, such licenses or settlements *must* be shown to be both technologically and economically comparable in order to be relied upon, and the comparability analysis must be performed in a sound, reliable manner. *See VirnetX,* 767 F.3d at 1330 (quoting *Finjan Inc. v. Secure Comp. Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010)). This is particularly so when the licenses or settlements being relied upon occurred before or after the hypothetical negotiation. *Id.* Reliance on non-comparable and irrelevant licenses in an

10

attempt to artificially inflate the reasonable royalty analysis is improper and merits exclusion at the *Daubert* stage. *LaserDynamics*, 694 F.3d. at 80.

> **b.    The Lenovo Agreement is not comparable, and Mr. Mills's adjustments to it are based on Mr. Robbins's "Expert Disclosure," which should be excluded**

The Lenovo license is *not* "sufficiently comparable" to the hypothetical negotiation in this case to be used as the foundation for Mr. Mills's damages theory. *See Lucent*, 580 F.3d at 1325. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

To account for the mismatch between the scope of the license hypothetically negotiated between UP and Apple and the scope of the Lenovo license, Mr. Mills is forced to tortuously adjust the royalty rate of the Lenovo license ████████████)[8] *six different ways*. Ex. N, 214-28. The fact that such adjustments are necessary confirms the non-comparability of the Lenovo agreement. Furthermore, each of Mr. Mills's adjustments relies on opinions or "facts" contained in Mr. Robbins's purported "Expert Disclosure" (Ex. S, which should be excluded, as discussed below). *None* of these adjustments is based on sound or reliable evidence, as at their core, each is dependent on Mr. Robbins, who has testified that he is *not* an expert in patent valuation (Ex. K, 116:8-22), and that he has a direct financial stake in the outcome of this litigation. *Id.* 71:13-15, 127:11-24. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[8] ████████████████████████████████████████████████

1

2

3

4

5

6          ██████████████████████████████  The ultimate royalty Mr. Mills calculates for the '092, '260, and '446

7   Patents thus depends on unrelated patents, unrelated litigations, and a date that is years after the

8   hypothetical negotiation (November 2014, when Mr. Robbins created his "scorecard"). *See* Ex. M,

9   76:23-77:4, 163:24-165:13; Ex. B, 181:20-182:13. *See LaserDynamics*, 694 F.3d at 76-77

10  (remanding for a new trial on damages where the damages opinion was pegged to the wrong date).[9]

11

12

13

14

15

16

17

18

19

20

21                                                                    Mr. Mills does not

22  (because he cannot) take these details into account in his analysis because they plainly undermine his

23  entire damages theory. For at least these reasons, the Lenovo license, and Mr. Mills's reliance on it,

24  should not be presented to the jury. *See Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 794328 at

25  *7-8 (N.D. Cal. Feb. 25, 2014) (excluding reliance on non-comparable license, despite attempts to

26  _____

27  [9]  For at least these reasons, this "scorecard" methodology is arbitrary, unsound, and must be

28      excluded. *Apple*, 757 F.3d at 1318; *XpertUniverse*, 2015 WL 249616, at *6.

account for the differences by adjusting its terms).[10]

        **c.**      **UP's Microsoft license is the most comparable license in the record**

**C.**      **Mr. Mills's Reliance on the SimpleAir Settlement to Determine a Royalty for the '831 Patent Should Be Excluded**

      Mr. Mills's opinion regarding what Apple and UP would have agreed to pay in 2009 for the

---

[10]

[11]

[12] The parties agree that the hypothetical negotiations for the four asserted patents would have occurred in 2008 (for the '092 and '260 Patents), in 2009 (for the '831 Patent), and in 2011 (for the '446 Patent). The parties, and Mr. Mills, further agree that the hypothetical negotiation would have been the same in 2011 as in 2008. *See* Ex. B, 32:13-21.

13

'831 Patent is also entirely unreliable. For this, Mr. Mills also looks at past license agreements, but Mr. Mills chooses to ignore *all* of UP's license agreements *to the patents-in-suit*, such as the Microsoft license, and instead relies exclusively on a 2012 agreement between Apple and SimpleAir *to settle* a case on the eve of trial for ███████, for a patent portfolio relating, at a high level, to push notifications. *See* Ex. B, 64:10-19. On such reliance the Federal Circuit is clear: "The propriety of using prior settlement agreements to prove the amount of a reasonable royalty *is questionable*." *LaserDynamics*, 694 F.3d at 77 (citing *Rude v. Westcott*, 130 U.S. 152, 164 (1889)) (emphasis supplied). Indeed, settlement agreements may *only* be used to establish a reasonable royalty "under certain limited circumstances" – that is, *only* when it is established as "the most reliable license in the record." *Id.* 77 (*quoting ResQNet*, 594 F.3d at 872). Mr. Mills has not established this, because he cannot. In fact, Mr. Mills failed to perform any analysis whatsoever of the litigation that led to this settlement, a failure that *in and of itself* merits exclusion *even if* the settlement agreement was the most reliable license in the record (and it is not). *See AVM Techs., LLC v. Intel Corp.*, 927 F.Supp.2d 139, 143-44 (D. Del. 2013). For example, his report contains "no analysis of factors that might have affected the value of the settlement," including the amount of damages sought, whether willfulness was at issue (with the resulting possibility of treble damages), and whether sanctions had been imposed. *Id.* Moreover, Mr. Mills admits that he did not consider, and does not know, the extent to which the cost of the trial itself, the cost of any post-trial briefing or appeals, and the uncertainty regarding a jury verdict affected Apple's and SimpleAir's negotiations.[13] Ex. B, 77:16-78:25, 80:10-81:11. Failure to consider factors like these before relying on a single settlement agreement to support a reasonable royalty opinion, as Mr. Mills has done here, is "completely speculative" and unreliable, and thus merits exclusion under *Daubert*. *See AVM*, 927 F.Supp.2d at 143-44.

