REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  Josh Krevitt, #208552
   jkrevitt@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   200 Park Ave.
3  New York, NY 10166-0193
   Telephone: 212.351.4000
4  Facsimile: 212.351.4035

5  H. Mark Lyon, # 162061
   mlyon@gibsondunn.com
6  Y. Ernest Hsin, # 201668
   ehsin@gibsondunn.com
7  Stuart M. Rosenberg, # 239926
   srosenberg@gibsondunn.com
8  GIBSON, DUNN & CRUTCHER LLP
   1881 Page Mill Rd.
9  Palo Alto, CA 94304-1211
   Telephone: 650.849.5300
10 Facsimile: 650.849.5333

11 *Attorneys for Defendant Apple Inc.*

12                **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14                  **SAN FRANCISCO DIVISION**

15 UNWIRED PLANET LLC, a Nevada limited      **Case No. 3:13-cv-4134-VC (JCS)**
   liability company,
16
                    Plaintiff,
17                                            **APPLE INC.'S MOTION FOR SUMMARY
                                              JUDGMENT AND OPPOSITION TO**
18       v.                                   **UNWIRED PLANET'S MOTION FOR
                                              SUMMARY JUDGMENT**
19 APPLE INC., a California corporation,
                    Defendant.
20                                            **Judge: Hon. Vince Chhabria**

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

<u>Page</u>

I.    INTRODUCTION ..................................................................................1

II.    OPPOSITION TO MOTION ON INEQUITABLE CONDUCT .............................................1

    A.    Compelling Evidence Shows that the '260 Inventors Intended to Deceive the PTO ............................................................................2

    B.    The UP.Link System is Highly Material .................................................3

III.    OPPOSITION TO MOTION ON THE GSM PRIOR ART ..........................................4

IV.    OPPOSITION TO MOTION ON THE "PROPOSAL FOR LFS" ....................................5

V.    OPPOSITION AND CROSS-MOTION ON APPLE'S ON-SALE BAR DEFENSE ...................................................................................6

    A.    Introduction ...................................................................................6

    B.    Background .....................................................................................7

        1.    The Motorola Agreement ..........................................................8

        2.    Further Development of LFS Software By Unwired Planet.......................................................................................8

        3.    Additional Sales and Marketing Efforts.................................9

    C.    Analysis........................................................................................10

        1.    Under Established Case Law, An Offer For Sale Can Precede The "Ready for Patenting" Date And Even The Conception Date.........................................................................10

        2.    There Is No Dispute That The Invention Was Ready For Patenting By November 3, 1997........................................11

        3.    Unwired Planet Entered Into Numerous Commercial Offers for Sale ...........................................................................11

VI.    OPPOSITION AND CROSS-MOTION ON THE MARKING REQUIREMENT .................................................................................14

    A.    The Court Should Deny Unwired Planet's Motion on Marking.......................................................14

    B.    The Court Should Grant Summary Judgment of No Pre-suit Damages .........................16

VII.    OPPOSITION TO MOTION ON LACHES................................................................16

    A.    Unwired Planet's Delay in Bringing Suit was Unreasonable and Inexcusable....................................................17

    B.    Unwired Planet's Delay Prejudiced Apple .............................................18

VIII.    APPLE'S MSJ OF NON-INFRINGEMENT OF THE '831 PATENT ...............................18

    A.    Introduction .................................................................................19

    B.    Background .................................................................................19

        1.    The '831 Patent Requires a *Narrowband Channel* and a *Wideband Channel* ...................................................................19

        2.    Overview of APNS and Unwired Planet's Infringement Theory ........................................................................................20

    C.    Argument ....................................................................................21

1.   APNS Does Not Use Two Distinct Communication
Channels .................................................................. 21

2.   The Alleged "Narrowband Channel" is Not Slower (Let
Alone Meaningfully Slower) Than the "Wideband
Channel" .................................................................. 22

3.   Dr. Jones's Assertion that "Header Information Is Not
Data" Cannot Avoid Summary Judgment ............... 24

4.   Unwired Planet Cannot Prove Infringement Even
Accepting Dr. Jones's Flawed Assumptions ............ 25

IX.   APPLE'S MSJ OF NON-INFRINGEMENT OF THE '446 PATENT ................ 26

A.   Introduction ....................................................................... 26

B.   Background ......................................................................... 27

1.   The '446 Patent Is Directed To a Specific Technique of
Server-Side Speech Recognition Using a "Voice
Channel" To Transmit Voice Input .......................... 27

2.   The Court's Claim Construction Requires Using a
"Voice Channel" ...................................................... 28

C.   Argument ............................................................................ 28

1.   Siri Only Uses Data Channels ................................. 28

2.   Siri Communications Are Not Transmitted Over a
Voice Channel .......................................................... 30

3.   Unwired Planet's Tautological Infringement Theory
Would Render the Courts' Claim Construction
Meaningless ............................................................. 32

X.   APPLE'S MSJ OF INVALIDITY OF THE '446 PATENT ........................... 32

A.   Background ......................................................................... 33

B.   Argument ............................................................................ 34

1.   Yamakita Discloses All Elements of Claim 15 ........ 34

2.   Yamakita Discloses All Elements of Claim 35 ........ 37

XI.   APPLE'S MSJ OF NON-INFRINGEMENT OF THE '260 PATENT ............... 38

A.   Background ......................................................................... 39

B.   Argument ............................................................................ 39

1.   The Asserted Claims Require Generating a
"Provisioning Request" that Contains Both (1) "User
Information Required to Establish a User Account" and
(2) the "User's Selection" of a Feature/Service ........ 39

2.   The Accused iOS Devices Do Not Generate a
"Provisioning Request" Containing the Required
Information ............................................................... 40

3.   UP Cannot Combine Two Separate Requests to Meet
this Claim Step ......................................................... 44

XII.   APPLE'S MSJ OF NON-INFRINGEMENT OF THE '092 PATENT .............. 45

1.   As Previously Construed, "Location Inputs" Must
Provide Information Regarding a Location, Not Just
Information Regarding The Equipment ..................... 46

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2. ██████████████████████████
.....................................................................................47

3. ████████████████████
.....................................................................................48

XIII. APPLE'S MSJ OF NO INDIRECT OR WILLFUL INFRINGEMENT ................................49

XIV. CONCLUSION ..........................................................................................................50

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

4

**Cases**

5

*Advanced Fiber Techs. Trust v. J&L Fiber Servs., Inc.*,
674 F.3d 1365 (Fed. Cir. 2012) ................................................................................ 50

6

7

*Allvoice Developments U.S., LLC v. Microsoft Corp.*,
988 F. Supp. 2d 1248 (W.D. Wash. 2013) ............................................................... 49

8

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
768 F.3d 1185 (Fed. Cir. 2014) ............................................................................ 2, 3

9

*Am. Med. Sys., Inc. v. Med. Eng. Corp.*,
6 F.3d 1523 (Fed. Cir. 1993) ................................................................................. 14

10

11

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ............................................................................. 34

12

*Amsted Indus. v. Buckeye Steel Castings* Co.,
24 F.3d 178 (Fed. Cir. 1994) ................................................................................. 16

13

*August Technology Corp. v. Camtek, Ltd.*,
655 F.3d 1278 (Fed. Cir. 2011) ............................................................................. 11

14

15

*Aukerman v. R.L. Chaides Const. Co.*,
960 F.2d at 1033 (Fed. Cir. 1992) ......................................................................... 18

16

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*,
682 F.3d 1003 (Fed. Cir. 2012) ............................................................................. 50

17

18

*Commil USA, LLC v. Cisco Systems, Inc.*,
720 F. 3d 1361 (Fed. Cir. 2013)
*cert granted*, 135 S. Ct. 752 (2014) ....................................................................... 50

19

20

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*,
291 F.3d 1317 (Fed. Cir. 2002) ............................................................................... 6

21

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997) ......................................................................... 40, 44

22

23

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S.Ct. 2060 (2011) ........................................................................................... 49

24

*Golden Bridge Tech. Inc. v. Apple, Inc.*,
2014 WL 1928977 (N.D. Cal. May 14, 2014) ....................................................... 15

25

*In re Hall*,
781 F.2d 897 (Fed. Cir. 1986) ................................................................................. 6

26

27

*In re Klopfenstein*,
380 F.3d 1345 (Fed. Cir. 2004) ............................................................................... 6

28

*In re Kollar*,
286 F.3d 1326 (Fed Cir. 2002) ............................................................................. 10

*In re Seagate Tech., LLC,*
   497 F.3d 1360 (Fed. Cir. 2007) .................................................................................... 49, 50

*Innogenetics, N.V. v. Abbott Labs.,*
   512 F.3d 1363 (Fed. Cir. 2008) ............................................................................................ 5

*IP Innovation L.L.C. v. Red Hat, Inc.,*
   2010 WL 9501469 (E.D. Tex. Oct. 13, 2010) ...................................................................... 5

*IXYS Corp. v. Advanced Power Tech., Inc.,*
   321 F. Supp. 2d 1156 (N.D. Cal. 2004) ............................................................................. 17

*Jamesbury Corp. v. Litton Indus. Products, Inc.,*
   839 F. 2d 1544 (Fed. Cir. 1988) ......................................................................................... 18

*KSR Int'l Co. v. Teleflex Inc.,*
   550 U.S. 398 (2007) .............................................................................................................. 5

*Kyocera Wireless Corp. v. ITC,*
   545 F.3d 1340 (Fed. Cir. 2008) ............................................................................................ 4

*LBS Innovations, LLC v. BP Am., Inc.,*
   2014 U.S. Dist. LEXIS 1697 (E.D. Tex. Jan. 6, 2014) ...................................................... 45

*Leader Techs., Inc. v. Facebook, Inc.,*
   678 F.3d 1300 (Fed. Cir. 2012) ......................................................................................... 13

*Maxwell v. Baker,*
   86 F.3d 1098 (Fed. Cir. 1996) ........................................................................................... 14

*Mformation Techs., Inc. v. Research in Motion Ltd.,*
   830 F. Supp. 2d 815 (N.D. Cal. 2011) ............................................................................... 17

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.,*
   2010 WL 583960 (N.D. Cal. Feb. 16, 2010) ...................................................................... 50

*Nike, Inc. v. Wal-Mart Stores, Inc.,*
   138 F.3d 1437 (Fed. Cir. 1998) ......................................................................................... 15

*Norian Corp. v. Stryker Corp.,*
   363 F.3d 1321 (Fed. Cir. 2004) ........................................................................................... 5

*Oracle Am., Inc. v. Google Inc.,*
   2011 U.S. Dist. LEXIS 131707 (N.D. Cal. Nov. 15, 2011) ................................................ 15

*Pfaff v. Wells Elecs., Inc.,*
   525 U.S. 55 (1998) .......................................................................................................... 7, 10

*Pixion, Inc. v. Citrix Sys., Inc.,*
   887 F. Supp. 2d 881 (N.D. Cal 2012)
   *aff'd,* 500 F. App'x 954 (Fed. Cir. 2013) ............................................................................ 5

*Robocast, Inc. v. Apple, Inc.,*
   --- F. Supp. 2d ---, 2014 WL 1622002 (D. Del. 2014) ...................................................... 50

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.,*
   249 F.3d 1307 (Fed. Cir. 2001) ..................................................................................... 10, 12

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Sealant Sys. Int'l, Inc. v. TEK Global S.R.L.*,
  2014 WL 1008183 (N.D. Cal. Mar. 7, 2014) ................................................................... 15

*Soverain Software LLC v. Amazon.com, Inc.*,
  383 F. Supp. 2d 904 (E.D. Tex. 2005) .......................................................................... 15

*SRI Int'l, Inc. v. Internet Sec. Sys.*,
  511 F.3d 1186 (Fed. Cir. 2008) ...................................................................................... 6

*Superspeed, LLC v. Google, Inc.*,
  2014 U.S. Dist. LEXIS 168570 (S.D. Tex. Dec. 5, 2014) ............................................. 13

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.*,
  90 F. 3d 1558 (Fed. Cir. 1996) ..................................................................................... 44

*U.S. Ethernet Innovations, LLC v. Acer, Inc.*,
  2013 U.S. Dist. LEXIS 116640 (N.D. Cal. Aug. 16, 2013) ........................................... 14

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F. 3d 1576 (Fed. Cir. 1996) ..................................................................................... 45

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010) ...................................................................................... 5

**Statutes**

35 U.S.C. §102 ................................................................................................................... 4

35 U.S.C. §102(a) .............................................................................................................. 4

35 U.S.C. §102(b) ........................................................................................................ 2, 4, 7

35 U.S.C. §287(a) ............................................................................................................ 14

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## I.     INTRODUCTION

The Court should deny Unwired Planet's motions for summary judgment because they rest on misunderstandings of the law and gloss over genuine, material factual disputes requiring trial.  Where the facts are not in dispute, Apple submits that the Court can and should enter summary judgment, but *for Apple*, not for Unwired Planet, as the law is on Apple's side in every instance.  For example, Unwired Planet seeks summary judgment that the '092 Patent is not invalid under the on-sale bar, but on the facts presented by Unwired Planet there is no dispute that the patent *is indeed invalid*, as the invention was offered for sale before the critical date.  Likewise, Unwired Planet seeks summary judgment on Apple's marking defense, but has misapprehended its own burden of proof on marking, and cannot make the showing required to meet the marking requirement.  Therefore, summary judgment is warranted in Apple's favor.

Moreover, Apple demonstrates below that the Court should grant summary judgment of non-infringement on each of the four patents-in-suit.  There are no genuine disputes of material fact regarding infringement, and Unwired Planet's infringement theories fail as a matter of law because they contradict the Court's claim constructions and the plain language of the asserted claims.  Therefore, the court should dismiss Unwired Planet's claims at summary judgment.

## II.     OPPOSITION TO MOTION ON INEQUITABLE CONDUCT

Apple's inequitable conduct defense is based on the failure of the '260 Patent inventors to disclose a critical piece of prior art to the PTO—the UP.Link system.  Apple submitted an invalidity expert report that demonstrates how the UP.Link system's "automatic provisioning" feature meets every limitation of the asserted claims, which recite a method of "provisioning" mobile devices with a "service or feature."  *See* Ex. 1 (Rysavy Rpt.) at ¶¶ 277-300, 629-659.[1]

Importantly, the UP.Link system was Unwired Planet's flagship product—indeed, its only product—in the years leading up to the '260 Patent.  *See, e.g.*, Exs. 2, 3 (Press Releases).  And, in addition to embodying every element of the asserted claims of the '260 Patent, it was already on sale in 1997, well over a year before the filing date of the '260 application.  *See, e.g.*

---

[1]  The cited exhibits are attached to the Declaration of Y. Ernest Hsin filed herewith.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  Ex. 1 at ¶¶ 297-300, Exs. 2-3 (Press Releases).  As a result, the UP.Link system invalidates the

2  asserted claims of the '260 Patent under the on-sale bar provision of 35 U.S.C. §102(b).

