H. MARK LYON, SBN 162061
mlyon@gibsondunn.com
Y. ERNEST HSIN, SBN 201668
ehsin@gibsondunn.com
STUART M. ROSENBERG, SBN 239926
srosenberg@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300

TRACEY B. DAVIES (admitted *Pro Hac Vice*)
tdavies@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Ave., Suite 1100
Dallas, TX  75201-6912
Telephone:  (214) 698-3100

BROOKE MYERS WALLACE, SBN 259169
bwallace@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNWIRED PLANET LLC, | CASE NO. 3:13-cv-4134-VC |
| Plaintiff, | **APPLE'S MOTION FOR ATTORNEYS' FEES PURSUANT TO 35 U.S.C. § 285** |
| v. | |
| APPLE INC., | |
| Defendant. | |

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     LEGAL STANDARD .......................................................................................... 1

III.    STATEMENT OF FACTS ................................................................................... 2

        A.      Unwired Planet ....................................................................................... 2

        B.      History of Related Litigation Between the Parties ................................. 3

        C.      Procedural History of This Suit .............................................................. 4

        D.      The '831 Patent ...................................................................................... 7

        E.      The '260 Patent ...................................................................................... 9

                1.      "Provisioning" ............................................................................ 9

                2.      "User information" ................................................................... 10

        F.      The '446 Patent .................................................................................... 11

        G.      The '092 Patent .................................................................................... 14

IV.     ARGUMENT ..................................................................................................... 16

        A.      UP's "Everything But the Kitchen Sink" Approach Should be Deterred ................. 16

        B.      UP Should Never Have Asserted the '831 Patent Against Apple ............................ 19

        C.      Assertion of the '260 Patent Against Apple Merits the Award of Fees .................... 21

                1.      UP's blatantly litigation-driven pursuit of an overbroad and
                        unsupported construction of "provisioning" merits fees ............................. 21

                2.      UP should have known it could not prove literal infringement of the
                        '260 patent ................................................................................ 22

        D.      UP Should Have Dropped the '446 Patent After the Court's Claim
                Construction Order ............................................................................... 23

        E.      UP Should Have Dropped the '092 Patent When Apple Served Its Non-
                Infringement Contentions .................................................................... 24

        F.      Apple's Attorneys' Fees and Costs are Reasonable and Should Be Awarded .......... 25

V.      CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES
## Cases

*02 Micro International Ltd. v. Monolithic Power System,*
    467 F. 3d 1355 (Fed. Cir. 2006) ........................................................................ 19

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
    377 U.S. 476, 488 (1964) ......................................................................... 15, 16

*Cartner v. Alamo Group Inc.,*
    561 F. App'x 958 (Fed. Cir. 2014) .................................................................. 21

*Chalumeau Power System LLC v. Alcatel-Lucent,*
    No. 11-1175, 2014 WL 4675002 (D. Del. Sept. 12, 2014) ......................... 23

*Commil USA, LLC v. Cisco Sys., Inc.,*
    575 U.S. ----, 135 S. Ct. 1920 (2015) ..................................................2, 17, 19

*Digital Biometrics, Inc. v. Identix, Inc.,*
    149 F.3d 1335 (Fed. Cir. 1998) ....................................................................... 23

*Ericsson, Inc. v. D-Link Systems, Inc.*
    773 F.3d 1201 (Fed. Cir. 2014) ....................................................................... 15

*Global-Tech Appliances, Inc. v. SEB S.A.,*
    131 S. Ct. 2060 (2011) ............................................................................... 15, 26

*Highmark, Inc. v. AllCare Health Management System, Inc.,*
    572 U.S. ----, 134 S. Ct. 1744 (2014) ............................................................... 2

*Highmark, Inc. v. Allcare Health Management System, Inc.,*
    687 F.3d 1300 (Fed. Cir. 2012) ....................................................................... 21

*In re Katz Interactive Call Processing Patent Litigation,*
    639 F.3d 1303 (Fed. Cir. 2011) ....................................................................... 18

*Intex Recreation Corp. v. Team Worldwide Corp.,*
    No. 04-1785, 2015 WL 135532 (D.D.C. Jan. 9, 2015) ................................ 22

*Kilopass Technologies, Inc. v. Sidense Corp.,*
    738 F.3d 1302 (Fed. Cir. 2013) ....................................................................... 26

*Linex Technologies, Inc. v. Hewlett-Packard Co.,*
    No. 13-159, 2014 WL 4616847 (N.D. Cal. Sept. 15, 2014) ....................... 19

*MarcTec, LLC v. Johnson & Johnson,*
    664 F.3d 907 (Fed. Cir. 2012) ......................................................................... 23

*Motorola Mobility LLC v. International Trade Commission,*
    535 Fed. Appx. 971 (Fed. Cir. 2014) .............................................................. 23

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
    572 U.S. ----, 134 S. Ct. 1749 (2014) ................................................... 1, 2, 19

*Ricoh Co. v. Quanta Comp. Inc.*,
   550 F.3d 1325 (Fed. Cir. 2008) ...................................................................................... 14, 25

*Sorkin v. Universal Building Product Inc.*,
   No. 1:08-CV-133, 2010 WL 519742 (E.D. Tex. Feb. 9, 2010) ........................................... 22, 24

## I.   INTRODUCTION

Defendant Apple Inc. hereby moves for its attorney fees under 35 U.S.C. § 285.  This case is "exceptional" within the meaning of that statute, thereby warranting fees for Apple as the prevailing party, because this case exemplifies the improper litigation strategy employed by Plaintiff Unwired Planet LLC ("UP") in its attempt to wring value out of an obsolete patent portfolio.  Here, and in other jurisdictions across the country, UP has pursued a host of meritless patent claims against Apple, and has often refused to drop its claims even after Apple has demonstrated them to be meritless.  Indeed, UP has even gone so far as to press meritless infringement claims after losing claim construction disputes that are dispositive of infringement – in other words, even *after* the presiding Judge has ruled that the claims do not cover what UP alleged they cover.  In one instance, UP even pressed on after claim construction despite having *promised explicitly* that it would stipulate to judgment in Apple's favor if Apple won on claim construction (which Apple did).  Simply put, this case stands out from the typical run of patent cases, both because UP's claims were unusually weak, and because UP's continued pursuit of those claims put an unusual and unwarranted burden on Apple and the Court.  Therefore this case is "exceptional" under the Patent Act, and the Court should award fees to Apple.

## II.   LEGAL STANDARD

Section 285 of the Patent Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  The standard for awarding fees in "exceptional" cases was recently articulated by the Supreme Court:  "an exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) *or* the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. ----, 134 S. Ct. 1749, 1756 (2014) (emphasis supplied).  The Court explained in *Octane*, and in another decision issued the same day, *Highmark, Inc. v. AllCare Health Management System, Inc.*, that this test is "inherently flexible" (*Octane*, 134 S. Ct. at 1756), and that the decision to impose fees is committed "to the discretion of the district court."  572 U.S. ----, 134 S. Ct. 1744, 1748 (2014).

Importantly, the Supreme Court overruled the Federal Circuit's prior test for attorney fees,

which had set a higher bar by requiring "litigation-related misconduct of an independently sanctionable magnitude or … that the litigation was *both* 'brought in subjective bad faith' *and* 'objectively baseless."  *Octane*, 134 S. Ct. at 1756 (emphasis added).  Instead, the Supreme Court held that courts may award fees when a case "st[ands] out from others" *either* with respect to the "substantive strength of the party's litigat[ion] position" *or* with respect to "the unreasonable manner in which the case was litigated."  *See id.* at 1756.  Some factors that can demonstrate that fees are warranted include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *See id.* n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 535 n.19 (1994)).  The Supreme Court recently stressed that "district courts have the authority *and responsibility* to ensure frivolous cases are dissuaded" by awarding attorney fees under section 285 when warranted.  *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. ----, 135 S. Ct. 1920, 1930 (2015) (emphasis supplied).