In addition, the SimpleAir settlement is *not* the "most reliable license in the record" (see discussion of Microsoft license, Part IV.B.2.c), and thus may not be the basis of a reasonable royalty

---

[13] Further, there is no indication that Mr. Mills considered the effect on the parties' negotiations of any of the myriad events that occurred in the days leading up to trial, such as the last-minute settlement of Apple's co-defendant, Research In Motion, the assignment of the case to a special master, or the conduct of court-ordered mediation, all of which can be discerned from an examination of the public docket.

for the '831 Patent. Mr. Mills failed to account for the differences in technological scope between the patents licensed to Apple by way of the SimpleAir settlement, and the '831 Patent. *See VirnetX*, 767 F.3d at 1330. In fact, as UP's technical expert admits, the SimpleAir patents are far broader in scope than the '831 Patent. Ex. F, app. A, 100 ("[T]he SimpleAir patents relate[] generally to the sending and delivery of messages over the Internet" while the "'831 Patent is more focused on securing data transmissions."). In addition, Mr. Mills failed to account for the difference in scope of products covered by the SimpleAir settlement (which included Apple's Mac computers), compared to this case, in which UP has accused only Apple's iOS devices. Ex. B, 95:13-97:18. Ultimately, Mr. Mills does not bother to explain why, at the hypothetical negotiation, Apple would have agreed to pay UP, an admittedly litigious company, ▮▮▮▮▮▮ for a license to a single patent that has a far narrower scope than the SimpleAir patents and covers fewer products, and still remain vulnerable to others of UP's patents (including those at issue here). Ex. B, 88:16-89:3, 94:13-95:10. In light of these failures, just as in *LaserDynamics*, the probative value of the SimpleAir settlement is "dubious" and "greatly outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury." *LaserDynamics*, 694 F.3d at 78 (district court erred by not excluding a settlement that was "far from being 'the most reliable license in the record'"); *Sentius Int'l v. Microsoft Corp.*, 2015 WL 451950, at *7 (N.D. Cal. Jan. 27, 2015) (precluding Mr. Mills from relying on a settlement agreement).

## V. ADMISSIBILITY OF MR. ROBBINS'S "EXPERT" TESTIMONY

Finally, Apple moves to exclude the entire Fed. R. Civ. P. 26(a)(2)(C) "expert" disclosure of UP's Vice President, Tim Robbins. Ex. S. Mr. Robbins admits that he is *not* an expert for UP and does *not* expect to provide expert testimony at trial. Ex. M, 8:5-9:7. UP should not be permitted to belatedly offer factual evidence it was obligated to provide during fact discovery, under the guise of expert discovery. Therefore Apple respectfully asks the Court to exclude the entire disclosure, and any reliance thereon, under Rule 702 and to order that Mr. Robbins not be permitted to testify as an expert.

## VI.    CONCLUSION

For the foregoing reasons, Apple respectfully asks the Court to exclude the testimony of Dr. Allenby, Mr. Mills, and Mr. Robbins under *Daubert*, Rule 702, and Rule 403.

Dated: March 16, 2015

JOSH KREVITT, SBN 208552
jkrevitt@gibsondunn.com
H. MARK LYON, SBN 162061
mlyon@gibsondunn.com
Y. ERNEST HSIN, SBN 201668
ehsin@gibsondunn.com
STUART M. ROSENBERG, SBN 239926
srosenberg@gibsondunn.com
BROOKE MYERS WALLACE, SBN 259169
bwallace@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP


By:   _____/s/ *Brooke Myers Wallace*_____
Brooke Myers Wallace, SBN 259169
bwallace@gibsondunn.com

*Attorneys for Defendant Apple Inc.*

CASE NO. 3:12-CV-4134-VC
APPLE'S *DAUBERT* MOTION

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Civil L.R. 5.4 and will be served upon all counsel of record for the parties who have consented to electronic service in accordance with Civil L.R. 5.4 via the Court's ECF system.

Dated:  March 16, 2015                    GIBSON, DUNN & CRUTCHER LLP


                                          By: /s/ Brooke Myers Wallace
                                              *Attorney for Defendant Apple Inc.*

CASE NO. 3:12-CV-4134-VC
APPLE'S *DAUBERT* MOTION