3  Unwired Planet nevertheless argues that the '260 inventors cannot have "deceptive

4  intent" because they provided, in this litigation, an excuse for not disclosing the UP.Link system

5  to the PTO.  However, the Federal Circuit has made clear that because "direct evidence of

6  deceptive intent is rare, a district court may infer intent from indirect and circumstantial

7  evidence, provided that such intent is the single reasonable inference."  *Am. Calcar, Inc. v. Am.*

8  *Honda Motor Co.*, 768 F.3d 1185, 1190-91 (Fed. Cir. 2014) (internal quotations omitted).  As

9  discussed below, there is compelling evidence to support the inference that two of the '260

10  inventors, Mr. King and Mr. Martin, withheld Unwired Planet's flagship UP.Link system with

11  intent to deceive the PTO.

12  **A.      Compelling Evidence Shows that the '260 Inventors Intended to Deceive the PTO**

13  Not only did Mr. King and Mr. Martin know about the UP.Link system, ***they were***

14  ***directly responsible for designing and developing UP.Link.***   Ex. 4 (King Dep.) at 46:3-47:22,

15  53:12-54:10, 60:8-63:17; Ex. 5 (Martin Dep.) at 43:4-45:13.  For example, Mr. King testified

16  that he was Unwired Planet's sole "Principal Architect" and was responsible for the architecture

17  of the UP.Link system.  Ex. 4 at 62:25-63:6.  Similarly, Mr. Martin confirmed that he "managed

18  application development" for the UP.Link system and was a "significant contributor to the

19  design and architecture" of the UP.Link system.  Ex. 5 at 43:4-45:13.

20  In addition, Mr. King and Mr. Martin were also responsible for Unwired Planet's patent

21  prosecution activities in the years prior to, and during, the prosecution of the '260 Patent.  For

22  example, Mr. King prioritized invention disclosures and "coordinat[ed] their prosecution with

23  outside counsel," while Mr. Martin described himself as the "general manager" for Unwired

24  Planet's "patent department" and even gave a presentation to engineering staff that *explains the*

25  *on-sale bar statute*.  Ex. 4 at 64:19-65:3; Ex. 5 at 150:11-151:13, 176:4-24.

26  Apple can also show that the inventors' excuse for withholding the UP.Link system from

27  the PTO is not credible.  As Unwired Planet states in its motion, the inventors testified that the

28  UP.Link system only provisioned a *server*, whereas the '260 Patent requires provisioning a

1    *mobile phone*.  UP Mtn. at 8.  Unwired Planet's argument is that when the user activates their

2    UP.Link email account from the mobile phone using the "automatic provisioning" feature,

3    settings on the server are updated, but no new email functionality is being provided to the mobile

4    device.  When examined on this point, however, the inventors contradicted their earlier

5    testimony and ultimately admitted that, for at least some customers, the email functionality *on*

6    *the user's mobile phone* was not operational until completion of the "automatic provisioning"

7    process.  *See* Ex. 4 at 212:16-213:7; Ex. 5 at 100:5-25, 187:3-19.

8         Given the inventors' direct role in designing the UP.Link system, their deep knowledge

9    of the patent process and on-sale bar, and their lack of a credible excuse for withholding the

10   UP.Link system from the PTO, the single best inference is that they acted with deceptive intent.

11   *Am. Calcar*, 768 F.3d at 1190-92 (affirming finding of inequitable conduct based on

12   circumstantial evidence and rejection of inventor's purported excuse for not disclosing key prior

13   art).  At a minimum, the fact-finder should be given an opportunity to consider that inference.

14   **B.     The UP.Link System is Highly Material**

15        Undisclosed prior art is material if "the PTO would not have allowed a claim had it been

16   aware of it."  *Am. Calcar*, 768 F.3d at 1189.  Unwired Planet's motion does not challenge Mr.

17   Rysavy's opinion that the UP.Link system is anticipatory prior art—and thus on that ground

18   alone it is proper to infer that the UP.Link system is material prior art.  Unwired Planet

19   nevertheless argues that the UP.Link system cannot be material because it is cumulative of other

20   prior art that was before the PTO.  UP Mtn. at 9-10.  Yet neither Unwired Planet nor its technical

21   expert contend that any references before the PTO also disclose the prior art UP.Link system, let

22   alone the UP.Link system's "automatic provisioning" feature.  Instead, Unwired Planet argues

23   that the UP.Link system is necessarily cumulative because Mr. Rysavy opined that a prior art

24   patent that was before the PTO—the Pepe patent—also anticipates the '260 Patent.  This

25   argument leads to the absurd conclusion that if a prior art reference before the PTO is deemed to

26   be invalidating (in a later litigation), then the inventors have immunity against any inequitable

27   conduct allegations *as a matter of law*.  Unwired Planet presents no case law recognizing this

28   illogical theory.  Because Apple has sufficient evidence to show both materiality and deceptive

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

intent, Unwired Planet's motion should be denied.

### III.   OPPOSITION TO MOTION ON THE GSM PRIOR ART

Apple's invalidity expert, Mr. Rysavy, has shown that the prior art GSM system invalidates the '831 Patent. Ex. 1 (Rysavy Op. Rpt.) ¶¶176-276. "GSM" stands for *Global System for Mobile Communications* and is a cellular communications system that has been used around the world since the mid-1990s. *See Id*. ¶176. The features of the GSM system are well-defined in the standards, technical books, and articles cited in Mr. Rysavy's report. *Id*. ¶176-77.

Unwired Planet erroneously argues that Apple is foreclosed from relying on the GSM system as an anticipation reference because Mr. Rysavy relies on multiple publications to describe how the GSM system worked. UP Mtn. at 11. Unwired Planet bases its motion on *Kyocera Wireless*, but that decision is inapt because it only addresses whether *multiple GSM standards publications* can be treated as a single *"printed publication"* under 35 U.S.C. § 102. *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (reviewing the ITC's determination that "Qualcomm did not show that the GSM standard was a *'printed publication'* under 35 U.S.C. § 102.") (emphasis added). Therefore, *Kyocera Wireless* does not foreclose Apple from proving at trial that the GSM system is anticipatory under other prongs of §102, such as by showing that it was "known or used by others," "in public use," and/or "on sale" during the relevant time period.[2] That is, the GSM *system* is a single item of prior art, and the publications Apple's expert cites constitute evidence of the features of that system.[3]

Moreover, when proving the features of a prior art system, defendants routinely rely on

---

[2] For example, §102(a) provides that a patent is invalid if "the invention was *known or used by others* in this country…before the invention thereof by the applicant for patent." 35 U.S.C. §102(a) (emphasis added). Section 102(b) provides that a patent is invalid if the invention was "*in public use or on sale* in this country, more than one year prior to the date of application for patent in the United States." 35 U.S.C. §102(b) (emphasis added).

[3] Apple can show that the GSM publications Mr. Rysavy relies on were all published before mid-1997, so they are evidence that the GSM system was "known…by others" at that time. *See* Ex. 1 (Rysavy Op. Rpt.) ¶177. Mr. Rysavy also cites to a *New York Times* article from August 1997, which discusses the carriers that have deployed GSM networks to subscribers, which shows the GSM system was "in public use" and "on sale" by that time. *See id*; Ex. 6.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

multiple documents and pieces of evidence—just like Apple has done in this case—and the courts routinely affirm this practice.  *See Pixion, Inc. v. Citrix Sys., Inc.*, 887 F. Supp. 2d 881, 890-905 (N.D. Cal. 2012) *aff'd*, 500 F. App'x 954 (Fed. Cir. 2013) (granting summary judgment of anticipation based on prior art system described in product documentation, published articles, and deposition testimony); *IP Innovation L.L.C. v. Red Hat, Inc.*, 2010 WL 9501469, at *4 (E.D. Tex. Oct. 13, 2010) ("This court sees no error in using multiple references to describe a single prior art system for the purpose of showing anticipation.").  Unwired Planet's motion is thus a transparent attempt to twist the holding of *Kyocera Wireless* in ways that it was never meant to be applied and that directly contravenes long-standing case law and litigation practice.[4]

### IV.   OPPOSITION TO MOTION ON THE "PROPOSAL FOR LFS"

Unwired Planet seeks partial summary judgment that a document entitled "Proposal for LFS," ("Proposal") authored by Bill Pierce of Motorola, describing the Location Finding System designed by SignalSoft, is not prior art to the '092 patent.  However, there is a material factual dispute as to whether the Proposal was distributed publicly at the relevant time, and ample evidence to support Apple's position that it was.  Therefore the Court should deny this motion.

Unwired Planet relies on *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321 (Fed. Cir. 2004), for the proposition that the question of prior publication is one of law, but the Federal Circuit has emphasized that it is a "legal conclusion *based on underlying factual determinations*."   *SRI Int'l,*

---

[4] Unwired Planet also erroneously argues that Apple is foreclosed from treating the GSM publications as an *obviousness* combination.  Unwired Planet contends that expert testimony is required to show a motivation to combine the GSM publications together and that Mr. Ryavy has not provided any such opinion.  Unwired Planet is wrong on both accounts.  Mr. Rysavy expressly opines that all of the GSM publications "describe the same GSM technology" (*see* Ex. 1 ¶177), and his limitation-by-limitation analyses cites to all of these publications to show how they relate to the same aspects of GSM (*see id.* ¶¶188-276).  In any event, the Supreme Court has clearly held that expert testimony is not required to show a motivation to combine references.  *See Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239 (Fed. Cir. 2010) (explaining that *KSR* "made clear that expert testimony concerning motivation to combine may be unnecessary") (citing *KSR Int'l Co. v. Teleflex Inc.* 550 U.S. 398, 427 (2007).  Indeed, even *Innogenetics*, cited by Unwired Planet, acknowledges that "there is no requirement that an expert opine on motivation to combine references," but rather addressed the extreme scenario in which there was a "complete absence of any proof" on the issue. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 (Fed. Cir. 2008).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Inc. v. Internet Sec. Sys.*, 511 F.3d 1186, 1192 (Fed. Cir. 2008) (quoting *Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1321 (Fed. Cir. 2002) ("Whether an anticipatory document qualifies as a 'printed publication' under § 102 is a legal conclusion based on underlying factual determinations.")); *see also In re Hall*, 781 F.2d 897, 898-899 (Fed. Cir. 1986) ("The § 102 publication bar is a legal determination based on underlying fact issues, and therefore must be approached on a case-by-case basis."). Only "*where no facts are in dispute*, [is] the question of whether a reference represents a 'printed publication' [a] question of law." *In re Klopfenstein*, 380 F.3d 1345, 1347 (Fed. Cir. 2004) (emphasis added).

Here, unlike the facts recited in *Norian*, the Proposal states explicitly on its face its public "distribution" to the TR45.2 and WIN participant group. Ex. 7 at 1. And while it was Motorola's practice to apply confidentiality designations to non-public documents, the Proposal by contrast does *not* have any confidentiality designation. *Compare id.* at 1 *with* Ex. 8 at 1. Apple also has expert evidence that the customary practice in working groups such these was "to circulate drafts of proposals." Ex. 9 at ¶20. Thus there is ample evidence for a jury to infer that the Proposal was actually distributed to the working group, which is sufficient under Federal Circuit precedent to establish that the document is a printed publication. *See, e.g.*, *Cooper Cameron*, 291 F.3d at 1321 (Fed. Cir. 2002) (holding that publications "need only be accessible to the interested public," and that the trial court had "improperly resolved questions of fact in [the patentee's] favor when it determined that the second report had not been distributed to SISL participants."). The Court should not resolve this disputed question of fact on summary judgment.

**V.    OPPOSITION AND CROSS-MOTION ON APPLE'S ON-SALE BAR DEFENSE**

**A.    Introduction**

Apple and Unwired Planet agree on one thing: Apple's on-sale bar defense for the '092 patent is appropriate for resolution on summary judgment. There are no material issues of fact. The dispute between the parties centers solely on two things: (1) the relevant law regarding the on-sale bar defense, and (2) the application of that law to the facts at hand.

Under U.S.C. 35 § 102(b), a patent is invalid if two key conditions are met: (1) the invention is the subject of a commercial offer for sale, and (2) the invention is ready for

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

patenting. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). It does not matter which condition is satisfied first, so long as both occur "more than one year prior to the date of the application for patent." Thus, Unwired Planet's claim that its offers for sale of the invention are invalid because they preceded the "ready for patenting" date entirely misses the mark: as long as *both* the offer for sale and the readiness for patenting precede the critical date, and as long as the offer included the version of the product that was later "ready for patenting," the on-sale bar applies. Similarly, Unwired Planet's protest that no product "embodying" the '092 patent was "delivered" before the critical date is simply irrelevant. There is no requirement that the invention be reduced to practice before the critical date.

Here, the undisputed facts demonstrate that: (1) Unwired Planet[5] made at least one offer for sale of its "LFS software" product prior to the critical date of November 3, 1997, (2) that offer for sale of LFS software included later versions of the product, and (3) Unwired Planet subsequently designed a version of the LFS software that was ready for patenting prior to the November 3, 1997 critical date. As a result, the on-sale bar applies as a matter of law.

**B.    Background**

The '092 patent claims priority to a provisional application filed November 3, 1998. The parties agree that the relevant critical date is November 3, 1997.

The '092 patent stems from technology developed in the mid-1990s called the Location Finding System ("LFS"). The LFS involved the use of different types of Location Finding Equipment ("LFE") and LFE-specific Location Finding Controllers ("LFC") to estimate the location of wireless subscribers using different technologies like Cell/Sector, Time Difference of Arrival (TDOA), and Angle of Arrival (AOA). *See* Ex. 10 (WLS Plan) at UPA_0068735 & UPA_0068756. The LFS was the core technology included in Unwired Planet's software suite, called Wireless Location Services ("WLS"). *Id.* at UPA_0068735; *see also* Ex. 11 (Fitch Dep.) at 48:4-13. WLS also encompassed Unwired Planet-developed applications that could access the

---

[5] Like Unwired Planet itself, Apple refers to both Unwired Planet and its predecessor company, SignalSoft, as "Unwired Planet," for the sake of simplicity.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  stored locations in LFS using an LFS Interface.  *See, e.g.*, Ex. 12 at UPA_0067221.