Finally, the Supreme Court's decisions in *Octane* and *Highmark* rejected the Federal Circuit's requirement "that patent litigants establish their entitlement to fees under § 285 by 'clear and convincing evidence[.]'"  *Octane*, 134 S. Ct. at 1758.  Instead, a simple "preponderance of the evidence" of "exceptionality" is sufficient to warrant a fee award.  *Id.*

### III.     STATEMENT OF FACTS

**A.     Unwired Planet**

UP was once an operating company that provided actual services.  In the 1990's and early 2000's, UP provided ways for the cell phones that were popular at the time – but that had very limited capabilities – to access computer networks like the Internet, for example by using intermediary server computers to do the heavy lifting that these simple cell phones could not do themselves.  *See* D.I. 205-1 at 1[1].

However, UP's technology and its operating business (catering to cell phones) have become obsolete.  In the age of the modern smartphone, it is now possible to put a full-fledged computer in

---

[1]  Unless otherwise indicated, all citations to the docket index are citations to the record in this case.

your pocket and to communicate with it over high-speed wireless networks.  Even UP itself predicted that its business would decline as smartphones overtook older cell phones.  In 2008, UP told the public that its products were built for "mobile phones," and that if customers adopted "competing products" such as "smart phones," then UP's business would be "adversely affect[ed]."  *Id.* at 9.  A few years later, UP sold its last remaining operating business and turned exclusively to patent litigation and licensing.

**B.     History of Related Litigation Between the Parties**

This is not the first time UP has sued Apple under patents that Apple simply does not use.  In 2011, UP sued Apple in the District of Delaware and the U.S. International Trade Commission (ITC), asserting five patents against Apple:  U.S. Patent Nos. 6,405,037; 6,403,409; 6,625,447; 6,233,608; and 6,289,212.  UP asserted each of those patents against the same products at issue here (iPhone, iPad, and iPod touch) and against a wide range of applications, including many of the same applications accused in this case.[2]

The case in Delaware was stayed pending the outcome of the ITC investigation.  During the 13-month-long ITC investigation, the parties undertook extensive discovery and litigated the case to within days of the ITC trial.  As the case proceeded, Apple showed again and again that UP's patents were invalid or directed at fundamentally different technology than Apple used in its products and therefore did not infringe.  First, UP dropped the '212 patent after Apple served its invalidity contentions.  *See* Complainant's Mtn. for Partial Termination, *In the Matter of Certain Devices for Mobile Data Commc'n*, Inv. No. 337-TA-809 (Mar. 9, 2012).  UP then dropped the rest of its patents after the Administrative Law Judge adopted claim constructions that eviscerated UP's case.  *See*

---

[2]  The '037 patent purportedly related to updating applications without making any changes in the mobile device and was asserted against the App Store and HTML5 web apps.  The '447 patent was allegedly directed to server-side transformation of Internet resources so that they could be processed and displayed by resource-constrained mobile devices.  It was asserted against the App Store, iTunes Store, MMS/iMessage, Weather, Stocks, and Safari for iOS.  The '409 patent purported to cover thin client software used on resource-constrained mobile devices to display "card decks" of information.  This patent was asserted against the App Store, iTunes Store, MMS/iMessage, and Safari apps.  The '608 patent allegedly related to sharing data between a mobile device and a PC; it was asserted against MobileMe, iCloud, Mail, App Store, and iTunes Store applications.  Lastly, the '212 patent allegedly covered accessing and managing e-mail while unconnected to a wireless network; it was asserted against the Mail application.

3

Complainant's Motion for Partial Termination, *Mobile Data Commc'n* (Oct. 2, 2012); Complainant's Notice of No Triable Issue of Fact as to Infringement, *Mobile Data Commc'n* (Oct. 5, 2012).

Rather than re-evaluate the validity and applicability of its patent portfolio to Apple's products in light of its losses at the ITC, however, UP instead returned to the District of Delaware for a second bite at the apple, pursuing infringement claims on three of the same patents it had just dropped in the ITC.  UP asked the court in Delaware to conduct an early *Markman* on key claim terms, promising that if the court were to construe these terms the same as the ITC had, then UP would promptly concede defeat by stipulating to a judgment of non-infringement.  Joint Rpt. Re: Claim Construction at 2, *Openwave Sys., Inc. v. Apple Inc.*, No. 11-765 (D. Del. July 12, 2013) (D.I. 33). The district court agreed to this unusual procedure, as did Apple (in reliance on UP's promise to the court).  *See id.*; Oral Ord., *Openwave* (July 15, 2013).  And UP then proceeded to make the same claim construction arguments that UP had made and lost in the ITC.  The district court rejected UP's arguments and adopted the exact construction as had the ALJ in the ITC – indeed, the *verbatim* construction.  Memo. Op. at 3, 6, *Openwave* (Feb. 19, 2014) (D.I. 62).

However, despite having said in no uncertain terms that it would stipulate to non-infringement if it lost on claim construction, UP *refused* to so stipulate, and instead attempted to continue the litigation and to rewrite the district court's construction after the fact (by submitting a proposed order with an unannounced alteration to the court's construction).  *See* Br. in Opp'n to MSJ of Non-Infringement at 6, *Openwave* (July 14, 2014) (D.I. 95); Letter and Proposed Ord., *Openwave* (Feb. 24, 2014) (D.I. 63, 64).  Apple had no choice but to prepare and file an early motion for summary judgment in order to hold UP to its word.  *See* Motion for Leave and MSJ of Non-Infringement, *Openwave* (Apr. 24, 2014) (D.I. 70, 73).  Only after that motion was fully briefed and decided did UP finally concede defeat.[3]  Stip. Re: Judgment, *Openwave* (Oct. 2, 2014) (D.I. 101).

**C.   Procedural History of This Suit**

In addition to the suits in the ITC and Delaware, UP filed this case against Apple in the

---

[3]  UP's conduct in Delaware is the subject of a pending motion for fees in that district.

District of Nevada, asserting 10 patents against Apple's iPhone, iPad, and iPod touch.[4]  UP's allegations in this case targeted many of the same iOS applications and features as were at issue in the ITC and Delaware.  And like the patents in those actions, none of these patents actually cover Apple's technology.[5]

UP served its initial infringement contentions in February 2013.  There, for the first time, UP identified that it was asserting *247 claims* against Apple.  *See* D.I. 72 at 16-18.  This amounted to roughly 80% of the total number of claims contained in the 10 patents.  For certain of the patents, UP was asserting all or nearly all of the patent's claims.

Apple was forced to seek the Court's intervention on a number of issues because of UP's scattershot approach.  For example, Apple had to repeatedly insist that UP comply with its obligation under the applicable local rules to disclose its infringement theories to Apple.  Early on, UP failed to comply with the Nevada Local Patent Rules requiring a claim-by-claim disclosure for allegations of indirect infringement.  *See* D.I. 90 at 5-9.  Instead, UP made a single, vague, generalized allegation of indirect infringement for all claims.  *See id.* at 6.  After UP refused to comply with the Local Rules, Apple sought the Court's intervention.  *See id.* at 5-9.  The Court ordered UP to supplement its contentions for each of the 247 claims.  D.I. 94 at 2.

Then, when UP refused to voluntarily narrow the scope of the case before Apple was scheduled to serve its invalidity contentions (which would have been hugely voluminous otherwise), Apple again was forced to seek the court's intervention.  *See* D.I. 72 at 16-18.  Magistrate Judge Cooke agreed that UP needed to circumscribe its case to no more than 70 claims, citing UP's familiarity with the accused products and applications and the court's need to "assist in expediting the

---

[4]  U.S. Patent Nos.  6,317,594; 7,020,685; 7,233,790; 7,299,033; 7,522,927, 6,813,491; 6,317,831; 6,321,092; 6,532,446; 6,647,260.  D.I. 1.

[5]  The '594 patent, dropped by UP before *Markman*, purportedly related to pushing alerts automatically to mobile devices upon certain triggering conditions.  It was asserted against APNS, Mail, Location Services, and iAds.  The '685 patent was allegedly directed at enabling access to Internet resources without a web browser; it was asserted against Siri.  The '790 and '033 patents were asserted against capability-based and domain-based distribution of content, respectively; both were asserted against the App Store and iTunes Store.  The '927 patent was purportedly directed at a specific type of location input interface and was asserted against Location Services.