2      **1.      The Motorola Agreement**

3      During development of the LFS, Unwired Planet entered into a "License and

4  Development Agreement" with Motorola, Inc. on March 29, 1996 (the "Motorola Agreement").

5  Ex. 13. ██████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████████

9  ████████████████████████████

10      **2.      Further Development of LFS Software By Unwired Planet**

11      Between 1995 and November 3, 1997, Unwired Planet created numerous design

12  documents describing the LFS software, the WLS suite of products, and an application for

13  locating wireless subscribers who dial "911," called the W911 application.  As described in

14  detail in the Opening Report of Apple's Expert, Dr. Charles Knutson, these documents provided

15  descriptions of the LFS software that would have fully enabled a person of ordinary skill to

16  practice the '092 patent, making the invention "ready for patenting."  *See* Ex. 14 (Knutson Op.

17  Rpt.) at ¶¶ 67-190.  Indeed, Unwired Planet's expert, Dr. Mark Jones, *does not dispute* Dr.

18  Knutson's conclusion that these pre-critical date documents show that the LFS software was

19  ready for patenting.  *See, e.g.*, Ex. 15 (Jones Dep.) at 116:3-8 ("Q. Do you offer an opinion in

20  your rebuttal report as to whether … the invention was ready for patenting?  A. I don't.").

21      These documents show that the LFS component of the WLS product was designed to use

22  multiple LFEs. For example, "Wireless Location Services Project Plan," dated July 20, 1995 and

23  written by one of the '092 patent inventors, discloses that the "LF technology" can determine

24  location "through the Time Difference of Arrival (TDOA) or the Angle of Arrival (AOA) of the

25  caller's wireless device signal." Ex. 10 at UPA_0068756. TDOA and AOA are two different

26  LFEs, according to the '092 patent. *See* Ex. 16 at 1:48-51 ("[A] number of types of LFEs exist

27  … includ[ing] so-called angle of arrival (AOA), time difference of arrival (TDOA)….").

28      Another key document, "Location Finding System Generalization," which was written

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  before February 18, 1997[6] by another '092 patent inventor ("LFS Generalization"), discloses that

2  the inventors were expanding LFS "to include support of various Location Determination

3  Technologies (LDT)." Ex. 17 at UPA_0025664. It further discloses that "it will be necessary to

4  support more than one type of LDT at a time, and to easily add new types of LDTs." *Id.* The

5  document then goes into great detail with regard to the accuracy of various LDTs, including

6  Cell/Sector, TOA, AOA, TDOA and GPS, and how estimated locations from those location

7  finding technologies can be combined. *Id.* at UPA_0025665-70. In fact, the document includes

8  substantially identical figures and descriptions of different LFEs as the '092 patent:



*See id.*; Ex. 16 ('092 patent), Figs. 3a through 5, col. 6:40-7:30, 9:36-10:18.

The foregoing documents are sufficient to establish that the invention was not only

conceived, but also ready for patenting well before the November 3, 1997 critical date. On this

score, neither Apple's technical expert nor Unwired Planet's expert disagree.

### 3. Additional Sales and Marketing Efforts

By the middle of 1997, Unwired Planet began increasing its marketing efforts of its LFS

software. For example, on May 9, 1997, Unwired Planet and SCC Communications Corporation

entered into an agreement ("SCC Agreement") ████████████████████████████

---

6  Although the precise date of "LFS Generalization" is not known, it is cited in another
   document dated February 18, 1997. *See* Ex. 18 (LDT Uncertainty) at FITCH0004712.
   Unwired Planet does not dispute that LFS Generalization is dated prior to February 18, 1997.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2

3

4

5

6      In addition to these licenses, Unwired Planet entered into marketing agreements for WLS

7  and W911.

8

9

10

11      Thus, by the time of the critical date, Unwired Planet had made commercial

12  sales or offers for sale to not just Motorola, but also a number of other technology companies.

13  **C.     Analysis**

14      **1.     Under Established Case Law, An Offer For Sale Can Precede The "Ready
             for Patenting" Date And Even The Conception Date**

15  The Supreme Court has established two conditions for satisfying the "on-sale bar"

16  defense: (1) the invention must be the subject of a commercial offer for sale, and (2) the

17  invention must be ready for patenting. *Pfaff*, 525 U.S. at 67 (1998).  A software license qualifies

18

19  as a sale or offer for sale.  *See, e.g., In re Kollar*, 286 F.3d 1326, 1330 n.3 (Fed Cir. 2002).

20      The "ready for patenting" prong can be established "by proof that prior to the critical date

21  the inventor had prepared drawings or other descriptions of the invention that were sufficiently

22  specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67-68.

23  *Pfaff* specifically rejected the requirement that the invention also be reduced to practice in order

24  to establish an on-sale bar.  *See id.* at 66; *see also Robotic Vision Sys., Inc. v. View Eng'g, Inc.*,

25  249 F.3d 1307, 1312 n.2 (Fed. Cir. 2001).  If the disclosure is sufficiently enabling, "whether or

26  not the software needed to implement the claimed method *existed at the time of the disclosure is*

27  *irrelevant." Id.*, 249 F.3d at 1311-12.

28      Importantly, Federal Circuit case law since *Pfaff* has made it clear that an invention need

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

not be ready for patenting at the time of an offer, as that "would render the second prong of the

*Pfaff* test superfluous." *August Technology Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1289 (Fed.

Cir. 2011). In fact, at the time of the offer, the invention need not even be *conceived*, so long as

the offer for sale has been accepted or remains open: "[I]f an offer for sale is extended and

remains open, a subsequent conception will cause it to become an offer for sale of the invention

*as of the date of the conception date*." *Id.* (emphasis added).

### 2. There Is No Dispute That The Invention Was Ready For Patenting By November 3, 1997

In this case, Unwired Planet's documents establish that the invention of the '092 patent

was ready for patenting prior to the critical date. *See* Ex. 14 at ¶¶ 67-190. In fact, the

disclosures in the LFS software development documents disclose everything that appears in the

'092 patent specification, *including many identical figures*. As noted above, Unwired Planet's

expert does not dispute this.

### 3. Unwired Planet Entered Into Numerous Commercial Offers for Sale

There were at least three offers for sale prior to the critical date of the '092 patent, each

of which was sufficient, on its own, to establish an on-sale bar: (1) the March 29, 1996 Motorola

Agreement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (2) the

May 9, 1997 SCC Agreement ▮▮▮▮▮▮▮▮▮ and (3) the

September 26, 1997 AT&T Agreement ▮▮▮▮▮▮ In view of space

constraints, however, Apple addresses only the Motorola Agreement in detail below.

### a. Interpreting The Motorola Agreement Presents Purely Legal Issues

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1      This argument fails for multiple reasons.  First, to the extent that Unwired Planet

2   contends that the on-sale bar does not apply because the invention was not reduced to practice

3   and commercially "available" until "1999 or 2000," it flies directly in the face of the case law.

4   *Pfaff* explicitly rejected the requirement that an invention be reduced to practice in order to

5   trigger the on-sale bar.  Indeed *Robotic Vision* emphasizes that "whether or not the software

6   needed to implement the claimed method existed at the time of the disclosure is irrelevant."  249

7   F.3d at 1311-12.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2

3

4

5

6

7

8

9

10

11

12

13

14        **b.      The Federal Circuit's Decision In *Robotic Vision* Is Squarely On Point**

15        *Robotic Vision*, which also involved a method claim implemented in software, is highly

16   instructive in applying the on-sale bar doctrine to the Motorola offer for sale.  In that case, the

17   patentee had offered to sell a system to Intel prior to the critical date. 249 F.3d at 1311.  Later on,

18   one of the inventors of the patent provided enabling disclosures to a co-worker to implement the

19   software, *after* the offer for sale but *before* the critical date.  Even though the software was not

20   ultimately completed or delivered to Intel until after the critical date, the Court still held that the

21   patent was invalid under the on-sale bar doctrine, because it was offered for sale and ready of

22   patenting prior to the critical date.  *Id.*  Both *Pfaff* prongs were met.

23

24   ───────────────────

         7  For these reasons, Unwired Planet's reliance on *Leader Techs., Inc. v. Facebook, Inc.*, 678

25         F.3d 1300 (Fed. Cir. 2012), and *Superspeed, LLC v. Google, Inc.*, 2014 U.S. Dist. LEXIS
           168570 (S.D. Tex. Dec. 5, 2014), is misplaced.  Both cases stand for the unremarkable

26         proposition that a sale or offer for sale of software must include the version that was "ready
           for patenting," not just an earlier version.  *Leader* at 1307; *Superspeed* at *15-16.

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Here, as in *Robotic Vision*, the undisputed facts show that: (1) the invention of the '092 patent was either sold or offered for sale to Motorola in March 1996, (2) the invention became "ready for patenting" thereafter, via a series of enabling disclosures prior to the November 3, 1997 critical date, and (3) the software was not actually reduced to practice before the critical date. Because Unwired Planet engaged in precisely the type of commercial activity the on-sale bar doctrine was designed to address –attempts to make money on the invention more than one year before filing a patent application – Claim 20 of the '092 patent is invalid as a matter of law.

## VI.     OPPOSITION AND CROSS-MOTION ON THE MARKING REQUIREMENT

Unwired Planet is wrong about its obligations under the patent marking statute. The Federal Circuit holds that where a patentee seeks pre-suit damages for alleged infringement, the burden is *on the patentee* for "pleading *and proving at trial* that [it] complied with the statutory requirements" of 35 U.S.C. § 287(a). *Maxwell v. Baker*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (emphasis added). Even assuming that Apple bears an initial "burden" to trigger application of the marking statute, Apple has more than met that "burden" here, by identifying the specific products that Unwired Planet failed to mark. Because Unwired Planet bears the true burden of proof on marking and cannot meet that burden, the court should deny Unwired Planet's motion, and should grant summary judgment to Apple that Unwired Planet cannot seek pre-suit damages for the '260, '831, and '446 Patents.[8] *See, e.g.*, *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, 2013 U.S. Dist. LEXIS 116640, *55 (N.D. Cal. Aug. 16, 2013) (granting summary judgment of no pre-suit damages for patentee's failure to comply with marking requirement).

### A.     The Court Should Deny Unwired Planet's Motion on Marking

Unwired Planet argues that Apple bears the "initial burden" on marking to "*prove that* [specific] products at issue *did, in fact, practice* the patents-in-suit." UP Mtn. at 24 (emphasis added). But Unwired Planet is wrong, as "[t]he patentee bears the burden" on marking. *Nike,*

---

[8] Apple concedes that the marking statute does not apply to the '092 Patent because it contains only method claims. But the '260, '831, and '446 Patents each contain apparatus claims (including claims asserted in this case), and therefore the marking statute applies to them. *See Am. Med. Sys., Inc. v. Med. Eng. Corp.*, 6 F.3d 1523, 1538-39 (Fed. Cir. 1993).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   *Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998).  This burden never shifts to

2   Apple; rather, it rests solely with Unwired Planet.  *See, e.g.*, *Soverain Software LLC v.*

3   *Amazon.com, Inc.*, 383 F. Supp. 2d 904, 908 (E.D. Tex. 2005) ("Although [plaintiff] attempts to

4   shift the burden of proof to [defendant], [plaintiff] bears the burden of proving that [its licensees]

5   complied with the marking statute.").  Unwired Planet cites two cases to argue that Apple bears a

6   burden of proof here (UP Mtn. at 27-29), but neither case supports that argument.  In *Oracle*, the

7   court was considering a *defendant's* motion for summary judgment of failure to mark, and

8   denied the motion while preserving the parties' ability "without prejudice to litigat[e] this point

9   at trial."  *Oracle Am., Inc. v. Google Inc.*, 2011 U.S. Dist. LEXIS 131707, at *10-11 (N.D. Cal.

10  Nov. 15, 2011).  And in *Sealant Systems*, the court did not impose a burden of proof on a

11  defendant, but rather held only that a defendant should provide "guidance . . . as to which

12  specific products are alleged to have been sold in contravention of the marking requirement,"

13  because without that, "a patentee . . . is left to guess exactly what *it* [the patentee] *must prove up*

14  to establish compliance with the marking statute."  *Sealant Sys. Int'l, Inc. v. TEK Global S.R.L.*,

15  2014 WL 1008183, at *31 (N.D. Cal. Mar. 7, 2014) (emphasis added; *accord Golden Bridge*

16  *Tech. Inc. v. Apple, Inc.*, 2014 WL 1928977, at *11 (N.D. Cal. May 14, 2014) (defendant need

17  only "*identify* unmarked products *believed* to practice the accused claims") (emphasis added).

18         Here, Apple provided just such guidance.  In its interrogatory responses, Apple alleged

19  that Unwired Planet "failed to establish that it has marked its own products" – *i.e.*, products that

20  Unwired Planet itself made and sold, like "Provisioning Manager Mobile Edition" and "Mobile

21  Management Server," which Unwired Planet itself identified in its initial disclosures as

22  practicing the '260 Patent.  D.I. 310-36 at 62; Ex. 24 at 9-10.  Apple also alleged that several

23  specific Microsoft Windows Phone 7 features practiced the '260, '446, and '831 Patents at the

24  time that Unwired Planet was obligated to mark them[9] – *i.e.*, after Unwired Planet granted a

---

26  [9]  Unwired Planet complains that Apple's claim charts cite to documents "from 2014," after
    this suit was filed.  UP Mtn. at 26.  But the evidence cited by Apple shows that Microsoft's
27  products embodied the patents *before* suit, regardless of whether the documents themselves
    are dated after suit.  For example, they show that Windows Phone version 7.5 – released in
28  September of 2011, a full year before suit – practiced the asserted patents.  *See, e.g.*, D.I.

[Footnote continued on next page]

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

license to Microsoft on these patents, and before Unwired Planet filed this suit.  D.I. 310-36 at

63-64.  Therefore Apple has indisputably met any "burden" it may have to trigger *Unwired*

*Planet's burden of proof* on marking (which Unwired Planet cannot meet), and the Court should

deny Unwired Planet's motion for summary judgment.