1   case and managing its docket."  D.I. 96 at 3.

2          Shortly after Apple provided detailed invalidity and non-infringement contentions on the 70

3   claims UP selected from the 10 patents, this case was transferred to the Northern District of

4   California.  By then, the case was approaching claim construction, and Apple again requested that UP

5   further focus its case.  Again, UP refused, and again Apple was forced to seek the court's

6   intervention.  At a Case Management Conference in front of Judge Gonzalez-Rogers in January 2014,

7   the Court agreed with Apple's view that the case should be narrowed, and UP then agreed to choose

8   its "10 best claims" from the 10 patents-in-suit to pursue through claim construction.  D.I. 188 at 22.

9   Rather than choose one claim from each patent, however, UP then *dropped 5 of the 10 patents-in-suit*

10  *without prejudice* – but only after having forced Apple to conduct fact investigation and prepare

11  invalidity and non-infringement contentions for all 10 patents.  *See* D.I. 259.  The parties then

12  proceeded to claim construction on the five remaining patents.

13         In July 2014, three months after the parties had exchanged all of their claim construction

14  disclosures and submitted all claim construction briefing, UP served a new set of proposed

15  supplemental infringement contentions for each of the asserted patents; again, at Apple's insistence.

16  *See* D.I. 242 at 3-4.  Apple objected to the new contentions provided for the '831, '092, and '491

17  patents because UP had attempted to improperly add brand new infringement theories against newly

18  accused technologies.  The Court denied UP's motion to amend its contentions, agreeing with Apple

19  that UP lacked any good cause for the late change in infringement theories.  *See* D.I. 261.

20         In November 2014, this Court's constructions confirmed, in almost every instance, that UP's

21  patents do not apply to Apple's products, and indeed should not have been asserted against Apple's

22  products at all.  Nevertheless, UP refused to acknowledge that the Court's ruling affirmed the

23  fundamental inapplicability of its patents to Apple's products.  UP dropped only one of the five

24  remaining patents (the '491 patent), and continued with four patents (the '831, '260, '446, and '092

25  patents) despite lacking any triable infringement theories under the Court's constructions (apart from

26  a claim for "de minimus" damages, addressed below).  *See* D.I. 295.

27         Shortly before trial, the Court granted summary judgment of non-infringement in favor of

28  Apple on the '831, '260, and '446 patents.  *See* D.I. 414 (hereinafter "SJ Ord.").  The Court also

granted summary judgment of no indirect infringement on all patents.  *See id.*  As a result, UP was

left with only a "de minimus" damages claim for direct infringement of the '092 patent, which UP

eventually dropped.  *See* D.I. 415.  Consequently, as of the conclusion of this case, UP has asserted

fifteen different patents against Apple in four jurisdictions without prevailing on a single one.

**D.      The '831 Patent**

As the Court found in its summary judgment order,

> [t]he '831 Patent describes a technique for more efficiently enabling secure data
> transactions using a narrowband channel.  Each of the asserted claims – claims 17, 23,
> and 25 – requires a wideband channel to first exchange security information, and a
> narrowband channel to then transmit the relevant data over the secure connection.  The
> primary difference between the two types of channels is the rate at which they transfer
> data.

SJ Ord. at 2.  Thus, to prevail UP had to be able to prove two things true with respect to APNS:  first,

that APNS used two different "channels" to send particular information to and from the accused

device; and second, that one of the channels was a "narrowband channel" and the other a "wideband

channel."  *See id.*

There was never any dispute that the claims required two different channels.  *Id.* at 3.

Moreover, there was no dispute that the accused information exchanged by APNS "occur over a

*single* Internet connection using TCP/IP protocols," which as the Court concluded, "seems to belie

the suggestion that they occur over different channels."  *Id.* (emphasis supplied).  Thus, for this

reason alone UP could never have prevailed on its claims relating to the '831 patent.

Importantly, the fact that APNS used only a single, persistent TCP/IP connection for all

communications was publicly known before UP filed the complaint in this case, as it was

prominently discussed in materials Apple provides to its application developers.  *See* D.I. 317-35 at

13 (Apple Inc., Local and Push Notification Guide (2011)) ("APNs uses a persistent IP connection

for implementing push notifications.").  Further, UP was aware of this document, and cited it in its

first infringement contentions served in February 2013.  *See* D.I. 317-35 at 13.

The parties did dispute whether APNS used a "narrowband channel" and a "wideband

channel."  After the parties briefed competing constructions of "narrowband channel," UP agreed to

Apple's proposed construction, as modified by the Court:  "channel with a meaningfully lower data

transfer rate or bandwidth than the wideband channel."  *See* D.I. 269 at 2 (hereinafter "CC Ord.").

In spite of agreeing that the asserted claims required that the different alleged channels used by APNS have "meaningfully" different data transfer rates or bandwidths, UP never identified two different channels used by APNS that actually transmitted data at different rates.  *See* SJ Ord. at 3. Instead, UP's infringement theory relied on a mischaracterization of "data transfer rate."  UP argued that a limitation on the size of push notifications sent via APNS would *create* a narrowband channel from an otherwise-wideband channel.[6]  *See* SJ Ord. at 5.  As UP argued,

> because the push notification contains significant overhead in the form of header information, and because header is not data, the payload (or data) reaches the iOS device at a slower rate than it otherwise would in a message with a lower percentage of header information, and thus the data transfer rate is meaningfully lower.

*Id.* at 4.  But, as the Court concluded, this argument was based on a "faulty premise," and indeed that argument "ha[d] nothing to do with the *capacity* of the alleged narrowband channel."  *Id.* at 3, 5 (emphasis in original).  And "[y]et that is precisely how a narrowband channel is defined in the '831 patent."  *Id.*  Having rejected UP's argument, the Court concluded that UP had "introduced no evidence to suggest" that APNS met the "narrowband channel" limitation of the asserted claims and granted summary judgment of non-infringement of the '831 patent in favor of Apple.  *See id.*

Significantly, Apple's original non-infringement contentions served in May 2013 made clear that APNS did not use "narrowband channel," as required by the asserted claims.  Lyon Decl. Ex. 1 at 1-2.  In fact, those non-infringement contentions *specifically rebutted* UP's argument – which the Court ultimately rejected – that the size-limitation on a push notification created a narrowband channel:

> [UP] contends that APNS infringes this claim, but APNS does not utilize a "narrowband channel" within the meaning of the asserted claims.  [T]o the extent [UP] contends that the size of individual notifications sent through APNS demonstrates that APNS utilizes a "narrowband channel," [UP]'s contention is incorrect, at least because the size of an APNS notification is not a characteristic of the data channel over which

---

[6]  UP attempted to proffer a new infringement theory (i.e., "throttling") in its infringement contentions served in July 2014, after the parties had briefed and argued claim construction.  *See* D.I. 261 at 3.  Apple objected, arguing that UP did not have good cause to add new theories that late in the case.  *See id.*  The Court agreed, precluding UP's new theories because they could have been advanced earlier based on the same public documents that UP had cited in earlier versions of its infringement contentions.  *See id.*  Then, UP's expert report included that very same infringement theory in direct contravention of the Court's order.  *See* D.I. 261 at 3-4.  This blatant disregard for the Court's order required Apple seek the Court's intervention again (by way of a Motion in *Limine*) on this issue.  *See* D.I. 382-4.

it is sent, let alone evidence of a "narrowband" or "wideband" channel within the meaning of the asserted claims.

*See id.* at 1. In October 2014, UP deposed Apple's corporate designee on APNS. *Id.* ¶ 40. This deposition further confirmed the substance of Apple's May 2013 non-infringement contentions. Nevertheless, UP refused to abandon its allegations against APNS. *See id.* at Ex. 5 at 2.