**B.      The Court Should Grant Summary Judgment of No Pre-suit Damages**

Because Unwired Planet cannot prove that it complied with the marking statute, the Court

should grant summary judgment that Unwired Planet may not seek pre-suit damages.  For the

'260 Patent, Unwired Planet has adduced *no evidence* that it ever marked *its own* UP.Link,

"Provisioning Manager Mobile Edition," or "Mobile Management Server" products, or

Microsoft's Marketplace.  Rather, Unwired Planet's only argument is that marking statute does

not apply because the '260 Patent "consist[s] solely of method claims."  UP Mtn. at 25.  But

Unwired Planet is flatly incorrect.  The '260 Patent contains *apparatus* claims to a "proxy

server," and Unwired Planet asserted them against Apple earlier in this litigation. *See* Exs. 25-28

(2/19/13 Inf. Cont.).  Thus the marking statute indeed applies.  *See supra* note 8.  For the '831

Patent, Unwired Planet has offered no evidence of marking for its own UP.Link product or for

Microsoft's push notification feature, nor any excuse for failing to mark.  And the same is true

for the '446 Patent and Microsoft's TellMe and Speech Recognition feature.

Finally, Unwired Planet cannot show that it ever gave pre-suit notice to Apple of "a

specific charge of infringement by a specific accused product or device," and therefore Unwired

Planet cannot invoke the actual notice provision of the marking statute to avoid summary

judgment.  *Amsted Indus. v. Buckeye Steel Castings* Co., 24 F.3d 178, 187 (Fed. Cir. 1994).

**VII.      OPPOSITION TO MOTION ON LACHES**

Unwired Planet argues that Apple's laches defense is based on "short periods of alleged

delay," and that Apple cannot establish prejudice from Unwired Planet's delay.  UP Mtn. at 36.

But Unwired Planet is wrong on both counts.  Unwired Planet's delay in bringing suit on these

---

[Footnote continued from previous page]
310-46 at 1.  Unwired Planet does not dispute that the marking requirement flows to Unwired
Planet's licensees, like Microsoft.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

patents was anything but short, and that delay has substantially and unfairly prejudiced Apple in its defense of this suit. At the least, there are genuine issues of fact requiring a trial on laches.

**A.      Unwired Planet's Delay in Bringing Suit was Unreasonable and Inexcusable**

Unwired Planet does not claim that it had any difficulty learning of Apple's alleged infringement, but rather apparently concedes to having been aware of it since January of 2008, almost five years before Unwired Planet filed this suit. UP Mtn. at 36. Unwired Planet admits that it delayed almost five years on the '092 patent, more than four years on the '260 patent, more than three years on the '831 patent, and almost one year on the '446 patent. *Id.* Unwired Planet argues that this delay is "minimal," but that characterization simply does not square with the facts. Periods of years are not "minimal" here in any reasonable sense. Regardless of whether a *presumption* of laches applies, Unwired Planet's delay was clearly long enough to merit the scrutiny of a trial, even under Unwired Planet's own authorities.[10] In *IXYS Corp.*, for example, the court held that a trial was warranted on a delay of *less than three years*, whereas here Unwired Planet delayed for *more than three years* on three of the patents-in-suit. *See IXYS Corp. v. Advanced Power Tech., Inc.*, 321 F. Supp. 2d 1156, 1163 (N.D. Cal. 2004).

Unwired Planet next argues that its delay was excused by negotiations and litigation with Apple starting in 2010. But Unwired Planet does not claim to have negotiated with Apple about the '092 patent, or to have filed suit on (or even provided claim charts regarding) any of the four patents-in-suit before this suit in 2012. Rather, Unwired Planet claims to have named three of the patents in discussions, before filing suit against Apple on *other, unrelated patents* in 2011. If anything, this history supports Apple's laches defense, as it shows that Unwired Planet could

---

[10] Unwired Planet relies on *Mformation Techs*. to argue that Apple bears a "heightened burden," but that is not what this case holds. Rather, the court wrote that "[a]lthough there are patent infringement cases finding 'unreasonable delay' based on a time period of *fewer than three years*, in such cases the courts place an additional burden on the defendant to prove that the delay was 'accompanied by extraneous improper tactics or misleading conduct' by the plaintiff." *Mformation Techs., Inc. v. Research in Motion Ltd.*, 830 F. Supp. 2d 815, 824 (N.D. Cal. 2011) (emphasis added). Here, Unwired Planet concedes that its delay was *longer than three years* for three patents-in-suit, and thus Apple is entitled to a trial and bears no "heightened burden."

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

have proceeded with claims under these three patents many years ago, but chose to sit on its

hands regarding them.[11]

**B.      Unwired Planet's Delay Prejudiced Apple**

Unwired Planet argues that there has been no evidentiary prejudice to Apple because the

parties "have been in litigation with each other since August 11, 2011," and have "been subject

to litigation holds and have been conducting discovery and deposing witnesses."  UP Mtn. at 40.

But Unwired Planet ignores the fact that it *sold its relevant businesses* in the years of delay,

starting *before* Unwired Planet first sued Apple in 2011.  If Unwired Planet had pursued its

claims promptly, then Apple could have obtained relevant discovery that Unwired Planet now no

longer has because it left with the operating businesses.  For example, Unwired Planet's 30(b)(6)

witness testified that basic questions about Unwired Planet server products marketed by the

"mediation group" (which Unwired Planet sold in May of 2011) were "beyond my technical

acumen."  Ex. 29 (Robbins Dep.) at 241:2-242:14; Ex. 30 Topics 123, 132.  And when Apple

asked basic questions about Unwired Planet's UP.Link product, Unwired Planet's witness

responded "honestly I'm not very familiar with it." Ex. 31 (Mendez Dep.) at 124:6-23.  Unwired

Planet should not be permitted to use its own delay to overcome Apple's defenses; that is

inequitable, and is exactly what laches prevents.  *See Aukerman*, 960 F.2d at 1033 (laches applies

where delay has "undermin[ed] the court's ability to judge the facts").

**VIII.    APPLE'S MSJ OF NON-INFRINGEMENT OF THE '831 PATENT**

Issue to be decided:  Whether Unwired Planet's infringement theory fails as a matter of

law to demonstrate that Apple's Push Notification Service (APNS) satisfies the "narrowband

channel" limitation of asserted Claims 17, 23, and 25 of the '831 Patent.

---

[11] Unwired Planet also argues that prior suits "against other alleged infringers is a recognized excuse for delaying suit," but Unwired Planet does not claim to have asserted *these patents* in any prior suit, just *other patents* against Apple.  UP Mtn. at 38.  Moreover, the Federal Circuit has refused to recognize this excuse where, as the here, the patentee had prior contact with the defendant but did not give prior notice "of an intent to enforce its rights against the [defendant] at the conclusion of the other litigation."  *Jamesbury Corp. v. Litton Indus. Products, Inc.*, 839 F. 2d 1544, 1553 (Fed. Cir. 1988).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**A.      Introduction**

Unwired Planet's infringement claims against APNS fail as a matter of law for multiple reasons.  First, the asserted claims undisputedly require two different communications channels—a "narrowband channel" and a "wideband channel."  Yet Unwired Planet cannot point to two different types of channels, let alone a "narrowband channel" and "wideband channel."  Indeed, Unwired Planet's expert concedes that APNS uses a TCP/IP data channel for all communications between APNS servers and an iOS device.  Second, the Court has construed "narrowband channel" to mean "channel with a meaningfully lower data transfer rate or bandwidth than the wideband channel."  So even if one were to accept the erroneous assertion that APNS uses two different communication channels, Unwired Planet still has no evidence that purports to show the data transfer rate, or *speed*, of any particular channel.  Unwired Planet has only addressed the *message formats* used for different types of messages sent between APNS servers and an iOS device—not the *speed* of the *channel* over which those messages are sent.

**B.      Background**

      **1.      The '831 Patent Requires a *Narrowband Channel* and a *Wideband Channel***

According to the '831 Patent, constraints on "narrowband channels," including their slower data transfer rate, made it inefficient to perform the exchange of security information needed to secure a narrowband channel.  Ex. 32 at Abstract.  The solution described in the '831 Patent is to first exchange the security information over a separate *wideband channel*.  *Id*.  The security information is then used to encrypt the data that is subsequently sent over the *narrowband channel*.  *Id*.  All of the asserted claims follow this paradigm and thus require (1) exchanging "security information" over a "wideband channel," and then (2) using that security information to securely transmit data over the "narrowband channel."

At the *Markman* hearing, the parties agreed to the Court's proposed construction of "narrowband channel" as a "channel with a meaningfully lower data transfer rate or bandwidth than the wideband channel."  D.I. 269 at 2.  It is undisputed that the "data transfer rate" or "bandwidth" of a channel in the context of the '831 Patent refers to the *speed* or *rate* at which

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  data is transmitted over the channel.[12]

2          **2.     Overview of APNS and Unwired Planet's Infringement Theory**

3          Unwired Planet accuses the Apple Push Notification Service (APNS) of infringement.

4  APNS is a service that enables registered app providers to deliver notification messages to iOS

5  devices.  These notifications can alert the user that new information is available for a particular

6  app.  *See* Ex. 34 (APNS Prog. Guide) at 5.  For example, a notification can alert the user that a

7  new email has arrived. Both third-party app providers (like Gmail, Facebook, etc.) and first-party

8  Apple providers (like iTunes, Facetime, etc.) can use APNS. *See* Ex. 35 at 24:15-25:2.

9          Rather than make connections to the servers of multiple different app providers, the iOS

10  device only needs to makes a single connection to the APNS servers, and notification messages

11  from all registered app providers are delivered over that single connection. *See* Ex. 34 (APNS

12  Prog. Guide) at 28-29.  Thus, the app provider first sends the notification message to APNS

13  servers, and then the APNS servers determine which iOS device is the intended recipient and

14  delivers the notification to that device.  *Id.*

15          All messages sent between APNS servers and an iOS device are TCP/IP Internet

16  communications.  Ex. 15 at 400:4-19.  TCP/IP are the standard transmission protocols used for

17  sending data over the Internet—browsing web pages, sending email, and downloading apps all

18  use TCP/IP.  *See* Ex. 36 ¶¶222-227.  Unwired Planet contends that the TCP/IP data channel used

19  to deliver push notification messages from APNS servers to the iOS device is a "narrowband

20  channel." Ex. 37 at 50.  Perplexingly, Unwired Planet contends this is a "narrowband channel"

21  *not* because of the *speed* of the *channel*, but because APNS enforces certain rules regarding the

22  maximum *size* of the *messages* APNS will deliver.  Until recently, APNS enforced a policy

23  requiring push notification "payloads" for most third-party apps to be no larger than 256 bytes.[13]

24  _____

25  [12]  Unwired Planet's expert, Dr. Jones, explains that "wideband channels support greater
          bandwidths or data transfer rates than do narrowband channels.  Accordingly, the ability to
26        transfer data between a server and a mobile device is ***slower*** on a narrowband channel as
          opposed to a wideband channel." Ex. 37 (Jones Op. Rpt.) at 7-8 (emphasis added).

27  [13]  The "payload" is the portion of the push notification message containing the information to
28        be presented to the user—such as an alert stating "You have one new email."  *See* Ex. 34
                                                              [Footnote continued on next page]

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Ex. 34 at 35.  Dr. Jones, Unwired Planet's expert, opines that this 256-byte payload maximum causes the channel used by APNS to be a "narrowband channel."  Ex. 37 at 50.

Regarding the claimed "wideband channel" that is used to exchange "security information," Unwired Planet contends that these limitations are met by the exchange of messages APNS uses to generate a "device token" (also called a "push token") and send the device token to an iOS device.  Ex. 37 (Jones Op. Rpt.) at 38.  A device token is a unique identifier that APNS generates to identify a given iOS device.  Ex. 34 (APNS Prog. Guide) at 30.  The device token is included as part of the header information of each push notification message and is what APNS uses to determine the specific iOS device to which the notification should be delivered.  *Id.*  Unwired Planet contends that the security messages related to generating the device token are transmitted over a "wideband channel" because these messages are not subject to the 256-byte payload maximum that applies to push notification messages.  *Id.* at 50.

## C.    Argument

### 1.    APNS Does Not Use Two Distinct Communication Channels

The asserted claims undisputedly require that *two different channels* be used—a "wideband channel" to exchange "security information," and a separate "narrowband channel" to transmit data that has been encrypted using that "security information."  This fundamental requirement is not met here.  There is no dispute that both the alleged "security information" and the push notifications are sent using the same TCP/IP protocols; Unwired Planet's expert admits as much.  Ex. 15 (Jones Dep.) at 400:4-19.

███████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████  *See id.* at 373:3-375:3.  In other words, both the alleged

_____

[Footnote continued from previous page]
(APNS Prog. Guide) at 35.  The majority of a push notification message consists of the payload, but the message also contains additional information, including information in "headers."  *Id*. at 13, 35.  ███████████████████████████████████████████████
████████████████████████████████████████  *See* Ex. 37 (Jones Op. Rpt.) at 53.  The header and payload together form a single push notification message.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

"security information" and push notifications are standard Internet data communications from the perspective of the network carrying those messages

Therefore, APNS does not use one type of channel for exchanging "security information" and a second, different type of channel to transmit data that is encrypted using the "security information." Instead, a TCP/IP data channel is used for all communication between an iOS device and APNS—regardless of what kind of information is being communicated. Consequently, summary judgment of non-infringement is appropriate for this reason alone.

**2.      The Alleged "Narrowband Channel" is Not Slower (Let Alone Meaningfully Slower) Than the "Wideband Channel"**

Even assuming, for the sake of argument, that APNS uses two distinct channels, Unwired Planet's infringement theory for the "narrowband channel" limitation is still fatally flawed. As discussed below, there can be no infringement because Dr. Jones only analyzes *message formats* used by push notifications messages versus other types of messages—not the relative *speed* at which the *channel* transmits those messages.

Dr. Jones opines that "[t]he network connection between an iOS device and APNS for the transmission of a push notification is a '*narrowband channel*'" because "APNS enforces a 256-byte maximum limit on the size of the payload of incoming push notifications." Ex. 37 (Jones Op. Rpt.) at 50. In contrast, according to Dr. Jones, the channel used to "exchange security information between the iOS device and APNS is not subject to the size limits placed on the delivery of push notifications and is a '*wideband channel*'." *Id.*

Dr. Jones's reasoning focuses erroneously on *message formats* rather than *channel speed*. Specifically, he focuses on the amount of header information that APNS push notification messages contain versus other TCP/IP traffic. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

In contrast, in Dr. Jones's view, headers only make up about 3% of total message size for non-APNS messages that are sent as "standard TCP/IP traffic" (and are not subject to the 256-byte maximum). *Id.* Based on these differences in header content, Dr. Jones summarily concludes

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    that the higher percentage of header information contained in push notification messages "will

2    result in a meaningfully lower data transfer rate, or bandwidth, compared to a wideband channel

3    that carries standard TCP/IP traffic."  *Id*. at 53-54.