## E.     The '260 Patent

As summarized by the Court, the '260 patent "discloses an invention for 'provisioning' the features and services available on a mobile communications device ...." SJ Ord. at 11. The Court found:

> As the patent describes, a number of parameters on a mobile device must be provisioned before that device can be used. The Background of the Invention identifies two problems the '260 Patent was intended to overcome. First, at the time of the invention, customers had to go to a physical store in order to provision their mobile device, which could be inconvenient and subject customers to the unwanted pressures of salespeople. Second, there was a significant amount of fraud in the telecommunications industry due to the lack of security. The invention of the '260 Patent provides a solution by allowing the users to provision the phone themselves, without the need to come into a store, and to do so in a secure manner.

CC Ord. at 3-4.

### 1.     "Provisioning"

A critical dispute at claim construction centered around the scope of the term "provisioning." UP proposed broadly construing the term as "providing, enabling, or modifying." D.I. 204 at 9. Apple proposed more narrowly construing the term as "enabling [or modifying] telecommunications capabilities on." *Id.* Thus, as the Court put it, the dispute boiled down to the following: what was it that the patent intended to be provisioned to the mobile devices? *See* CC Ord. at 4. Put another way, did the inventors contemplate the patent covering the provision of "only telecommunications capabilities," as Apple argued, or "all mobile device capabilities," as UP argued?

Apple's proposed construction was based on the teachings of the '260 patent and was consistent with the established understanding of that term of art. *See* CC Ord. at 5 ("[T]he specification … supports a construction of 'provisioning' that more closely aligns with Apple's proposal."). UP's construction, in contrast, was unmoored from the patent's technical context in an attempt to broaden the claims to encompass the downloading of all applications, music and other media by way of the App Store and iTunes Store.

9

During claim construction UP never successfully rebutted Apple's argument and evidence that the term "provisioning" had a specific, well-understood meaning within the '260 patent's technical field.  *See id.* at 4.  The Court agreed, concluding that "because 'provisioning' appears so often and almost always without context, it appears the Patent assumes that the user of the invention will know what 'provisioning' means, which suggests that the term had a well-understood, ordinary meaning in the art." *Id.* at 4-5.  In addition, the Court agreed with Apple that "the specification *uniformly* states that 'provisioning' is related to enabling or modifying the communication services and features of a mobile device," not just any feature, service, application, or content.  *See id.* at 5-6 (emphasis supplied).  In fact, the Court found that UP "failed to offer any compelling evidence of its own to support its much broader construction."  *Id.* at 5.  Thus, the Court adopted Apple's proposed construction in substance and construed "provisioning as "enabling or modifying communications capabilities."  *Id.* at 7.

As a result, UP had to drop its infringement allegations against the iTunes Store and iCloud, but maintained its infringement allegations against the App Store's alleged "provisioning" of applications that allegedly "enabled or modified communications capabilities."  Then, *for the first time* in UP's opening expert report, UP disclosed its theory that *any* applications that have *any* *communications capabilities at all* would practice the "provisioning" limitation as construed by the Court.  "Applications without communications capabilities do not interact with the Internet, servers located elsewhere, or other devices."  D.I. 356-38 at 14.

**2.   "User information"**

Another central dispute in the case centered around the "user information" term of Claim 1. Claim 1 recites, in relevant part, "a method for provisioning a two-way mobile communications device," which comprises, in relevant part, "receiving user information required to establish a user account..." and "generating a provisioning request comprising the user information and the user's selection."  SJ Ord. at 11.  As the Court held at summary judgment, "[t]he asserted claim requires that 'the user information' in the provisioning request be the same 'user information required to establish a user account'" *Id.* at 12.  The Court concluded that this requirement of the claims was "evident" because:

> there is no type of 'user information' mentioned in the claim other than that needed to establish a user account, because the inventor's use of 'the' in 'the user information' suggests a reference back to this earlier-cited user information needed to establish the account, and because the same claim term should be given a consistent meaning within the same claim.

*Id.* at 12-13.  Yet, as the Court found, "the user information in the alleged provisioning request is *not* the same user information required to establish a user account."  *Id.* at 13 (emphasis supplied).  That is, none of the "user information" used to establish the user account (i.e., the user's email address (which then serves as the user's AppleID), a password, birth date, country or region, challenge questions or responses, and billing information) was included in the accused "provisioning request," the buyProduct request.  Thus, as the Court concluded, UP had "no[] literal infringement argument" for this patent, and the Court granted summary judgment of non-infringement in Apple's favor.  *Id.*

Importantly, Apple informed UP early in the case, in May 2013, that the accused products did not meet this limitation of the '260 patent.  Lyon Decl. Ex. 2 at 2 ("The step of 'generating a provisioning request comprising the user information and the user's selection' is not performed.  For example, UP has failed to establish, and cites no evidence to demonstrate, that any request from the iOS device includes both [the] 'user information' and 'the user's selection,' as required by the claim.").  During fact discovery, Apple even spelled out in detail how the accused products cannot meet this limitation.  *Id.* at Ex. 3 at 28 (explaining that a buyRequest "does not include the user's Apple ID or password").  And UP had ample opportunity to explore this issue at the depositions of Apple's corporate designee on the App Store and iTunes Store on October 10, 2014, as well as the deposition UP took of another Apple engineer with knowledge of App Store and iTunes Store on November 17, 2014.  *See id.* ¶ 41.

**F.    The '446 Patent**

The '446 patent, as the Court found,

> discloses an invention for extending speech recognition capabilities to mobile devices.  Under the method taught by the patent, a user speaks into a mobile device, the user's speech is sent over a voice channel to a server, the server converts the speech into a symbolic data file, and the server then sends the data file back to the mobile device over a data channel.

SJ Ord. at 5.  The reason for this, according to the '446 patent, was to permit devices without "additional computing resources" (*see* CC Ord. at 19), to access speech recognition applications on

---

11

remote servers.  Thus, as the Court concluded at claim construction and again at summary judgment, the "core" inventive feature of the '446 patent is that "two separate channels are used[:]  a voice channel for sending voice input from the device to the server, and a data channel for sending the data file from the server back to the mobile device …."  SJ Ord. at 5; *see also* CC Ord. at 21-22.

At claim construction, UP argued that "voice input" should be not be construed.  Apple disagreed, and argued that patent's description of the present invention required that the term be construed as "speech provided over a voice channel."  D.I. 204 at 24-28.  The Court agreed with Apple and adopted Apple's proposed construction.  CC Ord. at 20-24.  As the Court held, Apple's construction was correct because "[t]he patent consistently maintains the distinction between voice input being sent over a voice channel to the server device, and the data file which is then sent back to the mobile device over a data channel."  *Id.* at 21.  Moreover, the Court agreed with Apple that the patent's explanation of the "present invention" included the task of "establishing a voice communication channel."  *Id.*  Because the patent "never discloses an embodiment that would be excluded by the voice channel limitation," the Court agreed that under Federal Circuit law, the claims' scope should be limited as Apple proposed.  *Id.* at 20-21 (citing *Verizon Servs. Corp. v. Vonage Holding Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 425 F.3d 1312, 1318 (Fed. Cir. 2006)).[7]

Thus, in order to prove infringement, UP had to prove that Siri used "two separate channels" *and* that the user's voice input was sent to the Siri servers over a "voice channel."  *See* SJ Ord. at 5.  UP argued that a trial was necessary because "[d]etermining where a voice channel ends and becomes a data channel requires an overall assessment" of a "fact intensive multifactor analysis."[8]  *See id.* at 7.  But the Court disagreed and entered summary judgment of non-infringement.  According to the

---

[7]  The scope of the '446 patent could not be so broad as to include any method of accessing server-side speech recognition applications because it is undisputed that UP did not invent server-based speech recognition.  *See* D.I. 356-3 at 27.  Indeed, during prosecution, the PTO rejected claims of the '446 patent on the basis that the prior art already taught server-based speech recognition.  *Id.*  UP's expert, Dr. Mark Jones, admitted as much during his deposition.  *Id.*

[8]  The very first time UP actually articulated this theory was in supplemental briefing after the close of all briefing on Apple's motion for summary judgment of non-infringement of the '446 patent.  *See* D.I. 378.