4         This conclusory infringement theory fails because it only addresses *message format*

5    characteristics and not the *data transfer rate* of the *channel* over which the message is sent.

6    Whether the message format for push notifications requires ████████ of header data or 84,000

7    bytes of header data, the bytes comprising those messages will travel over a given channel at

8    whatever data transfer *rate* that channel supports.  For example, if the data channel supports a

9    data transfer rate of 14,400 bits-per-second (bps),[14] the messages with ████████ of header data

10   will be transmitted at the *same* 14400 bps *rate* as the message with 84,000 bytes of header data.

11        Similarly, whether APNS enforces a 256-byte maximum payload size or a 25,000 byte

12   maximum, the speed of the *channel* is the same.  Again, if the data channel supports a data

13   transfer rate of 14400 bps, the message with a 256-byte payload will be transmitted across that

14   data channel at the same 14400 bps *rate* as the message with the 25,000-byte payload.

15        Indeed, when actually questioned about channel speed, Dr. Jones conceded that the data

16   channel connecting APNS servers with an iOS device does not transmit different types of

17   information at different speeds.  In other words, both the alleged "security information" and the

18   push notification messages are composed of bits of information, and all bits will travel across the

19   data channel at the same speed, regardless of the type of message to which they belong.  For

20   example, Dr. Jones contends that one piece of "security information" sent over the alleged

21   "wideband channel" is a ████████████████  Yet Dr. Jones admitted that the fact of

22   whether a message contains a ████████████ or a push notification "will *not* affect the

23   speed" at which the bits making up that message travel across the channel.  Ex. 15 (Jones Dep.)

24   at 382:5-383:20 (emphasis added); *see also id*. at 384:15-385:17.

25        Dr. Jones's admissions are dispositive.  The Court's construction of "narrowband

26   channel" requires a "channel with a meaningfully lower data transfer rate or bandwidth than the

27   _____

28   [14]  In computer systems, data is measured in *bits*.  Eight *bits* of data equals 1 *byte*.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  wideband channel." Therefore, there can be no infringement when it is undisputed that the bits

2  comprising the alleged "security information" that are sent over the "wideband channel" are not

3  transmitted at a different speed than the push notifications that are sent over the alleged

4  "narrowband channel."

### 3. Dr. Jones's Assertion that "Header Information Is Not Data" Cannot Avoid Summary Judgment

Confronted with Apple's non-infringement position, Dr. Jones asserts in his Reply Report

that header data should somehow count against the data transfer rate of the channel. Incredibly,

Dr. Jones opines that "the amount of **header data** associated with a message impacts the data

transfer rate of the communication channel. Header information is not data." Ex. 38 (Jones

Reply Rpt.) at 13 (emphasis added). Despite referring to "header *data*" in this very statement,

Dr. Jones's view is apparently that "header data" is not "data," and that only the payload portion

of the message is "data." Therefore, according to Dr. Jones, the time spent sending the header

portion of the message should be seen as increasing the amount of time required to send a

particular push notification payload. This convoluted reasoning should be rejected as a matter of

law because it has no basis in the '831 patent, is contradicted by the very technical dictionary on

which Dr. Jones relies, and defies common sense.

The '831 Patent does not measure the data transfer rate of a channel by how much header

information a particular message contains. Instead, the '831 specification consistently describes

data transfer rate simply in terms of how many *bits per second* can be transferred across a

channel: "As an example, the narrowband channel can transfer data at a rate of about 400 bits

per second (bps), while the wideband channel can transfer data at a rate of at least 14400 bps."

Ex. 32 at 3:3-6, 8:6-14. Using header content to adjust the data transfer rate of a channel is a

fabrication by Dr. Jones, not a part of the '831 patent.

Moreover, Dr. Jones's opinion is inconsistent with the very technical dictionary on which

he relies. He cites to the definition of "data transfer rate" from Newton's Telecom Dictionary,

but this definition makes no distinction between headers and payloads—indeed, it makes no

mention of headers at all. Instead, consistent with the '831 specification, this dictionary broadly

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   defines "data transfer rate" as "[t]he average number of bits, characters, or blocks per unit time

2   passing in a data transmission system."  Ex. 38 (Jones Reply Rpt.) at 14.

3          Dr. Jones's treatment of header content also makes no sense from a basic technological

4   perspective.   Headers do not contain extraneous information.  A push notification message—or

5   any message being sent over the Internet—cannot be successfully delivered without the header

6   content.  As discussed, the headers identify the iOS device to which the notification should be

7   delivered and the specific app to which it pertains, among a host of other information.  The

8   header information and the payload are part of a single, integrated message.

9          **4.     Unwired Planet Cannot Prove Infringement Even Accepting Dr. Jones's
               Flawed Assumptions**

10         Even if one accepts Dr. Jones's unsupported views regarding the impact of message

11  headers, Dr. Jones's infringement analysis still fails as a matter of law.  Under the Court's

12  construction, the "narrowband channel" must have a meaningfully lower data transfer rate or

13  bandwidth than the "wideband channel," which is the channel used for exchanging "security

14  information."  Therefore, applying his own assumptions about the impact of header content, Dr.

15  Jones should have compared the header content of push notifications (which are sent over the

16  alleged "narrowband channel") with the header content of the alleged "security information"

17  (which is sent over the "wideband channel.")  Yet this is not the analysis Dr. Jones performed.

18         Instead, Dr. Jones compared the header content of push notification messages with

19  "standard TCP/IP traffic."  Ex. 37 (Jones Op. Rpt.) at 53.  Indeed, Dr. Jones's ultimate

20  conclusion regarding the "narrowband channel" limitation is that the APNS push-notification

21  channel "is narrowband because its significant overhead will result in a meaningfully lower data

22  transfer rate, or bandwidth, ***compared to*** a wideband channel that carries ***standard TCP/IP***

23  ***traffic***."  *Id.* at 53-54; Ex. 38 (Jones Reply Rpt.) at 15 (emphases added).

24         As mentioned previously, Unwired Planet contends that the messages exchanged between

25  an iOS device and APNS to generate a device token meet the "security information" limitation.

26  Yet Dr. Jones does not know specifically how much header information the "security

27  information" messages contain or what percentage of their total message size is taken up by

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

header information. Ex. 15 (Jones Dep.) at 394:24-398:10. This is a critical omission because without that information, Dr. Jones cannot compare the data transfer rate of the "wideband channel" with that of the "narrowband channel" *under his own methodology*. Summary judgment is thus proper because Dr. Jones has no evidence to provide infringement of the "narrowband channel" limitation even under his own flawed assumptions about header content.

## IX. APPLE'S MSJ OF NON-INFRINGEMENT OF THE '446 PATENT

Issue to be decided: Whether Apple is entitled to summary judgment of non-infringement of asserted Claims 15 and 35 of the '446 Patent because Unwired Planet cannot prove that Siri satisfies the "voice channel" requirement of the '446 Patent.

### A. Introduction

During the claim construction process, the parties' debate over whether the asserted claims of the '446 patent required a "voice channel" was fiercely contested. The stakes were so high because this claim construction issue is dispositive of infringement: it cannot reasonably be disputed that the accused Siri technology uses only a data channel, not a voice channel, to transmit all information between the mobile device and the Siri servers where speech recognition takes place. Siri sends the user's speech data to the servers over the Internet using TCP/IP transmission protocols. TCP/IP data channels are the standard form of Internet data connections, and are thus the same data channels Apple devices use for APNS push notifications, as discussed above, as well as for most Internet communications like web browsing and email.

Once Unwired Planet lost the claim construction fight and the Court ruled that the '446 claims require a "voice channel," Unwired Planet should have dropped its infringement claims. Instead, Unwired Planet has persisted in pursuing its claims, albeit under a completely different guise from the one it advanced during claim construction. During claim construction, Unwired Planet explicitly acknowledged an inherent technological distinction between a "voice channel" and a "data channel," but argued that the asserted claims did not require use of a "voice channel." Now, Unwired Planet advances an entirely different theory – namely that *any channel*, whether by nature a voice channel or by nature a data channel, is a "voice channel" whenever voice-related data is transmitted over it. This argument, in additional to being tautological,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  renders the Court's construction of the "voice input" term entirely meaningless because it

2  assumes there is no inherent difference between data channels and voice channels.

3        The '446 Patent's description of its "present invention" and the Court's claim

4  construction explicitly recognize the distinction between a channel that is by nature a voice

5  channel and one that is by nature a data channel.  Unwired Planet simply ignores that distinction.

6  Consequently, Unwired Planet's infringement claims fail as a matter of law and should be

7  dismissed on summary judgment.

8  **B.    Background**

9        **1.    The '446 Patent Is Directed To a Specific Technique of Server-Side Speech
10               Recognition Using a "Voice Channel" To Transmit Voice Input**

11       At a high level, the '446 Patent is directed to server-based speech recognition – *i.e.*,

12  sending voice input from a device to a remote server running speech recognition software, and

13  then returning a result to the device.  But the '446 Patent did not invent, nor even purport to

14  invent, the concept of server-side speech recognition.  Indeed, during prosecution, the PTO

15  rejected claims of the '446 Patent on the basis that the prior art already taught server-based

16  speech recognition.  *See* Ex. 39 (5/21/2002 Office Action) at 6-7.  Thus, Unwired Planet's own

17  technical expert, Dr. Mark Jones, agreed at his deposition that Unwired Planet did not invent

18  server-based speech recognition and that server-based speech recognition systems used with

19  mobile devices already existed before the '446 patent was filed.  Ex. 15 at 308:19-309:25.

20       As discussed at great length in the parties' claim construction briefing and during the

21  *Markman* hearing, the '446 Patent teaches a specific architecture in which the user's speech is

22  sent from the mobile device to the server over a *voice channel*.  The server analyzes the user's

23  speech to generate a "symbolic data file," which is then returned to the mobile device over a

24  separate *data channel*.  Specifically, the '446 specification explains that the "*present invention*

25  relates to a wireless communication system that utilizes a remote speech recognition server

26  system to translate voice input received from mobile devices," and further explains that this

27  "translation process begins by *establishing a voice communication channel* between a mobile

28  device and the speech recognition server."  Ex. 40 at 2:46-53 (emphasis added).  Next, "the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   speech recognition server system translates the speech into a symbolic data file, which is then

2   sent to the user through a *separate data communication channel*."  *Id*. at 2:56-58 (emphasis

3   added).  In this way, the '446 Patent makes clear that the use of separate voice and data

4   channels—a *voice channel* to send voice input to a server, and a *data channel* to send a data file

5   back from the server—is integral to the "present invention" of the patent.

6         **2.**      **The Court's Claim Construction Requires Using a "Voice Channel"**

7         Each of the asserted claims requires a speech recognition server to obtain "voice input"

8   from the mobile device.  Pointing to the distinction between *voice channels* and *data channels*

9   emphasized in the '446 Patent's description of its "present invention," Apple argued that "voice

10  input" means "speech input provided over a *voice channel*."  *See* D.I. 204 at 24-27.

11        Unwired Planet, in contrast, argued that no construction was necessary, or in the

12  alternative, that "voice input" simply means "speech input."  *See* D.I. 203 at 14-15; D.I. 209 at

13  16-17.  Unwired Planet urged that the claims did not require use of a "voice channel" and argued

14  that requiring a "voice channel" would exclude certain embodiments that purportedly used a data

15  channel to transmit voice information to the speech recognition server.  *Id*.

16        In its *Markman* order, the Court rejected Unwired Planet's position and adopted Apple's

17  proposed construction of "voice input" as "speech provided over a voice channel."  D.I. 269 at

18  24.  In its analysis, the Court noted that the '446 Patent "consistently maintains the distinction

19  between voice input being sent over a voice channel to the server device, and a data file which is

20  then sent back to the mobile device over a data channel."  *Id*. at 21.

21  **C.**      **Argument**

22        **1.**      **Siri Only Uses Data Channels**

23        Apple's Siri software does not use a "voice channel" for sending the user's speech data to

24  the Siri servers where speech recognition occurs.  Instead, Siri uses a TCP/IP data channel to

25  transmit both the user's speech data *and* the resulting data file.  Ex. 36 (Rysavy Rebuttal Rpt.) at

26  ¶¶ 382-83, 475.  Thus, while the '446 patent teaches *two* distinct types of channels for

27  communicating with a server – a voice channel to send speech to a server, and a separate data

28  channel to receive a data file back from a server – Siri takes the exact opposite approach.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Indeed, Unwired Planet's expert, Dr. Jones, concedes that Siri uses a ████████████

2    ██████, and that this connection utilizes the same TCP/IP protocols for all

3    communications.[15]  Therefore, it is undisputed that Siri uses the same TCP/IP protocols for both

4    (1) sending the user's speech data to the speech recognition server and (2) returning the resulting

5    data file to the user's mobile device.

6        Nevertheless, Unwired Planet contends that Siri uses a "voice channel" because Siri

7    software on the accused iOS devices can encode the user's speech into data packets that are

8    transmitted to the remote Siri server.  *See* Ex. 15 (Jones Dep.) at 260:20-261:11; Ex. 33 (Jones

9    Op. Rpt.) at D-40.  But this infringement theory cannot be squared with the "present invention"

10   of the '446 Patent, which, as discussed above, explains that one type of channel—a "voice

11   channel"—is used to send the user's voice input to the speech recognition server, while a

12   different type of channel—a "data channel"—is used to return the recognition results in a data

13   file to the user's mobile device.  *See* Ex. 40 ('446 Patent) at 2:46-58, 3:1-19.  It makes no sense

14   to contend that Siri sends the user's speech data over a "voice channel" when this channel uses

15   the same TCP/IP protocols that are used by what the '446 Patent identifies as the "data

16   channel"—*i.e.*, the channel used to return the resulting data file to the mobile device.

17       Moreover, TCP/IP is not a voice technology.  Instead, TCP/IP is the set of transmission

18   protocols for sending data over the Internet.[16]  *See* Ex. 36 (Rysavy Rebuttal Rpt.) at ¶¶ 223-238,

19

---

20   [15]  *See* Ex. 33 (Jones Op. Rpt.) at D-68 (noting that an iOS device communicates with the Siri
     servers "over the TCP socket connection, which is established between the Siri client and

21   server when the Siri client (or dictation) is launched by the user."); *see also* Ex. 15 (Jones
     Dep.) at 267:6-11 ("The communications [between an iOS device and Siri] are encapsulated

22   within TCP/IP."), 301:6-9 ("[D]o iOS devices communicate with Siri servers over a TCP

23   connection?  A. They do.").