Court, "UP's argument seems to belie the teachings of the '446 patent, which suggests that a voice

channel is a fairly simple and well-understood concept." *Id.* Thus, the Court concluded: "[T]here …

must be a recognizable line that separates what is a voice channel from what is not. A voice channel

must be an actual, identifiable type of channel, not some ambiguous channel that can be labeled a

voice channel merely because it transports voice." *Id.* Indeed, without this "discernable limit" or

"recognizable line" between the "voice channel" and "data channel" disclosed in the '446 patent, the

'446 patent "would be rendered meaningless" and "raise a serious concern that the patent [was]

invalid for indefiniteness." *Id.* at 7-8 (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct.

2120 (2014)).

     In May 2013, Apple argued that UP could not prove that Siri operates according to the '446

patent. *See* Lyon Decl. Ex. 4 at 2 ("UP's contention is incorrect, at least because the accused

products do not use two different or separate communication paths for sending encoded voice data to

Siri servers and returning speech recognition results back to the iOS device."); *see also* D.I. 199-2 at

78 (Mar. 10, 2014). These facts were confirmed by the deposition of Apple's corporate designees on

Siri on September 24, 2014, and October 21, 2014. Lyon Decl. ¶ 42. And indeed, there was never

any "factual dispute about how Siri works," and UP "acknowledge[d] that Siri sends voice input

using TCP/IP protocols." SJ Ord. at 6. Nevertheless, UP refused to abandon its allegations. Lyon

Decl. Ex. 5 at 1. As the Court characterized UP's infringement arguments:

> Against all this [evidence to the contrary], UP contends that the channel between an
> iOS device and the Siri servers is a voice channel, both because a voice channel *can*
> exist over TCP/IP protocols, and because the Siri channel includes a number of voice
> channel characteristics.

*Id.* at 9 (emphasis in original). But, as the Court concluded, the evidence UP put forth in support of

that argument[9] was "insufficient to lead a reasonable juror to believe that a channel which uses

TCP/IP protocols, a channel which does not distinguish between voice and non-voice data, and a

---

[9] Many of this evidence was put forth for the first time in UP's *reply* expert report on infringement
of the '446 patent and in the supplemental briefing UP submitted after the close of briefing on
Apple's summary judgment of non-infringement. Because these theories were never even
articulated in UP's *opening* expert report, much less during fact discovery, Apple filed a Motion
in *Limine* to exclude that evidence at trial. *See* D.I. 394-4. This Motion in *Limine* was pending
when the Court granted summary judgment in favor of Apple.

channel which does not include any of the properties needed to ensure real-time transmission, is a 'voice channel' as that term is used in the '446 patent," and granted summary judgment of non-infringement in favor of Apple.  *Id.* at 10.

### G.     The '092 Patent

UP began this case asserting 16 of the claims of the '092 Patent against Apple's Location Services; at claim construction, UP elected to pursue just claim 20.  Claim 20 is a method claim, as are all of the '092 patent's claims.  UP alleged that Apple infringed this method claim directly under 35 U.S.C. § 271(a) in two ways:  first, by "us[ing] the Accused Products via its internal use (through its employees' use) and testing in the United States," and second, by "mak[ing] the Location Services software and load[ing] it on the Accused Products," and "[w]hen Apple's Location Services software provides location information to an application, the software performs each limitation of claim 20 of the '092 patent."  Lyon Decl. Ex. 6 at 53-54.

But as even UP itself recognized eventually, this second theory of direct infringement by Apple (making the software and loading it onto the Accused Products) clearly fails as a matter of law under longstanding Federal Circuit precedent.  That is because the Federal Circuit has held squarely for many years that "a party that sells or offers to sell software containing instructions to perform a patented method does not infringe the patent under § 271(a)."  *E.g.*, *Ricoh Co. v. Quanta Comp. Inc.*, 550 F.3d 1325, 1335 (Fed. Cir. 2008).  The Federal Circuit recently confirmed this axiom in *Ericsson, Inc. v. D-Link Systems, Inc.*, explaining as follows:

> Our other decisions echo the idea from *Ricoh* that the direct infringer must *actually* perform the steps in the method claim.  *See, e.g.*, ... *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) (finding sale of software alone does not directly infringe method claims of patent and seller can only be liable for infringement as contributor and/or inducer); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use.").

773 F.3d 1201, 1221 (Fed. Cir. 2014) (emphasis in original) (some citations omitted).  Thus, the law is and has been clear:  UP could not prevail under § 271(a) for Apple making the accused software and loading it onto the accused products.  If UP was going to recover for direct infringement against Apple, it would only be to the extent UP could show that Apple's own internal testing and use of the accused products infringed claim 20 of the '092 patent.  The damages associated with that

14

1   infringement, however, were "de minimus," according to UP.  *See* D.I. 416 at 2.

2          Therefore, the only remaining avenue by which UP could prevail and recover appreciable

3   damages was if it could prove that Apple was liable for *indirectly* infringing the asserted method

4   claim under §§ 271(b) or (c).  UP alleged that Apple induced its customers and third party application

5   developers to infringe of claim 20 of the '092 patent.  Lyon Decl. Ex. 6 at 55-57.

6          In order to prevail on a theory of indirect infringement, however, UP would have had to show

7   both that Apple knew of the '092 patent *and* knew that the acts of its customers and third party

8   application developers *actually infringed* claim 20 of the '092 patent.  For direct infringement, "a

9   defendant's mental state is irrelevant" because "[d]irect infringement is a strict-liability offense."

10  *Commil*, 135 S.Ct. at 1926 (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2065-

11  66 n.2 (2011)).  In contrast, "liability for inducing infringement attaches only if the defendant knew

12  of the patent and that 'the induced acts constitute patent infringement.'"  *Id.* (quoting *Global-Tech*,

13  131 S.Ct. at 2068).  Similarly, "contributory infringement requires knowledge of the patent in suit

14  and knowledge of the patent infringement."  *Id.* at 6 (citing *Aro Mfg. Co. v. Convertible Top*

15  *Replacement Co.*, 377 U.S. 476, 488 (1964)).

16         The Supreme Court recently confirmed its prior holdings in *Global-Tech* and *Aro*.  *Id.* at 9.

17  Rejecting the appellee's attempt to qualify or limit those holdings, the Supreme Court explained:

18         [T]hat would lead to the conclusion, both in inducement and contributory infringement
           cases, that a person, or entity, could be liable even though he did not know the acts
19         were infringing.  In other words, even if the defendant reads the patent's claims
           differently from the plaintiff, and that reading is reasonable, he would still be liable
20         because he knew the acts might infringe.  *Global-Tech* requires more.  It requires
           proof the defendant knew the acts were infringing.

21  *Id.*  Thus, under the Supreme Court's decisions in *Global-Tech* and *Aro*, as confirmed in *Commil*, UP

22  could only prevail on a claim of indirect infringement against Apple if UP could show that Apple

23  knew that Location Services infringed claim 20 of the '092 patent.  UP did not do that in this case,

24  nor could it ever have done so.

25         At no point did UP identify any credible evidence that Apple actually knew about the '092

26  patent before UP filed its complaint in this case.  *See* D.I. 356 at 49-50.  And, as the Court confirmed

27  at summary judgment:

28

                                                    15

Apples noninfringement argument – namely, that its devices only use one location input rather than a plurality of inputs – is strong enough that no reasonable juror could conclude that Apple acted with actual knowledge that it was inducing or contributing to infringement.

SJ Ord. at 16. Accordingly, the Court granted summary judgment of no indirect infringement of the '092 patent to Apple.

UP was aware that Apple contended that it did not infringe the '092 patent because its devices did not use a plurality of location inputs in May 2013, when Apple served its non-infringement contentions. Lyon Decl. Ex. 7 at 6 ("The claimed step of 'receiving a plurality of device dependent location inputs …' is not performed. For example, UP has not identified any apparatus or functionality that 'receive[s] a plurality of device dependent location inputs' within the meaning of this claim."). Moreover, the substance of this non-infringement contention was further confirmed in the deposition of Apple's corporate designee on Location Services on November 14, 2014. *Id.* ¶ 43.