24   [16]  The "IP" part of TCP/IP stands for *Internet Protocol*, and defines how data sent over the
     Internet is broken up into smaller units called "packets" and routed according to their "IP

25   addresses."  *See* Ex. 15 (Jones Dep.) at 252:3-22.  The "TCP" part of TCP/IP stands for
     *Transmission Control Protocol*, which is the protocol used to establish the connection

26   between two nodes on the Internet, such as an iOS device and a Siri server.  *See id.* at 251:5-

27   19.  The job of TCP is to ensure that IP packets reach their intended destination and are
     reassembled without errors.  *Id.*  In this way, TCP and IP work together to reliably transmit

28   data packets over the Internet.

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

383-384. Unsurprisingly, TCP/IP is the *same* set of protocols Apple devices use for APNS push notifications, as discussed above, as well as a wide range of Internet data communications, such as browsing web pages, sending emails, or downloading apps. *Id.* at ¶¶ 223-28.

Indeed, the '446 Patent specifically refers to TCP/IP as a protocol that is utilized on the ***data channel*** —not the voice channel used for sending voice input to the server. For example, dependent Claims 9 and 41 specify that TCP/IP can be used for the communication path that returns that data file, but no claims mention TCP/IP in reference to the path used to send the voice input to the server. As another example, the '446 specification explains that TCP/IP are the transmission protocols for the "wired network" depicted in Figure 1 (*i.e.*, the Internet). *See* Ex. 40 at 5:64-6:3. However, the "wired network" in Figure 1 is depicted as completely distinct from the voice channel (line 126) and instead is part of the pathway traveled by the data file when it is returned to the mobile device. *See id.* at Fig. 1, 6:64-67, 7:13-17.

Siri simply does not fit within the paradigm taught by the '446 Patent. Because Siri uses a TCP/IP data channel for all communications, summary judgment is appropriate.

### 2. Siri Communications Are Not Transmitted Over a Voice Channel

Unwired Planet's infringement theory also cannot be squared with the fact that the '446 specification describes the "voice channel" as the type of communications channel used for making or receiving *phone calls*. *See* Ex. 40 ('446 Patent) at 4:44-45 (stating that mobile devices "receive ***phone calls*** through a voice communication channel…."); 6:21-25 (explaining that the voice channel "is generally established and coordinated using the infrastructure and procedures generally known in the art for setting up a ***phone call***."). Yet it is undisputed that the accused iOS devices do not send the user's speech input to the Siri servers by placing a phone call or using any kind of phone service. Neither the user nor the iOS device dials a phone number in order to communicate with the Siri servers.

Instead, as discussed above, the user's speech data is sent to the Siri servers over the Internet using the TCP/IP protocols—the same protocols used for other Internet data, such as push notifications, web browsing, and email. Indeed, Dr. Jones, does not dispute that wireless carriers, like AT&T and Verizon, treat Siri as a data service, not a voice service. This is why Siri

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  usage counts as *data* usage rather than as part of the voice minutes allotted under a user's voice

2  plan.[17]  Similarly, because Siri is not a voice service, it works on iOS devices that have no phone

3  or cellular capabilities at all, such as WiFi-only iPads and iPods. *See* Ex. 41 at 35; Ex. 42 at 37.

4  Moreover, the TCP/IP protocols are unaffected by (and unaware of) whether voice-

5  related information or other types of data are being transmitted.  Indeed, Dr. Jones admits that

6  the TCP/IP "transmission protocols do not distinguish one type of data from another type of data.

7  ***TCP/IP is not concerned with whether it is transmitting voice data or non-voice data***." Ex. 43

8  (Jones Reply Rpt.) at D-9 (emphasis added).  It defies logic to argue that Siri uses a "voice

9  channel" if there is no differentiation between voice-related data and non-voice data.

10  Moreover, despite the fact that the '446 Patent teaches that voice channels are provided by

11  wireless carriers,[18]  Unwired Planet completely ignores how wireless carriers define voice

12  channels.  Apple's technical expert, Mr. Rysavy, explained that wireless carriers separately

13  manage voice services (*i.e.* phone calls) and data services (*e.g.* Internet traffic like Siri, web

14  browsing, and email) for important technological reasons.  *See* Ex. 36 (Rysavy Rebuttal Rpt.) at

15  ¶¶397-406.  For example, wireless carriers assign a higher priority to phone calls than TCP/IP

16  Internet traffic (such as Siri).  *Id*. at ¶¶398-99, 402.  As another example, wireless carriers apply

17  different error correction and delay mechanisms to phone calls than are applied to TCP/IP traffic

18  because of the unique requirements of conversational speech.  *Id*. at ¶¶398-99, 401.

19  Significantly, Dr. Jones, does not even address—let alone dispute—that wireless carriers use

20  these mechanisms for managing voice calls but do *not* apply them to Siri communications.

21  For these reasons, the TCP/IP data channel used to send the user's speech data to the Siri

22  servers has no resemblance to what the '446 Patent describes as a "voice channel," making

23  summary judgment of non-infringement appropriate.

---

24  [17]  *Compare* Ex. 36 (Rysavy Rebuttal) at ¶¶ 393-95 *with* Ex. 43 (Jones Reply Rpt.) at D-10.  *See*

25  *also* Ex. 44 ("Siri is available on iPhone 4s or later, iPad with Retina display, iPad mini, and

26  iPod touch (5th generation) and ***requires Internet access***. … Cellular ***data*** charges may

apply.") (emphasis added).

27  [18]  *See* Ex. 40 ('446 Patent) at 5:7-9 ("Access to the voice communication channel generally

28  requires that the user and/or device be recognized by wireless carrier network 104.").

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### 3. Unwired Planet's Tautological Infringement Theory Would Render the Courts' Claim Construction Meaningless

It is undisputed that Siri does not place a phone call, does not use voice minutes, and is not treated by wireless carriers as a voice call. Instead, as Unwired Planet and its expert concede, all Siri communications are transmitted using the TCP/IP protocols, which do not distinguish between voice-related data and non-voice data, and which are the same protocols used for Internet data communications like push notifications, web browsing, and email. Given these undisputed facts, Unwired Planet's infringement theory boils down to the conclusory contention that whenever software on a mobile device transmits voice-related information to a server, it is using a "voice channel."

Unwired Planet's infringement theory thus reduces to a mere tautology which violates the very point of the Court's claim construction. By requiring use of a "voice channel," the Claim Construction Order affirmed that the '446 Patent covers only a particular way of accessing a speech recognition server—*not all ways* of doing so. Indeed, as previously discussed, Unwired Planet's own expert concedes that Unwired Planet did not invent server-based speech recognition for mobile devices.

Yet Unwired Planet's infringement theory contravenes this fundamental premise. If a voice channel were deemed to exist any time software on a mobile device sends voice-related information to a server (regardless of how it is sent), then the "voice channel" limitation would be meaningless, as it would be satisfied by *any* speech-recognition system involving a server, including the prior art. Indeed, if Unwired Planet truly believed from the outset that a "voice channel" could be any channel used to transmit voice-related information, then there was no reason for Unwired Planet to dispute Apple's proposed construction in the first place. Thus, because Unwired Planet's infringement theory turns the "voice channel" requirement set forth in the Court's claim construction into a non-limitation, it is incorrect as a matter of law.

### X. APPLE'S MSJ OF INVALIDITY OF THE '446 PATENT

Issue to be decided:  Whether asserted Claims 15 and 35 of the '446 Patent are anticipated by the prior art Yamakita patent as a matter of law.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**A.    Background**

Unwired Planet did not invent server-based speech recognition. As discussed above with respect to the "voice channel" issue, Unwired Planet's own technical expert, Dr. Jones, concedes that server-based speech recognition systems for mobile devices existed in the prior art. *See supra* Section IX.B.1. One such prior art system is disclosed in U.S Patent No. 5,956,681 (hereinafter "Yamakita").[19] Ex. 48. *See* Ex. 46 (Cohen Op. Rpt.) ¶¶ 384-440; Ex. 47 (Cohen Reply Rpt.) ¶¶ 163-92. Indeed, Dr. Jones conceded at deposition that Yamakita discloses a server-based system that receives speech input from a mobile device, converts that speech into text data, and returns the text to the mobile device. *See* Ex. 15 (Jones Dep.) at 350:4-22.

In the system taught by Yamakita, when the user is ready to begin a speech recognition session, the mobile device generates a request called the "text speech recognition /formatting start request command," which indicates whether the user wants to dictate an E-mail or a Fax. Ex. 48 (Yamakita) at 4:29-38, 5:45-48. The user then speaks into the mobile device's microphone, and the speech is encoded into data that can be transmitted to the server. *See id.* at 5:8-16, 8:22-26.

Yamakita further discloses that the encoded speech data is transmitted over a TCP/IP connection to a remote server system called the "speech control host." *See id.* at 5:13-15. The server system includes a component called the "text speech recognition section," which is responsible for performing speech recognition. *See id.* at 5:28-34, Fig. 1 (108, 117). After the speech is initially converted into text, it is transferred to another server component, called the "formatted text generation section," which appropriately formats the text as an E-mail or Fax, based on the user's format choice. *Id.* at 5:30-61. This formatted text is then returned to the mobile device over the TCP/IP connection and displayed to the user. *Id.* at 6:1-18.

Importantly, similar to Siri, Yamakita teaches that a mobile phone communicates with the speech recognition server over the Internet using a TCP/IP data connection. It is a bedrock

---

[19] It is not disputed that Yamakita is prior art to the '446 Patent. Yamakita issued as a U.S. Patent on September 21, 1999, prior to the earliest claimed priority date of the '446 Patent, which is November 24, 1999. *See* Ex. 45 (Jones Rebuttal Rpt.) at 2.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

principle of patent law that the scope of a patent must be treated the same for purposes of both infringement and validity. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses."). Therefore, even if the Court were to accept Unwired Planet's infringement contentions, under which the "voice channel" requirement can be satisfied by a TCP/IP data connection, then the asserted claims of the '446 Patent are invalidated by Yamakita. As demonstrated below, when applying Unwired Planet's reading of the asserted claims, Yamakita discloses all elements of those claims.

**B.     Argument**

   **1.     Yamakita Discloses All Elements of Claim 15**

   Asserted Claim 15 is a dependent claim that depends from Claim 14, which in turn depends from independent Claim 1. Accordingly, the invalidity analysis set forth in this section addresses each of the limitations of Claims 1, 14, and 15.

   **Claim 1 – *Preamble* and *receiving a request for speech recognition services*.** The preamble of Claim 1 recites "[a] method of providing speech recognition services to a wireless communication device having a display screen and a user interface," and the first method step requires "receiving a request from the wireless communication device for speech recognition services at a server devices running a speech recognition application." Dr. Jones does not even address either of these limitations in his validity report, so there is no dispute that they disclosed by Yamakita. *See* Ex. 45 (Jones Rebuttal Rpt.) at 65-67.

   **Claim 1 – *Obtaining voice input*.** The next step of the claimed method requires "retrieving a voice input signal associated with the request from a first communication path." As discussed above, Yamakita teaches that after the user speaks into the microphone on the mobile device, the user's speech is encoded into data packets, which are then sent to the server over a TCP/IP connection.

   Dr. Jones simply ignores the fact that Yamakita teaches the very process that he contends infringes, and instead asserts, without further discussion, that Apple "does not provide any

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

analysis of how transmitting speech information using a TCP/IP connection meet this claim element or the Court's construction of 'voice input' as 'speech provided over a voice channel.'" Ex. 45 (Jones Rebuttal Rpt.) at 66.[20]  Unwired Planet cannot have it both ways—if encoding a user's speech into data packets and transmitting them over a TCP/IP connection meets the requirement of using a "voice channel" for infringement, it also meets this requirement for purposes of invalidity.

**Claim 1 – *Converting voice input into a symbolic data file.***  The next step of the claimed method entails "converting the voice input signal into a symbolic data file using the speech recognition application."  As mentioned above, Dr. Jones conceded at deposition that the server system disclosed by Yamakita includes speech recognition software for converting the user's speech into a text file.  Moreover, Dr. Jones does not dispute this limitation in his report beyond referring to his earlier arguments regarding the prior "voice input" limitation, which have already been addressed.

**Claim 1 – *Sending the symbolic data file to the mobile device.***  The last step in Claim 1 requires "sending the symbolic data file to the wireless communication device using a second communication path."  Yamakita teaches that, after the converted text is formatted as an E-mail or Fax document, it is returned to the mobile device over the TCP/IP connection.  *See* Ex. 48 (Yamakita) at 6:1-18.  Apple's invalidity expert, Dr. Cohen, explained in his opening report that if Siri's use of a TCP/IP connection for all communications between the iOS device and the Siri servers can satisfy this limitation, then Yamakita also satisfy this limitation for the same reasons.  *See* Ex. 46 (Cohen Op. Rpt.) at ¶ 416.

---

[20]  Dr. Jones also makes the separate argument that Yamakita only discusses "transmitting" or "receiving" voice input, rather than "retrieving" it—and then vaguely asserts that "the '446 Patent used 'receiving' and 'retrieving' differently."  Ex. 45 (Jones Rebuttal Rpt.) at 66. However, the '446 specification, *never* discloses the server "retrieving" voice input, and instead only teaches that voice input is "received" by, or "provided" to, the server.  *See* Ex. 40 at Abstract, 2:46-49, 3:13-15, 6:56-58, 10:32-34, 11:40-43, 12:46-51, 13:1-5, 13:30-38. Moreover, Dr. Jones conceded that he is not aware of any technical advantages of having a server "retrieve" voice input as oppose to "receiving" it.  Ex. 15 (Jones Dep.) at 345:2-346:3.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    The only dispute offered by Dr. Jones is another conclusory assertion. Dr. Jones asserts

2    that "Dr. Cohen's report overly simplifies the issue at hand," without further explanation. Ex. 45

3    (Jones Rebuttal Rpt.) at 66. Here again, Unwired Planet cannot have it both ways—if, for

4    purposes of infringement, a TCP/IP connection can provide both a "first communication path"

5    and a "second communication path," then a TCP/IP connection also meets these limitations for

6    purposes of invalidity.

7    **Claim 14 – _Device specific identification information_.** Dependent Claim 14 narrows the

8    method of Claim 1 by requiring that "the request received from the wireless communication

9    device includes device specific identification information." Yamakita teaches that each request

10   for speech recognition includes a "terminal identification code" that identifies the mobile

11   terminal. _See_ Ex. 48 (Yamakita) at 4:29-38, 19:57-63. Dr. Jones does not dispute that the

12   "terminal identification code" satisfies the "device specific identification information"

13   requirement. _See_ Ex. 45 (Jones Rebuttal Rpt.) at 67; Ex. 15 (Jones Dep.) at 350:23-353:7.