UP eventually dismissed with prejudice its claim for *direct* infringement of the '092 patent by Apple, which UP recognized could yield only "de minimus" damages. D.I. 416 at 2. Yet UP chose to pursue its claim of *indirect* infringement on the '092 patent throughout fact and expert discovery, and indeed until it was dismissed by the Court at summary judgment, forcing Apple to expend resources on fact and expert discovery, and motion practice, in the interim.

## IV.   ARGUMENT

### A.   UP's "Everything But the Kitchen Sink" Approach Should be Deterred

The Court should award attorneys' fees to Apple under Section 285 because UP's kitchen-sink approach is "exceptional" and ought to be deterred. UP has asserted hundreds of claims from fifteen different patents against Apple in four different jurisdictions over the course of four years. In all that time and paper, UP has failed to present even *one* infringement theory worth trying for any claim of any patent. Instead, UP has forced Apple and this Court (as well as the Districts of Nevada, Delaware, and the ITC) to devote their resources to meritless infringement claims, at significant and unnecessary expense (including by taking time away from other parties who need the attention of the courts). UP should not be permitted to pursue its improper strategy with impunity. As the Supreme Court cautioned just last month in *Commil*, "district courts have the authority and responsibility to ensure frivolous cases are dissuaded" by awarding attorney fees under section 285 in cases like this.

16

134 S.Ct. at 1930.

UP first sued Apple in the ITC, but then dismissed its claims leading up to (and on the eve of) trial, only to seek a second bite of the Apple on the same patents in the District of Delaware.  And rather than content itself with a do-over in Delaware, UP also pursued this suit in the District of Nevada, presumably hoping to wear Apple down with fighting on two fronts simultaneously.  UP's litigation strategy here, as in the other two suits, has been to litigate with a broad, blunt sword, and to maintain meritless claims well past the point at which a reasonable litigant would have recognized defeat.

For example, UP's assertion early in this case of 247 claims from 10 patents unfairly and unreasonably prejudiced Apple.  UP knew that it could never bring that many claims to trial.[10] Moreover, UP should have been in a position to focus its case against Apple in light of its familiarity with the accused products and many of the accused applications from the ITC case.  By the time UP filed this case in the District of Nevada, UP and Apple had been litigating in the ITC for 13 months. And UP told the world that its team had "conducted a careful review" of its assets (i.e., of UP's own patents) "before filing this complaint."  Lyon Decl. Ex. 8 at 3.  Nevertheless, UP asserted a menagerie of claims against Apple, presumably in the hope that something would stick and that Apple would tire of spending resources on litigating claims that would inevitably be abandoned. Indeed, UP abandoned 5 of its patents without prejudice – fully half of the patents-in-suit in this case – but only after forcing Apple to investigate prior art, prepare and serve invalidity contentions, and wade through and investigate UP's vague infringement contentions for dozens of then-dropped claims.  A reasonable litigant would have chosen a reasonable number of patents and claims from day one.  UP's contrary approach was exceptionally wasteful.  *Cf. In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1312 (Fed. Cir. 2011) (approving of procedure for limiting asserted claims where "many of the claims are duplicative").

Likewise, UP's refusal to provide adequate infringement contentions under the Local Rules

---

[10]  Indeed, early in the case UP informed the district court in Nevada that "UP is mindful of the Court and jury's time, and will identify a reasonable number of claims it will present at trial." D.I. 72 at 22.

1    supports an award of fees to Apple.  As the court in Nevada held, UP failed to meet its obligation to

2    identify on a claim-by-claim basis how Apple could possibly be held liable as an indirect infringer.

3    *Id.*  This failure is not surprising given that UP has never had a triable claim for indirect infringement

4    (for the reasons addressed in Apple's Motion for Summary Judgment and in the Court's Summary

5    Judgment Order granting Apple's Motion on this issue).  But while a reasonable litigant would have

6    recognized its obligations under the local rules, and would have withdrawn any claim of indirect

7    infringement on these facts (or would never have asserted indirect infringement in the first place), UP

8    chose to be unreasonable, and chose to make Apple and the courts work through unnecessary motion

9    practice.

10        Similarly, UP was unreasonable when it attempted to add new infringement theories late in

11   the case, long after the deadline for infringement contentions (but on the basis of information that was

12   available to UP before the deadline).  As the Court recognized, UP failed to establish good cause for

13   adding new theories, and Apple likely would have been prejudiced unfairly by their addition in any

14   event.  D.I. 261 at 7.  A reasonable litigant would not have attempted UP's shifting-sands tactic.  *See,*

15   *e.g.*, *02 Micro Int'l Ltd. v. Monolithic Power Sys.*, 467 F. 3d 1355, 1364 (Fed. Cir. 2006) (explaining

16   that local patent rules are designed to "prevent the 'shifting sands' approach").

17        This kind of litigation-driven gamesmanship should not be encouraged, and instead should be

18   deterred.  Each weak patent claim asserted in litigation puts a substantial strain on the court system

19   and on the parties, including via pleadings, scheduling disputes, discovery and discovery disputes,

20   and substantive motion practice.  Thus, parties should be incentivized to focus on the merits of patent

21   disputes rather on their capacity to inflict cost.  If UP is allowed to continue pursuing its kitchen-sink

22   approach with impunity, then similarly situated patentees will be incentivized to take the same

23   improper approach, clogging the court system and burdening defendants.[11]  Therefore fees are

24   _____

25   [11]  Not only should UP's repeatedly unsuccessful targeting of Apple with inapplicable patents and
     infringement theories merit an award of fees as a deterrent to other similarly situated plaintiffs,
26   fees should also be awarded to Apple as a deterrent to *UP*.  As documents produced in this
     litigation and relied upon by UP's damages expert show, UP has purportedly identified other
27   assets from its legacy patent portfolio as allegedly applicable to Apple's products.  *See* D.I. 355-
     14 at 11-12, 355-23.  And that does not take into account the approximately 2,500 patents UP
28   acquired from Ericsson, some of which UP has already asserted against Apple's competitors in

     *(Cont'd on next page)*

18

1    warranted here.  *See Commil*, 135 S.Ct. at 1926.

2         Moreover, fees are warranted because even UP's strongest claims in this case – in the four

3    patents that UP did not drop before summary judgment – were exceptionally weak and did not merit

4    trial.  *See Octane*, 134 S. Ct. at 1756 (fees warranted where case stands out "with respect to the

5    substantive strength [or weakness] of a party's litigating position").  And not only were UP's best

6    claims dismissed at summary judgment, but UP could have and should have recognized earlier – even

7    before filing this case, and at the absolute latest by the time of the Court's claim construction decision

8    – that they *would be* dismissed at summary judgment.  UP's unreasonable litigation decisions on

9    these four patents warrant fees as well.  *See id.* (fees can also be warranted by "the unreasonable

10   manner in which the case was litigated").  Below, each of the patents that UP pressed after claim

11   construction is addressed in detail.

12   **B.    UP Should Never Have Asserted the '831 Patent Against Apple**

13        UP's election to assert the '831 patent against Apple is "exceptional" and merits the award of

14   attorneys' fees because UP should have known that the '831 patent was directed to fundamentally

15   different technology than was used by APNS.  The plain language of the patent's claims and

16   specification clearly laid out the limitations of the '831 Patent:  two different channels; one

17   "wideband channel" and one "narrowband channel."  UP's pre-suit and in-suit investigation should

18   have revealed that APNS met neither of those requirements, and so UP's case on the '831 patent was

19   doomed from the beginning.