14   **Claim 15 – _Retrieving user specific files_.** Asserted Claim 15 further narrows the method

15   of Claim 1 by requiring that "the device specific identification information is utilized to retrieve

16   user specific files to process the request for speech recognition services." As Apple's invalidity

17   expert, Dr. Cohen, explained in his reports, Yamakita teaches that for each user request, the

18   server system generates a file referred to as the "registration table," which is depicted in Figure

19   10. Ex. 48 (Yamakita) at 28:61-29:6, Fig. 2. The registration table is stored in memory at the

20   server and uses the "terminal identification code" of the mobile device to keep track of both (1)

21   the user's format preference (_i.e._, E-mail or Fax) and (2) additional files that are used in the

22   speech recognition process. _Id._ These additional files are the "speech buffer file," which stores

23   the user's speech data to be recognized, as well as the "text buffer file," which contains the initial

24   text translation of the user's speech. _Id._; 31:40-50, 32:1-15. The server uses the "text buffer

25   file" corresponding to the user's "terminal identification code" to create a text file formatted as

26   either an E-mail or a Fax document, depending on the format preferences stored for that

27   "terminal identification code."

28   In this way, Yamakita teaches that "device specific identification information" is used to

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    retrieve "user specific files" that are utilized during the speech recognition process.[21]  In

2    response, Dr. Jones raises two issues, both of which fail as a matter of law.  First, Dr. Jones

3    argues that the registration table file, speech buffer file, and text buffer file cannot satisfy the

4    claim language because they are not retrieved before speech recognition takes place.  *See* Ex. 45

5    (Jones Rebuttal Rpt.) at 67-68.  But Claim 15 does not state that "user specific files" must be

6    retrieved before any speech recognition is performed—the claim only requires that "user specific

7    files" be used "to process the request for speech recognition services."   There is no dispute that

8    these files are used to create the formatted text file containing the recognized text that is returned

9    to the user, and are thus used to process the user's speech recognition request.

10        Second, Dr. Jones argues that the user's formatting preference is not retrieved from a file

11   but instead is only provided by the user in the initial request.  *Id.* at 68.  Dr. Jones's argument

12   fails because it is contradicted by the express language of Yamakita, which, as already discussed,

13   teaches that the formatting preference is stored in the server's registration table after it is

14   provided by the user.  *See* Ex. 48 (Yamakita) at Fig. 10, 28:61-29:2, 35:9-15.[22]

15        **2.      Yamakita Discloses All Elements of Claim 35**

16        Asserted Claim 35 is a dependent claim that depends from Claim 34, which in turn

17   depends from independent Claim 31.  The teachings of Yamakita discussed above also

18   demonstrate that Yamakita discloses all limitations of Claims 31, 34, and 35.

19   _____

20   [21]  It is Apple's position that the "user specific" claim language requires that the "user specific
         file" correlate to a known user.  Unwired Planet disagrees and takes the position that a file
21       can be "user specific" so long as the system determines that the file should be applied to the
         current user.  *See* Ex. 15 (Jones Dep.) at 311:23-312:7.  Therefore, under Unwired Planet's
22       own infringement theory, Yamakita discloses this limitation.  The parties can provide
         supplemental claim construction briefing to the extent the Court determines that the
23       interpretation of the "user specific files" limitation raises issues of claim construction.

24   [22]  To the extent Dr. Jones is arguing that the registration table is not a "file," this argument is
         contradicted by Dr. Jones's own testimony.  Dr. Jones's defined a file as merely a "unit of
25       organization of data" in which the pieces of data are "typically related" to each other.  *See*
         Ex. 15 (Jones Dep.) at 310:19-311:1.  This definition clearly covers the registration table.
26       Moreover, Dr. Jones conceded that files have been well-known in the art since the 1950s and
         further conceded that Unwired Planet did not invent using "user specific files" in speech
27       recognition systems.  *Id*. at 311:6-18, 312:18-313:7.

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    For example, the limitations of independent Claim 31 are virtually the same as those of

2 Claim 1, with the primary difference being that Claim 31 is drafted in the form of a "computer

3 readable medium" containing computer program code for providing speech recognition services.

4 However, Dr. Jones does not dispute that Yamakita discloses the requisite computer readable

5 medium. *See* Ex. 45 (Jones Rebuttal Rpt.) at 68-69. Furthermore, Dr. Jones does not make any

6 arguments with respect to Claim 31 other than referring back to his analysis of Claim 1.

7 Therefore, Yamakita discloses all of the limitation of Claim 31 for the reasons discussed above

8 with respect to the corresponding limitations of Claim 1.

9    Similar to Claim 15, Claim 34 requires "retrieving user specific files associated with the

10 request [for speech recognition services]" and "utilizing the user specific files in the conversion

11 process to convert the voice input into a symbolic data file." As discussed above with respect to

12 Claim 15, the registration table, speech buffer file, and text buffer file are all used in the process

13 of converting the user's speech into a formatted text file (i.e., a "symbolic data file") that is

14 ultimately returned to the user's mobile device. Thus, Yamakita discloses Claim 34 for the

15 reasons already discussed with respect to Claim 15.

16    Finally, asserted Claim 35 adds the requirement that "the user specific files contain user

17 preferences." Again, as already discussed, the user's formatting preference—*i.e.*, E-mail or

18 Fax—is stored in the server's registration table and used to convert the user's speech input into

19 an appropriately formatted text file that is returned to the user's mobile device. Dr. Jones argues

20 that these formatting preferences must be stored across all of a user's sessions in order to meet

21 the "user preferences" requirement. Dr. Jones is wrong because the plain language of the claims

22 contains no such requirement. Indeed, the '446 Patent specifically contemplates that the user can

23 provide new preferences with each speech recognition session. *See* Ex. 40 ('446 Patent) at 5:42-

24 46, 8:63-9:6. As a result, Dr. Jones has no basis for distinguishing Claim 15 from Yamakita.

25    **XI.    APPLE'S MSJ OF NON-INFRINGEMENT OF THE '260 PATENT**

26    <u>Issue to be decided:</u> Whether Apple is entitled to summary judgment of non-

27 infringement of the '260 Patent because Unwired Planet cannot prove that the accused iOS

28 devices perform the step of "generating a provisioning request comprising the user information

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  and the user's selection," as required by asserted claims 1 and 16 of the '260 Patent.

2  **A.    Background**

3          As the Court has explained, the '260 Patent relates to the process of "'provisioning' the

4  features and services that are available on mobile communication devices." *Markman* Order (D.I.

5  269) at 3.  Unwired Planet has accused Apple of infringing the '260 Patent by allowing users of

6  iOS devices to download certain content to their devices.  But Unwired Planet's infringement

7  theories fail, because they are based on an overbroad reading of the patent.  For example, the

8  Court has already ruled that Unwired Planet's view of the term "provisioning" is overbroad and

9  incorrect, and Unwired Planet was forced to drop its baseless infringement claims against

10  Apple's iTunes Store and iCloud as a result of the Court's ruling.  *See* D.I. 269 at 4-7.

11          Here, Apple will show that Unwired Planet's remaining allegations – against Apple's

12  App Store – fare no better.  Even putting aside the meaning of "provisioning," the accused iOS

13  devices indisputably do not infringe the '260 Patent when they are used to download apps from

14  the App Store because they do not perform the particular *method* of provisioning claimed in the

15  patent.  Specifically, the accused iOS devices do not "generat[e] a provisioning request

16  comprising the user information and the user's selection," as required by the asserted claims of

17  the '260 Patent, and therefore the Court should grant summary judgment of non-infringement.

18  **B.    Argument**

19          **1.    The Asserted Claims Require Generating a "Provisioning Request" that
                    Contains Both (1) "User Information Required to Establish a User Account"
20                   and (2) the "User's Selection" of a Feature/Service**

21          Claim 1 of the '260 Patent recites "[a] method for provisioning a two-way mobile

22  communication device," while Claim 16 depends from Claim 1 and thus includes all of the same

23  method steps (and additional limitations).  Ex. 49 at 9:15-18; 10:19-20.  In one of these method

24  steps, a mobile device must "receiv[e] user information required to establish a user account," so

25  that the account can be charged or referenced when the user wants to provision the device with a

26  new communications feature.  *Id.* at 9:19-20.  For example, the specification explains that the

27  "user information" received by the device for this purpose can include "credit card information,

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   bank-cards, etc." *Id.* at 5:18-19; *id.* at 7:12-13 (discussing "information required to establish a

2   user account (e.g., credit card information)").

3           In a subsequent method step, when the user selects a new feature or service to add to the

4   device (for example, voice mail or call forwarding), the device must "generat[e] a provisioning

5   request *comprising the user information **and** the user's selection*." *Id.* at 9:27-28 (emphasis

6   added). The word "comprising" means here that each "provisioning request" must include, at a

7   minimum, both "the user information" and "the user's selection." *See, e.g.*, *Genentech, Inc. v.*

8   *Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("Comprising is a term of art used in claim

9   language which means that the named elements are essential…."). In this claim step, "the user

10  information" that is included in the "provisioning request" must be the *same* "user information"

11  that is recited earlier in the claim – *i.e.*, the "user information required to establish a user

12  account," such as a credit card number. There is no other "user information" recited anywhere

13  else in the claim, and therefore there is nothing else to which "*the* user information" could refer.

14          In sum, each asserted claim of the '260 Patent requires a mobile device to, *inter alia*,

15  receive "user information" that is "required to establish a user account," and then generate a

16  "provisioning request" that includes both (1) that *same* "user information" that was received by

17  the device to establish a user account, and (2) the "user's selection" of a feature or service.

18          **2.      The Accused iOS Devices Do Not Generate a "Provisioning Request"**
19                  **Containing the Required Information**

20          The Court should grant summary judgment of non-infringement of the '260 Patent

21  because it is undisputed that the accused iOS devices do *not* generate a "provisioning request"

22  containing the information required by the asserted claims – *i.e.*, containing both (1) the "user

23  information" that was received by the device as "required to establish a user account," and (2)

24  the "user's selection" of a feature or service.

25          Unwired Planet is accusing Apple of infringing the '260 Patent via the App Store, which

26  allows users of iOS devices to purchase applications to run on their devices. Unwired Planet

27  contends that the claim term "user account" in the '260 Patent reads on an iOS device user's

28  iTunes Store account (which is used for both the iTunes Store and the App Store). Ex. 50 (Jones

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Op. Rpt.) at 14.  In his infringement report, Unwired Planet's expert, Dr. Jones, lists the

2    information that he opines is "required to establish" an iTunes Store account:  "In order for users

3    to create an iTunes Store account, users provide their country or region, an email address as their

4    Apple ID, a password, their birthdate, challenge questions and responses, and billing

5    information" consisting of a credit card number and/or redemption code.  *Id.* at 14-17, 47.

6         Unwired Planet thus must prove that this same "user information required to establish a

7    user account" – *i.e.*, a user's email address, birthdate, credit card information, etc. – is *literally*

8    *included* in a "provisioning request" generated by an iOS device.  More specifically, Unwired

9    Planet must show that an iOS device generates a single "provisioning request" that literally

10   contains *both* (1) this same "user information" and (2) the user's selection of a feature or service.

11   But Unwired Planet cannot make this showing because the undisputed facts are to the contrary.

12        a.    A ████████ Request Does Not Contain the Claimed "user
             information"

13

14        UP contends that the claim term "provisioning request" in the '260 Patent reads on a

15   ████████████ which is allegedly generated by an iOS device when a user attempts to

16   purchase an application from the App Store.  Ex. 50 (Jones Op. Rpt.) at 55-56.  But it is

17   undisputed that a █████ equest does *not* contain ████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████ Ex. 15 (Jones Dep.)

20   at 206:10-20. ████████████████████████████████

21   ████████████████████████████████

22   ████████████████████████. *Id.* at 191:17-192:4, 194:4-22, 195:19-

23   25. ████████████████████████████████████

24   ████████████████████████████████ it is beyond dispute

25   that a buyProduct request is *not* a "provisioning request comprising the user information and the

26   user's selection."  Thus it is undisputed that Apple does not perform the claim step of

27   "generating a provisioning request comprising the user information and the user's selection," and

28   therefore does not infringe the '260 Patent as a matter of law.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**b.**   **Apple's** ████████████ **are Not the Claimed "user information"**

Faced with these undisputed facts, Unwired Planet attempts to salvage its infringement case by relying on two pieces of information that – ████████████████████████ ██████████████████ – may actually be contained in a ████████ First, Unwired Planet points to a ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████ *See* Ex. 50 (Jones Op. Rpt.) at 55-56.

It is beyond dispute, however, that neither a ████████████████ is "receiv[ed]" by an iOS device as part of what is "required to establish a user account." The ████████████ are only generated by Apple's servers, and thus are never entered by a user—and they are not even included by Dr. Jones on his list of items, discussed above, that he opines are required to establish an iTunes Store account. *See* Ex. 50 (Jones Op. Rpt.) at 47. Indeed, it is beyond dispute that a ████████████ do not even *exist* when a user is first establishing an iTunes Store account – rather, they are created *later* at Apple servers – and therefore they cannot be "receiv[ed]" by an iOS device as part of what is "required to establish an account."[23]

Unwired Planet argues that a ████ satisfies the requirements of the asserted patent claims because Apple can use a ████ to *refer to* a user's account, and to *look up* the email address that was provided by a user when the user established an iTunes Store account. Ex. 50 (Jones Op. Rpt.) at 15, Ex. 15 (Jones Dep.) at 203:7-13. But this argument fails as a matter of law, because Unwired Planet concedes that the information *actually* provided to establish an account (*i.e.*, an email address) is not *literally* present in the alleged "provisioning request." Likewise, the information contained in the alleged "provisioning request" ████████████ was not *literally* received by the iOS device in order to "establish a user account." Unwired Planet's

---

[23] *See* Ex. 15 (Jones Dep.) at 205:7-11 ████████████████████████ ████████████████████████████████████████ ████████████████████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    expert concedes these points clearly and unequivocally. *See* Ex. 15 (Jones Dep.) at 205:24-206:2

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████

5           Moreover, it is undisputed that a ██████████████████████

6    ██████████████████████████████████ Therefore, regardless of

7    how Apple may *use* the ██████ on its servers, it is beyond dispute that the ██████ is not

8    "receiv[ed]" by an iOS device as "user information required to establish a user account," and

9    therefore it cannot serve as "the user information" that must be present in a "provisioning

10   request."