20   ───────────────────────
     *(Cont'd from previous page)*

21   Europe (e.g., Google, Samsung).  As history has proven, simply losing over and over again has
     not deterred UP from targeting Apple, and indeed the same accused products, with more and
22   more patents – patents, which, if UP is taken at its word, are not its "best."  *See* UP Press Release,
     http://investor.unwiredplanet.com/releasedetail.cfm?ReleaseID=602439 (Oct. 31, 2011) (quoting
23   Ken Denman, UP's then-CEO, as stating that the ITC and Delaware litigations were UP's "best
     option" for "unlock[ing] the substantial value of [its] intellectual property," and were instituted
24   after UP "carefully evaluated its legal position and litigation prospects"); D.I. 188 at 22 (UP
     stating that it would chose its "10 best claims" from the 75 then at issue).  This behavior is
25   unreasonable and merits an award of fees.  *See Linex Techs., Inc. v. Hewlett-Packard Co.*, No. 13-
     159, 2014 WL 4616847, at *3 (N.D. Cal. Sept. 15, 2014) (awarding fees and holding that "[e]ven
26   though neither forum's decision was binding on this court's determination as res judicata, [the
     defendant] was not free to pursue another case targeting the same technology with impunity.
27   Patent litigation is a burdensome venture for all parties involved.  Thus, plaintiffs must conduct
     careful investigation before bringing suit.").

28

                                                    19

As the Court confirmed at summary judgment, "[a]s a threshold matter, to prevail on this infringement claim [UP] must be able to prove that APNS uses two separate channels, as required by the '831 patent." SJ Ord. at 3.  UP had no credible reason to believe that Apple's APNS used two separate channels for communications between the APNS servers and the iOS device, as the claims required.  And, in fact, APNS does not use two different channels:  "There is no dispute that the exchange of [the accused information] occur over a single Internet connection using TCP/IP protocols, which seems to belie the suggestion that they occur over different channels." *See id.*  APNS's use of this persistent TCP/IP connection is referenced repeatedly and prominently in publicly available developer documentation that UP itself cited in its initial infringement contentions.  D.I. 317-35 at 14 (Apple Inc., Local and Push Notification Guide (2011)) ("APNs uses a persistent IP connection for implementing push notifications.").  It is no wonder that UP never did proffer any evidence that even credibly supported a claim that APNS used two separate channels, as the Court confirmed:  "[UP] has given no real explanation (or evidence) of how the back-and-forth communication between the APNS servers and the iOS devices occurs over different channels." *See* SJ Ord. at 3.  Because the '831 patent's requirement of two separate channels is apparent from the asserted claims and specification, and because there was no credible basis for UP to argue that APNS met this requirement, and thus infringed the '831 patent, Apple should be awarded its fees for defending against this patent all the way until the eve of trial.

Additionally, and indeed an independent basis for awarding fees, UP had no credible basis for arguing that APNS used a "narrowband channel."  The '831 patent's specification explicitly and repeatedly distinguishes "narrowband channels" from "wideband channels" on the basis of their capacity for transferring data.  Indeed, the Court concluded that the "fundamental difference" between the claimed narrowband and wideband channels is their meaningfully different data transfer rates.  *See id.*

But rather than accepting that this meant that the '831 patent was simply not applicable to APNS (or Apple's products more generally), UP put forth the "faulty," and indeed baseless, argument that "data-size restrictions and overhead in the form of header[s] result in push notifications reaching an iOS device at an overall lower transfer rate." *See id.* at 5.  As the Court correctly concluded,

20

however, UP's argument "ha[d] nothing to do with" the "fundamental" difference between the two

types of claimed channels: that is, "the capacity of the alleged narrowband channel to transfer data at

a lower rate." *See id.*  It was just a smokescreen intended to distract from the plain fact that APNS

uses a single, "wideband" channel for all communications.  UP's loss on this patent was not simply a

failure of proof (although the Court agreed that UP produced "no evidence" to support its

infringement theory).  *See id.*  Rather, the Court concluded that UP *could not* distinguish the channel

used by APNS by its data transfer rate.  And indeed, UP could never have established that APNS met

the "narrowband channel" limitation of the asserted claims.

Pursuing fundamentally flawed infringement theories merits the award of fees.  *E.g.*, *Cartner

v. Alamo Grp., Inc.*, 561 F. App'x 958, 969 (Fed. Cir. 2014) (affirming section 285 award because

patentee pressed frivolous infringement argument after *Markman* order rendered asserted claim

invalid); *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1311-12 (Fed. Cir. 2012),

vacated by 134 S. Ct. 1744 (2014), affirmed under new standard by 577 Fed. Appx. 995 (2014)

(awarding fees under both section 285 standards where plaintiff "offered no plausible arguments that

the preamble should not have been limiting," despite the fact that it supplied antecedent basis for

several claim limitations, and for pursuing an infringement theory that did not meet the plain

language of the claims); *Intex Recreation Corp. v. Team Worldwide Corp.*, No. 04-1785, 2015 WL

135532, at *3-4 (D.D.C. Jan. 9, 2015) (awarding fees from the day the patentee had refused to

abandon case under the court's issued construction); *Sorkin v. Universal Bldg. Prod. Inc.*, No. 1:08-

CV-133, 2010 WL 519742, at *3 (E.D. Tex. Feb. 9, 2010) (awarding attorneys' fees under old

standard for all expenses incurred after the claim construction order because, although the claims

were likely "untenable from a very early date," the construction certainly made it impossible for the

accused product to infringe).  For these reasons, Apple should be awarded fees for its defense against

UP's unreasonable and baseless prosecution of the '831 patent.

**C.     Assertion of the '260 Patent Against Apple Merits the Award of Fees**

      **1.     UP's blatantly litigation-driven pursuit of an overbroad and unsupported construction of "provisioning" merits fees**

UP's unsupported proposed construction of "provisioning" was baseless, and plainly

litigation-driven.  During claim construction, UP never tried to dispute that the term "provisioning"

APPLE'S MOTION FOR ATTORNEYS' FEES
CASE NO. 3:13-CV-4134-VC

had a specific, well-understood meaning within the '260 patent's technical field – namely, the process of configuring mobile devices to enable communications capabilities.  UP simply ignored that well-understood meaning and proffered a construction that was completely unsupported.  *See* CC Ord. at 5 (finding UP had "failed to offer any compelling evidence of its own to support its much broader construction").  Indeed, UP's proposed construction ran counter to the specification's "uniform" reference to "provisioning" as being "related to enabling or modifying the communications services and features of a mobile device." *See id.* at 5-6.  Simply, there was never any indication that the inventors of the '260 patent had redefined the word "provisioning" to mean something other than how a person of ordinary skill in the art would understand this term of art, just as the Court concluded during claim construction.  *See id.* at 4-5.  Thus, UP never had any credible basis for asserting this patent against the iTunes or iCloud (or applications that did not enable or modify communications capabilities).  Rather, UP's proposed construction was plainly driven by greed and enabled by a willingness to push the boundaries of its litigation positions far beyond their support.  This conduct merits the imposition of fees. *See, e.g., MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012) (awarding fees under old standard where "MarcTec's proposed claim construction was so lacking in any evidentiary support that assertion of this construction was unreasonable and reflects a lack of good faith," and where "MarcTec's decision to continue the litigation after claim construction further supports the district court's finding that this is an exceptional case[]"); *Chalumeau Power Sys. LLC v. Alcatel-Lucent*, No. 11-1175, 2014 WL 4675002, at *3 (D. Del. Sept. 12, 2014) (awarding attorneys' fees where plaintiff's lawsuit, including its claim construction positions, were frivolous).