11          UP's arguments regarding the ████████ fail on the same ground. Unwired Planet argues

12   that an ██████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████ Unwired Planet's expert

20   admits this unequivocally. *See* Ex. 15 (Jones Dep.) at 207:15-18 ████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ██████████████████████████████████████████

24         ██████████████████████████████████████████

25   ████████████████ ████████████████████████████████

26

27   ─────────────────────────

     [24] *See* Ex. 15 (Jones Dep.) at 207:19-208:1 ████████████████████████████████████

28   ████████████████████████████████████████████████████████

                                                    [Footnote continued on next page]

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   Therefore Unwired Planet cannot plausibly argue that the ███████ literally meets the claim

2   requirement of "user information required to establish a user account."[25]

3           **3.      UP Cannot Combine Two Separate Requests to Meet this Claim Step**

4           Finally, Unwired Planet offers an *alternative* theory that iOS devices infringe the step of

5   "generating a provisioning request…" because they generate *two separate requests*, neither one

6   of which contains both "the user information and the user's selection."  Unwired Planet contends

7   that the combination of one request that allegedly contains "the user information" with a

8   *separate* request that allegedly contains "the user's selection" can meet this claim step.  In Dr.

9   Jones's words, this theory is that "'the provisioning request' is *the combination* of the

10  ███████████████ and the ██████████████ *See* Ex. 50 (Jones Op. Rpt) at 56 (emphasis

11  added).  But like Unwired Planet's main theory, this one also fails as a matter of law.

12          The asserted claims clearly require both the user information and the user's selection to

13  be contained in the *same* request, by reciting "a provisioning request *comprising the user*

14  *information and the user's selection*."  Ex. 49 at 9:27-28 (emphasis added).  As a matter of law,

15  the word "comprising" means here that "the named elements [*i.e.*, 'the user information and the

16  user's selection'] are essential" to the claimed "provisioning request."  *Genentech, Inc.*, 112 F.3d

17  at 501.  Unwired Planet cannot rewrite the patent claims to eliminate this requirement, and to

18  allow for two separate requests where the claims call for *both* items of information to be present

19  *together* in the same request.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F. 3d 1576, 1583 (Fed.

20  Cir. 1996) ("A patentee may not proffer an interpretation for the purposes of litigation that would

21  _____

22  [Footnote continued from previous page]

███████████████████████████████████████████████████████

23  ████████████████████████████████████████

24  [25] Because Unwired Planet's expert has not provided any opinions about infringement under the
    Doctrine of Equivalents, Unwired Planet cannot now rely on that doctrine to avoid summary

25  judgment.  For example, Unwired Planet cannot argue that the differences between a ████████
    █████████████████████████████████ are insubstantial, or that they serve

26  substantially the same function.  Unwired Planet would be wrong on the merits in any event,
    but these arguments are barred at the gate and cannot be considered here, as Unwired Planet

27  has failed to disclose any expert testimony regarding application of the DOE.  *See Texas*
    *Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

alter the indisputable public record… and treat the claims as a 'nose of wax.'").

This is particularly true here because Unwired Planet has only asserted *literal* infringement, and it is abundantly clear that the "combination" of information from two separate requests cannot literally meet the requirement for all of that information to be contained within the *same* request.[26] Indeed, Unwired Planet's expert even admits that the ███████████ is sent in "a separate network transaction" from the ███████████, so there is no dispute that they are literally not in the same request. Ex 15 (Jones Dep.) at 218:12-18. Therefore the Court should hold that Unwired Planet's alternative theory fails as a matter of law, and should grant summary judgment of non-infringement, just like another district court did recently in remarkably similar circumstances.[27]

## XII.  APPLE'S MSJ OF NON-INFRINGEMENT OF THE '092 PATENT

<u>Issue to be decided</u>:  Whether Apple is entitled to summary judgment of non-infringement of Claim 20 of the '092 Patent because Unwired Planet cannot prove that the accused iOS devices practice the limitation of "receiving a plurality of device dependent location inputs provided by said location finding equipment."

The Accused Devices do not infringe as a matter of law.  Under the Court's claim construction, ███████████████████████████

---

[26] The '260 Patent explains that the reason that *both* the user's account information *and* the user's selection need to be included together in the "provisioning request" is so that the user's account can be "verified" to ensure it is consistent with the particular communications feature or service that the user has selected.  For example, the specification explains that "[t]he provided accounting information can be verified by applications resident on provisioning server 120 or by outside financial services," and that "[o]nce the information in the provisioning request is verified, provisioning content is forwarded to mobile device 100…."  Ex. 49 at  5:19-24; *see id.* at 6:41-45 ("the processing of the provisioning request" includes "verifying the request components" and "matching the requested device features and services with available features and services").

[27] *See LBS Innovations, LLC v. BP Am., Inc.*, 2014 U.S. Dist. LEXIS 1697, *18 (E.D. Tex. Jan. 6, 2014) ("Plaintiff's argument is essentially that if multiple fields, taken together, perform the job of a single data field, then they satisfy the data field limitation. This is effectively an argument under the doctrine of equivalents, rather than an argument about literal infringement. If the claim requires a single data field, and no such field exists, then the claim is not infringed. Thus, summary judgment of no literal infringement is appropriate here.").

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

 Unwired Planet's accusations regarding ████████ ████████████████████████████████████ are not location inputs giving the required "information regarding a wireless station's location." Instead, these inputs are only ███████ ███████████████████████████████ 28 ████████████████████ ███████████████████████████████ akin to names or social security numbers, as opposed to coordinates (latitude & longitude) or other geographical information. Unwired Planet does not dispute any of these material facts. Instead, it argues that the ████████ meet the Court's construction of "location inputs" because it is possible to █████████████████████ ████████████████████████████████████, much like looking a person's address in a phone book once one has the person's name. Because the Court has already found that the claim language requires a location input to provide location information, not just information from which a location might otherwise be subsequently derived, summary judgment of non-infringement is appropriate.

### 1. As Previously Construed, "Location Inputs" Must Provide Information Regarding a Location, Not Just Information Regarding The Equipment

When considering Claim 20 of the '092 patent, the Court construed "location input" to mean "information regarding a wireless station's location." D.I. 269 at 17. The Court noted that the patent claim requires more than "merely information that can be used" to find a location. D.I. 238 at 105:6-7. Instead, a "location input" must be "information *about the location*" of the wireless station. *Id.* (emphasis added). The Court noted that information like a person's Social Security Number or name are not "location inputs," even if they "could be used" to determine that person's location. *Id.* at 105:18-21 ("But [location inputs are] not any old information that could be used to determine somebody's location, like their Social Security Number or their name."). Instead, a location input must be information "attached to a physical location," like latitude and longitude or a zip code. *Id.* at 107:7-8. Thus, as construed, "location inputs" cannot merely be identifying information that can be "used" to locate a particular piece of equipment,

---

28 The data provided by the accused ██████████████████████████████████████ ████████████████████████████████████████████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  but must be information *attached* to and providing a physical location for that equipment.

2  **2.** ████████████████████████████████ **Not "Location Inputs"**

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████

13  ██████████

14  ████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████

19  ████████████████████████████████████

20  In this case, ████████████████████████████████████████

21  ██████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  However, ████████████████████████████████████████████

25  ██████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████

1    Unwired Planet's position is directly at odds with the Court's construction.  As the Court

2    explained, a location input is not any input that can be *used*, through a series of steps, to locate a

3    wireless station; instead, it must be "information regarding [that] location" – *i.e.*, "attached to a

4    physical location," like coordinates on a map.  D.I. 238 at 107:7-8.  ███████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ████████████████████████████████████ is analogous to a person's name or

8    Social Security Number—identifiers that the Court has expressly recognized are not a location

9    inputs. *See id.* at 105:18-21.  As such, Unwired Planet's infringement claim cannot prevail.

10    Unwired Planet contends that because the ██████████████████████████

11    █████████████████████████████████████████████████████████ are

12    "information regarding a wireless station's location."  *See* Ex. 53, (Jones Op. Rpt.) at C-80.  ██

13    ████████████████████████████████████████████████████████████████

14    ████████████████████████████████████ That argument is analogous to claiming

15    that the SSNs of one's *neighbors* are information regarding the location of the individual,

16    because such information indicates proximity to those neighbors.  However, without a database

17    that maps SSNs to residential zip codes, *no individual's <u>or</u> neighbor's residence* is located.  The

18    knowledge that these SSNs belong to individuals who live near each other *still says nothing*

19    *about where they live* – they could be neighbors in San Francisco or in Fresno.  ██████████

20    ████████████████████████████████████████████████████████

21    ████████████████████████████████████████████████████████.

22    **3.**  ████████████████████████████████████████

23    ████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████████████

25    ████████████████████████████████████████. Even Unwired Planet

26    agrees that a device with only one LFE system does not infringe the '092 patent, thus summary

27    judgment of non-infringement in favor of Apple is warranted .  *See, e.g.*, Ex. 15 at 67:23-68:5

28    ("Q. So if a device only had … one LFE … [i]t wouldn't infringe Claim 20?  A. Yeah.").

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### XIII.   APPLE'S MSJ OF NO INDIRECT OR WILLFUL INFRINGEMENT

Issue to be decided:  Whether Apple is entitled to summary judgment of no willful infringement and no indirect infringement.

While direct infringement is a strict liability tort, indirect and willful infringement are not – they each require proof of the defendant's *mental state*, and for willfulness the proof must be by *clear and convincing* evidence.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060, 2067 (2011) (indirect infringement must be based on "purposeful, culpable expression and conduct"); *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007) (willfulness requires "clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent," and further that the risk of infringement "was either known or so obvious that it should have been known" to the defendant).

Unwired Planet cannot prove indirect or willful infringement here, because it cannot show that Apple has ever had the intent to infringe or cause infringement.  With regard to its pre-suit allegations, Unwired Planet cannot show that it ever told Apple what *Unwired Planet believed* was infringing the patents, let alone show that Apple itself had any intent to infringe.[29] Therefore summary judgment is warranted.  *See, e.g., Allvoice Developments U.S., LLC v. Microsoft Corp.*, 988 F. Supp. 2d 1248, 1263 (W.D. Wash. 2013) (granting summary judgment of no indirect infringement even though evidence was "sufficient to demonstrate knowledge of the patent," it did not show a triable issue "regarding whether [defendant] had knowledge (actual or willful blindness) that the induced acts constituted patent infringement"); *Robocast, Inc. v. Apple, Inc.*, 39 F. Supp. 3d 552, 568-69 (D. Del. 2014) (no willful infringement, despite defendant's knowledge of the patent, because there was no evidence that defendant knew of the subject matter of the patent or of any alleged infringement).

---

[29] At most, Unwired Planet can allege that it identified or produced copies of the patents to Apple before suit.  Ex. 54 (3rd Amended Response to Apple Rog 15).  Unwired Planet also alleges that Apple's *outside patent counsel*, responsible for prosecuting certain Apple patents that are not related to this lawsuit, learned of the asserted Unwired Planet patents in connection with prosecution of Apple's patents.  *Id.* But Unwired Planet has not offered any evidence or reason to believe that anyone involved in the design or sale of Apple's *products* ever learned of the patents through these patent office proceedings.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    For the post-suit time period, Unwired Planet likewise has no evidence of Apple's intent,

2    and moreover Apple has shown above that it has strong (indeed, dispositively strong) non-

3    infringement defenses to each of Unwired Planet's asserted patents.  Even if the court determines

4    that Apple's defenses are not completely dispositive of infringement, they are dispositive of

5    willfulness under the objective prong.  *See Bard Peripheral Vascular, Inc. v. W.L. Gore &*

6    *Associates, Inc.*, 682 F.3d 1003, 1005-06 (Fed. Cir. 2012) (patentee generally cannot satisfy

7    objective recklessness prong of willful infringement "where an accused infringer relies on a

8    reasonable defense to a charge of infringement"); *Monolithic Power Sys., Inc. v. O2 Micro Int'l*

9    *Ltd.*, 2010 WL 583960, at *9 (N.D. Cal. Feb. 16, 2010) (granting summary judgment of no

10   willful infringement).  It is also undisputed that Apple has held these defenses in good faith, and

11   thus does not have the intent required for indirect or willful infringement.   *See, e.g.*, *Advanced*

12   *Fiber Techs. Trust v. J&L Fiber Servs., Inc.*, 674 F.3d 1365, 1377 (Fed. Cir. 2012) (affirming

13   grant of summary judgment of no willfulness as a matter of law, because "numerous factors"

14   indicated that the defendant's acts were not objectively reckless, including the defendant's

15   "compelling non-infringement and invalidity arguments"); *Commil USA, LLC v. Cisco Systems,*

16   *Inc.*, 720 F. 3d 1361, 1367-68 (Fed. Cir. 2013) *cert. granted in part*, 135 S. Ct. 752, 190 L. Ed.

17   2d 474 (2014) ("a good-faith belief of non-infringement is relevant evidence that tends to show

18   that an accused inducer lacked the intent required to be held liable for induced infringement").[30]

19                    **XIV.   CONCLUSION**

20    For the foregoing reasons, Apple respectfully asks the Court to deny Unwired Planet's

21   motions for summary judgment and to grant Apple's motions for summary judgment.

---

26   [30]  Apple's invalidity defenses are also evidence negating the intent for indirect and willful
         infringement.  *See Seagate*, 497 F.3d at 1371 (willfulness requires knowledge with respect to
27       infringement "of a *valid* patent") (emphasis added); *Commil*, 720 F.3d at 1468 ("It is
         axiomatic that one cannot infringe an invalid patent.").
28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dated: March 16, 2015.

By: */s/ Y. Ernest Hsin*

Josh Krevitt
jkrevitt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave.
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

H. Mark Lyon
mlyon@gibsondunn.com
Y. Ernest Hsin
ehsin@gibsondunn.com
Stuart Rosenberg
srosenberg@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Rd.
Palo Alto, CA 94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

*Attorneys for Defendant Apple Inc.*

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

### **CERTIFICATE OF SERVICE**

2       The undersigned hereby certifies that the foregoing document was filed electronically in

3 compliance with Civil L.R. 5.4, and will be served upon all counsel of record for the parties who

4 have consented to electronic service in accordance with Civil L.R. 5.4 via the Court's ECF system.

5 Dated: March 16, 2015         By: */s/ Christina Kogan*

6                                   Christina Kogan

7                                   GIBSON, DUNN & CRUTCHER LLP

8                                   *Attorney for Defendant Apple Inc.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28