        **2.**      **UP should have known it could not prove literal infringement of the '260 patent**

From the outset, the plain language of the claim 1 of the '260 patent and the undisputed canons of claim interpretation made it plainly "evident" that in order to prevail UP would have to establish that the "user information" that was sent to the "provisioning server" in the "provisioning request" was the same as the "user information required to establish a user account." *See* SJ Ord. at 12-13; *see also, e.g., Motorola Mobility LLC v. Int'l Trade Comm'n*, 535 Fed. Appx. 971, 975 (Fed. Cir. 2014); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir. 1998) ("[T]he

same word appearing in the same claim should be interpreted consistently."). As a result, UP should have known from the outset that it could not establish that Apple literally infringed the asserted claims. That is because UP already knew what "user information" was input to "establish a user account" and what information was sent in the accused "provisioning request" (i.e., the buyProduct request). The information used to establish a user account is known by anyone who has ever created an AppleID for themselves, and the accused App Store, including the "buy" process, was at issue in the 13-month-long ITC case (which was litigated through discovery, expert reports, summary judgment, and to within days of trial). In fact, UP had accused the App Store infringing 4 of the 5 patents asserted in that case, and its operation was subject to extensive discovery.[12] But rather than concede that this patent did not cover Apple's accused products, UP forced Apple to conduct discovery, claim construction, and expert discovery, brief summary judgment, and prepare to present that case at trial before the Court ordered summary judgment of non-infringement in favor of Apple on this issue. Pursuing an unsupportable (and indeed unsupported) infringement theory merits the award of attorneys' fees. *See* cases cited *supra*, Part B; *Sorkin*, 2010 WL 519742, at *3 (awarding fees where "reasonable investigation," pre-suit or after documents were produced, foreclosed literal infringement claim and where plaintiff never asserted doctrine of equivalents).

**D.     UP Should Have Dropped the '446 Patent After the Court's Claim Construction Order**

UP's continued assertion of the '446 patent against Siri after the Court construed all asserted claims to require the use of a "voice channel" to send the claimed voice input to the remote Siri servers was unreasonable. UP's infringement theory after claim construction had no merit, as it was undisputed that Siri used only TCP/IP protocols to transmit information to and from the mobile device. *See* SJ Ord. at 6. Thus, not only did Siri not infringe the '446 patent's requirement of using "two separate channels," Siri indisputably did not use a "voice channel." *See id.* at 5, 10. UP's arguments to the contrary were meritless.

Specifically, UP's argument that a channel that uses a TCP/IP protocol like the one used by

---

[12]   At the very least, by the time that UP prepared and served its opening expert reports, UP had to have known that it could not prove literal infringement of the '260 patent.

23

Siri could *become* a "voice channel" simply by virtue of the fact that it transmitted voice data was unreasonable.  As the Court put it, UP "urge[d] the Court to think about different types of transmissions as existing on a spectrum; some types of transmission clearly use voice channels, others clearly use data channels, and still others are somewhere in between…." SJ Ord. at 7. Determining "where a voice channel ends and becomes a data channel requires," according to UP, "a fact-intensive multifactor analysis." *Id.*  This argument, of course, *ignores* the very *nature of the channel* over which the data was sent, which was the "core" (*see id.* at 5), and indeed critical, distinction of the purported invention of the '446 patent.  The Court agreed, finding in its summary judgment order that "[UP]'s argument seems to belie the teachings of the '446 patent, which suggests that a voice channel is a fairly simple and well-understood concept." *Id.*  This willful blindness to the "core feature" of its purported invention would have rendered UP's  patent "meaningless," according to the Court. *Id.* at 5, 7. Advancing arguments that would render a patent "meaningless" is exceptional.

Another fatal flaw in UP's argument is that it injected "serious concerns" that the asserted claims were indefinite.  As the Court found, by defining a "voice channel" so ambiguously, UP would make it "unlikely," and indeed impossible, for a person skilled in the art to read the patent and determine, for the purposes of avoiding infringement, what is and is not a voice channel. *See id.* at 8. It is unreasonable for patent plaintiffs to put forth infringement theories that ignore the critical distinction between their patents and the prior art, and indeed render the asserted claims indefinite, all in the effort to cover accused products and technology that are fundamentally outside of the scope of the asserted claims.  This kind of behavior merits the award of attorneys' fees to Apple for all activity after the Court issued its claim construction order.  *See* cases cited *supra*, Part B.

**E.     UP Should Have Dropped the '092 Patent When Apple Served Its Non-Infringement Contentions**

The law governing UP's potential avenues for proving infringement of claim 20 of the '092 patent is clear, and has not changed since before this suit was filed.  As a result, UP should have known that it could not prove that Apple directly infringed the asserted method claims by making and installing the Location Services software on the accused devices. *E.g.*, *Ricoh*, 550 F.3d at 1335.  UP

also should have known, as soon as it received Apple's non-infringement contentions, that the strength of those non-infringement contentions provided Apple with a complete defense to any claim of indirect infringement.  As the Court confirmed, Apple had not only a good faith belief that it did not infringe claim 20 of the '092 patent, but "no reasonable juror" could ever have found that it did.  This is more than enough to meet *Global-Tech*'s standard for a complete defense to indirect infringement.  UP therefore should have known that it could only prove infringement of claim 20 of the '092 patent if it could show that Apple employees used or tested Location Services.  And in that case, it should have known that it could only recover damages for that infringement.  As UP ultimately conceded when it stipulated for a final judgment on the '092 patent, those damages were "de minimus," and UP had no intention of taking a patent with "de minimus" damages to trial.  There is simply no reason that UP should not have come to that conclusion and dismissed the '092 patent months ago.  Forcing Apple to litigate a patent that UP would never have taken to trial is exceptional, and warrants the imposition of fees.

**F.      Apple's Attorneys' Fees and Costs are Reasonable and Should Be Awarded**

This Court should exercise its discretion and award Apple the attorneys' fees and costs it was forced to incur defending itself against UP's baseless claims of infringement.  "[I]t is clear that the aim of § 285 is to compensate a defendant for attorneys' fees it should not have been forced to incur." *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir. 2013) (awarding fees under old standard).  Moreover, "one's misguided belief, based on zealousness rather than reason, is simply not sufficient by itself to show that a case is not exceptional in light of objective evidence that a patentee has pressed meritless claims." *Id.* at 1311.  In total, Apple spent $12,558,697 in attorneys' fees and approximately $2.5 million in non-taxable costs on this action (not including the fees incurred by Apple on the preparation of this motion).  *See* Lyon Decl. ¶¶ 4-39.  The rates and amounts charged by Apple's counsel were reasonable.  Apple's counsel leanly staffed this case, despite the huge number of asserted claims and variety of accused products.

## V.      CONCLUSION

For the foregoing reasons, Apple's motion for fees pursuant to 35 U.S.C. § 285 should be granted.

1

2    Dated:  June 19, 2015

3                                              H. MARK LYON
                                               Y. ERNEST HSIN
4                                              STUART M. ROSENBERG
                                               TRACEY B. DAVIES
5                                              BROOKE MYERS WALLACE
                                               GIBSON, DUNN & CRUTCHER LLP
6

7                                              By:    _/s/ H. Mark Lyon_____
                                                      H. Mark Lyon
8                                                     *Attorney for Defendant Apple Inc.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF CONFERENCE**

2      The undersigned hereby certifies that pursuant to L.R. 54-5(b)(1), counsel for Apple met and

3  conferred with counsel for UP for the purpose of attempting to resolve any disputes with respect to

4  this motion and that no agreement was reached.

5  Dated:  June 19, 2015                     GIBSON, DUNN & CRUTCHER LLP

6

7                                        By:    /s/ Y. Ernest Hsin
                                                Y. Ernest Hsin
8                                               Attorney for Defendant Apple Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **ATTESTATION OF CONCURRENCE IN FILING**

2

3         In accordance with the Northern District of California's General Order No. 45, Section X(B),

4   I attest that concurrence in the filing of the document has been obtained from H. Mark Lyon and Y.

5   Ernest Hsin.

6   Dated: June 19, 2015                          By: */s / Brooke Myers Wallace*
                                                            Brooke Myers Wallace

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28

1

**CERTIFICATE OF SERVICE**

2          The undersigned hereby certifies that the foregoing document was filed electronically in

3   compliance with Civil L.R. 5-1 and will be served upon all counsel of record for the parties who have

4   consented to electronic service in accordance with Civil L.R. 5-1 via the Court's ECF system.

5   Dated:  June 19, 2015                    GIBSON, DUNN & CRUTCHER LLP

6

7                                            By:    /s/ Brooke Myers Wallace
                                                   Brooke Myers Wallace
8                                                  Attorney for Defendant Apple Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPLE'S MOTION FOR ATTORNEYS' FEES
CASE NO. 3:13-CV-4134-VC